1  TODD WIND, MN State Bar No. 196514
   *twind@fredlaw.com*
2  PAMELA JOY ABBATE, MN State Bar No. 389889
   *pabbatedattilo@fredlaw.com*
3  FREDRIKSON & BYRON, P.A.
   200 South Sixth Street, Suite 4000
4  Minneapolis, MN 55402
   Telephone: (612) 492-7046
5  Facsimile: (612) 492-7077

6  RONALD J. SCHOLAR, State Bar No. 187948
   *rscholar@kmtg.com*
7  SHANE R. LARSEN, State Bar No. 283966
   KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
8  A Professional Corporation
   400 Capitol Mall, 27th Floor
9  Sacramento, California 95814
   Telephone: (916) 321-4500
10 Facsimile: (916) 321-4555

11 Attorneys for Defendants EUROFINS
   LANCASTER LABORATORIES, INC.,
12 EUROFINS AIR TOXICS, INC. and EUROFINS
   ENVIRONMENT TESTING US HOLDINGS,
13 INC.

14                    UNITED STATES DISTRICT COURT

15      EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

16

17 RONALD MASTERSON, an individual;        Case No.
18 LINDA L. FREEMAN, individually and as
   Trustee of the LINDA FREEMAN TRUST,    **NOTICE OF REMOVAL OF ACTION**
19                                         **UNDER 28 U.S.C. § 1441(b) [DIVERSITY]**
             Plaintiffs,
20
            v.
21
   EUROFINS LANCASTER
22 LABORATORIES, INC., a Minnesota
   corporation; EUROFINS AIR TOXICS, INC.,
23 a California corporation; and EUROFINS
   ENVIRONMENT TESTING US HOLDINGS,
24 INC., a Delaware Corporation; and DOES 1
   through 20,
25
             Defendants.
26

27

28

through their undersigned counsel, hereby remove this action originally filed in the California Superior Court, County of Sacramento, Case No. 34-2014-00166921-CU-BC-GDS ("State Court") to this Court, pursuant to 28 U.S.C. §§ 1441(b), 1446 and 1332.  The ground for removal is as follows:

1.    The action's removal is authorized by 28 U.S.C. § 1441(b) because the action falls within the diversity jurisdiction of this Court under 28 U.S.C. § 1332.

## JURISDICTIONAL ALLEGATIONS

2.    Plaintiff Ronald Masterson ("Masterson") is a citizen and resident of the State of California. (See Exhibit 1 [Compl. ¶1.])

3.    Plaintiff Linda Freeman ("Freeman") is a citizen and resident of the State of California. (Compl. ¶2.)

4.    Defendant EUROFINS LANCASTER LABORATORIES, INC. ("LANCASTER") is citizen of the State of Minnesota.  LANCASTER is a Minnesota corporation with its principal place of business in Pennsylvania.

5.    Defendant EUROFINS ENVIRONMENT TESTING US HOLDINGS, INC. ("EUROFINS") is a citizen of the State of Delaware. EUROFINS is a Delaware Corporation with its principal place of business in Pennsylvania.

6.    Defendant EUROFINS AIR TOXICS, INC. ("EUROFINS AIR TOXICS") is a citizen of the State of California. EUROFINS AIR TOXICS is a California corporation with its principal place of business in California. For the reasons set forth below, EUROFINS AIR TOXICS is not a proper party to this action.

7.    This action arises out of Defendants EUROFINS' and LANCASTER'S January 2012 acquisition of Air Toxics, Inc., a corporation previously owned by Plaintiffs.

Plaintiffs and Defendants EUROFINS and LANCASTER entered into a Stock Purchase Agreement on January 31, 2012. Following the acquisition, Defendants EUROFINS and LANCASTER changed the name of Air Toxics, Inc. to EUROFINS AIR TOXICS, INC.

8.    Pursuant to the Stock Purchase Agreement, Defendants EUROFINS and LANCASTER agreed to pay Plaintiffs a Deferred Element Payment if EUROFINS AIR TOXICS' revenues and EBITA over the next two calendar years ("the Measurement Period") met certain thresholds. Plaintiffs' State Court Complaint asserts that Plaintiffs should have received a higher Deferred Element Payment than Defendants EUROFINS and LANCASTER determined was owed at the end of the Measurement Period, due to Defendants EUROFINS' and LANCASTER's alleged breaches of the Stock Purchase Agreement and alleged fraud in the negotiations of the Agreement. (Compl. ¶ 79.)

9.    Plaintiffs' Complaint asserts five causes of action, each of which arises out of the negotiations and execution of the January 2012 Stock Purchase Agreement.

10.    Two of Plaintiffs' causes of action are asserted against EUROFINS AIR TOXICS—Count Four (Breach of the Implied Covenant of Good Faith and Fair Dealing) and Count Five (Accounting). However, both of these causes of action are premised on the allegation that EUROFINS AIR TOXICS was a party to the Stock Purchase Agreement and therefore owed Plaintiffs certain duties. (Compl. ¶¶ 69, 79.) However, as set forth below, EUROFINS AIR TOXICS was not a "Buyer" or "Buying Party" and owed no duty to the Sellers (Plaintiffs here).

11.    With respect to Count Four of the Complaint, the Stock Purchase Agreement contains a Delaware choice of law provision. (Compl. Ex. A, Section 10.3.) Under

Delaware law, non-parties to a contract cannot be sued for breach of the implied covenant of good faith and fair dealing. *See Gerber v. Enter. Prods. Hldgs, LLC*, 67 A.3d 400, 421 (Del. 2013), overruled on other grounds by *Winshall v. Viacom Int'l, Inc.*, 2013 WL 5526290 (Del. Oct. 7, 2013). California law is consistent with Delaware law on this issue. *Racine & Laramie v. Dept. of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031-32 (Cal. App. 4th Dist. 1992).

12.    With respect to Count Five of the Complaint, any right Plaintiffs have to an "accounting" is governed by the Stock Purchase Agreement, which sets forth the financial and business information to which Plaintiffs are entitled. Plaintiffs are owed those rights from the sellers—LANCASTER and EUROFINS. EUROFINS AIR TOXICS' predecessor, Air Toxics, Inc., is a party to the Stock Purchase Agreement. However, Air Toxics, Inc. was the *seller*, along with Plaintiffs, and therefore owes no duties to Plaintiffs under the Stock Purchase Agreement.

13.    Plaintiffs have refused, without explanation for the actual legal basis supporting the claims, to dismiss the claims asserted against EUROFINS AIR TOXICS.

14.    It is clear that Plaintiffs improperly joined EUROFINS AIR TOXICS, a California corporation, as a defendant in this matter in an attempt to and solely for the purpose of preventing removal to federal court as there is no reasonable basis in law or in fact for the Plaintiffs' claims against EUROFINS AIR TOXICS. Thus, EUROFINS AIR TOXICS' citizenship may be ignored for diversity purposes. *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68, 117 S. Ct. 467, 136 L. Ed. 2d 437 (1996); *McCabe v. Gen. Foods*, 811 F.2d 1336, 1339 (9th Cir. 1987) (a fraudulently joined defendant will not defeat diversity jurisdiction).

15.     Plaintiffs claim they are entitled to a Deferred Element Payment under the Stock Purchase Agreement.  The amount of the Deferred Element Payment contemplated by the Stock Purchase Agreement is set forth in Paragraph 23 of the Complaint.  Regardless of which Deferred Element Plaintiffs claim they are owed (i.e., $750,000, $1.25 million, $3 million or $4 million), the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     This Court therefore has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because this is an action between citizens of different states in which the amount in controversy exceeds $75,000 exclusive of interest and costs.

## PROCEDURAL ALLEGATIONS

17.     *Timeliness.*  This action was filed in the State Court on August 21, 2014. Defendants EUROFINS AIR TOXICS and LANCASTER were served on August 29, 2014. Defendant EUROFINS was served on September 3, 3014. The action is therefore being removed within the 30-day period provided by 28 U.S.C. § 1446(b)(1). *See Rosset, et al. v. Hunter Engineering, Co., et al.*, No. C-14-01701, 2014 U.S. Dist. LEXIS 97441 (N.D. Ca. July 17, 2014) (quoting *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48, 119 S. Ct. 1322, 143 L. Ed. 2d 448 (1999) (the 30-day deadline to remove set forth in § 1446(b) is triggered by service of summons and complaint)).

18.     *Venue.*  As required by the venue provision of 28 U.S.C. § 1446(a), this Court is the district court for the district within which the action has been pending.

19.     *All Defendants.*  All defendants (EUROFINS, LANCASTER and EUROFINS AIR TOXICS) join in the removal of this action.

20. *Other.* No proceedings have taken place in the State Court action other than the filing and service of the Summons and Complaint. As contemplated by 28 U.S.C. § 1446(a), Defendants file those documents as served on Defendants by reproducing them as Exhibits hereto. Exhibit 1 is the Summons and Complaint. Exhibit 2 contains the Notices of Service of Process and Proof of Service. Exhibit 3 is a Notice of Case Management Conference and Order to Appear issued by the State Court. Consistent with 28 U.S.C. § 1441(b), no party in interest *properly* joined and served as a defendant is a citizen of California, the state in which the action was brought. Pursuant to 28 U.S.C. § 1446(d), notice of the filing of the notice of removal will be furnished promptly to the adverse party and a copy of the notice will be filed with the clerk of the State Court.

WHEREFORE, Defendants hereby remove this Action to this Court from the Superior Court for the State of California, Sacramento County.

Dated: September 24, 2014

KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
A Professional Corporation

By:      /s/ Ronald J. Scholar
Ronald J. Scholar
Attorneys for Defendants EUROFINS
LANCASTER LABORATORIES, INC.,
EUROFINS AIR TOXICS, INC. and EUROFINS
ENVIRONMENT TESTING US HOLDINGS,
INC.

# EXHIBIT 1

SUM-100

## SUMMONS ON FIRST AMENDED
### (CITACIÓN JUDICIAL) COMPLAINT

<div>

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
EUROFINS LANCASTER LABORATORIES, INC., a Minnesota
corporation; EUROFINS AIR TOXICS, INC., a California
corporation; and (Additional Parties Form is Attached)

**YOU ARE BEING SUED BY PLAINTIFF:**

**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**
RONALD MASTERSON, an individual; LINDA L. FREEMAN,
individually and as Trustee of the LINDA FREEMAN TRUST

</div>



FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED/ENDORSED

AUG 2 2 2014

By: Erica Medina
DEPUTY CLERK

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>(El nombre y dirección de la corte es):<br>Sacramento County Superior court<br>720 Ninth Street<br>Sacramento, CA 95814 | CASE NUMBER: (Número del Caso):<br>34-2014-00166921-CU-BC-GDS |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
M. MAX STEINHEIMER          DOWNEY BRAND LLP.
3425 Brookside Road, Suite A        209-473-6450
Stockton, CA 95219

| DATE: AUG 2 2 2014 | Clerk, by | E. MEDINA | , Deputy |
|---|---|---|---|
| (Fecha) | (Secretario) | | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

   *EUROFINS LANCASTER LABORATORIES, INC., a minnesota corporation*

3. ☒ on behalf of (specify):
   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☒ by personal delivery on (date): 8/29/14

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

MASTERSON

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| MASTERSON v. EUROFINS LANCASTER LABORATORIES | 39-2014-00166921-CU-BC-GDS |

INSTRUCTIONS FOR USE

➢ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➢ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

EUROFINS ENVIRONMENT TESTING US HOLDINGS, INC., a Delaware Corporation; and DOES 1 through 20

Page ___1___ of ___1___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

Martin Dean's
ESSENTIAL FORMS™

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

SUM-100

# SUMMONS ON FIRST AMENDED
## (CITACIÓN JUDICIAL) COMPLAINT



FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED/ENDORSED

AUG 2 2 2014

By: Erica Medina
DEPUTY CLERK

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
EUROFINS LANCASTER LABORATORIES, INC., a Minnesota
corporation; EUROFINS AIR TOXICS, INC., a California
corporation; and (Additional Parties Form is Attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
RONALD MASTERSON, an individual; LINDA D. FREEMAN,
individually and as Trustee of the LINDA FREEMAN TRUST

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below:

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: | CASE NUMBER: (Número del Caso): |
| (El nombre y dirección de la corte es): | 34-2014-00166921-CU-BC-GDS |

Sacramento County Superior court
720 Ninth Street
Sacramento, CA 95814

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
M. MAX STEINHEIMER            DOWNEY BRAND, LLP
3425 Brookside Road, Suite A       209-473-6450
Stockton, CA 95219

| | | | |
|---|---|---|---|
| DATE: AUG 2 2 2014 | Clerk, by | E. MEDINA | , Deputy |
| (Fecha) | (Secretario) | | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)):

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☑ on behalf of (specify): *EUROFINS AIR TOXICS, IN a California corporation*
   under: ☑ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☑ by personal delivery on (date): 8/29/14

Page 1 of 1

SUMMONS

Form Adopted for Mandatory Use.
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

Martin Dean's
ESSENTIAL FORMS™

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

MASTERSON

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| MASTERSON v. EUROFINS LANCASTER LABORATORIES | 39-2014-00166921-CU-BC-GDS |

### INSTRUCTIONS FOR USE

➤ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➤ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

EUROFINS ENVIRONMENT TESTING US HOLDINGS, INC., a Delaware Corporation;
and DOES 1 through 20

Page _____1_____ of _____1_____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

Martin Dean's
ESSENTIAL FORMS™

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

**SUM-100**

# SUMMONS ON FIRST AMENDED COMPLAINT
## (CITACIÓN JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED/ENDORSED

AUG 22 2014

By: _____ Erica Medina
DEPUTY CLERK

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
EUROFINS LANCASTER LABORATORIES, INC., a Minnesota
corporation; EUROFINS AIR TOXICS, INC., a California
corporation; and (Additional Parties Form is Attached)

**YOU ARE BEING SUED BY PLAINTIFF:**

*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
RONALD MASTERSON, an individual; LINDA L. FREEMAN,
individually and as Trustee of the LINDA FREEMAN TRUST

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site *(www.lawhelpcalifornia.org)*, the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Sacramento County Superior court
720 Ninth Street
Sacramento, CA 95814

CASE NUMBER: *(Número del Caso):*
34-2014-00166921-CU-BC-GDS

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
M. MAX STEINHEIMER            DOWNEY BRAND LLP
3425 Brookside Road, Suite A      209-473-6450
Stockton, CA 95219

DATE: AUG 22 2014         Clerk, by    E. MEDINA           , Deputy
*(Fecha)*             *(Secretario)*                *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]



**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

Martin Dean's
ESSENTIAL FORMS™

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

MASTERSON

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| MASTERSON v. EUROFINS LANCASTER LABORATORIES | 39-2014-00166921-CU-BC-GDS |

**INSTRUCTIONS FOR USE**

➤ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➤ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff  ☒ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

EUROFINS ENVIRONMENT TESTING US HOLDINGS, INC., a Delaware Corporation; and DOES 1 through 20

Page ___1___ of ___1___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]
Martin Dean's
ESSENTIAL FORMS

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  DOWNEY BRAND LLP
   M. MAX STEINHEIMER (Bar No. 52830)
2  ANTHONY L. VIGNOLO (Bar No. 203933)
   AVALON C. JOHNSON (Bar. No. 288167)
3  3425 Brookside Road, Suite A
   Stockton, CA  95219-1757
4  Telephone:    (209) 473-6450
   Facsimile:    (209) 473-6455
5  msteinheimer@downeybrand.com
   avignolo@downeybrand.com
6  ajohnson@downeybrand.com

7  Attorneys for Plaintiffs
   RONALD MASTERSON, an individual; LINDA L.
8  FREEMAN, individually and as Trustee of the LINDA
   FREEMAN TRUST

9

10                 SUPERIOR COURT OF CALIFORNIA

11                   COUNTY OF SACRAMENTO

12                   UNLIMITED JURISDICTION

13

| | |
|---|---|
| 14  RONALD MASTERSON, an individual; LINDA L. FREEMAN, individually and as Trustee of the LINDA FREEMAN TRUST,<br><br>15<br><br>16<br><br>                Plaintiff,<br>17<br>        v.<br>18<br>19  EUROFINS LANCASTER LABORATORIES, INC., a Minnesota corporation; EUROFINS AIR TOXICS,<br>20  INC., a California corporation; and EUROFINS ENVIRONMENT TESTING<br>21  US HOLDINGS, INC., a Delaware Corporation; and DOES 1 through 20,<br>22<br>                Defendants.<br>23 | CASE NO.   34-2014-00166921-CU-BC-GDS<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) Fraud (Misrepresentation);**<br>**(2) Fraud (Promise Made);**<br>**(3) Breach Of Contract;**<br>**(4) Breach Of The Covenant Of Good Faith And Fair Dealing**<br>**(5) Accounting** |

24        COMES NOW Plaintiffs RONALD MASTERSON, an individual; LINDA L.

25  FREEMAN, individually and as Trustee of the LINDA FREEMAN TRUST

26  (collectively, "Plaintiffs") bringing causes of action against Defendants EUROFINS

27  LANCASTER LABORATORIES, INC., a Minnesota corporation; EUROFINS AIR TOXICS,

28

1382158.2

-1-

1    INC., a California corporation[1]; and EUROFINS ENVIRONMENT TESTING US HOLDINGS,

2    INC., a Delaware Corporation (collectively, "Defendants").  Plaintiffs allege as follows:

### THE PARTIES

4         1.       At all times mentioned herein, Plaintiff RONALD MASTERSON

5    ("MASTERSON") was, and is, a resident of Sacramento County, California.

6         2.       Plaintiff LINDA FREEMAN ("FREEMAN"), individually and as trustee of the

7    Linda Freeman Trust, is a currently a resident of Sacramento County, California.

8         3.       Defendant EUROFINS LANCASTER LABORATORIES, INC.

9    ("LANCASTER") is a Minnesota corporation with its principal place of business in

10   Pennsylvania.

11        4.       Defendant EUROFINS AIR TOXICS, INC. ("AIR TOXICS") is a California

12   corporation with its principal place of business in Iowa.

13        5.       Defendant EUROFINS ENVIRONMENT TESTING US HOLDINGS, INC.

14   ("EUROFINS") is a Delaware Corporation with its principal place of business in Iowa, and owns

15   Air Toxics

16        6.       Plaintiffs are informed and believe, and based thereon allege, that at all times

17   relevant to this First Amended Complaint, each Defendant was the agent or partner of each of the

18   other Defendants, and was at all times acting within the scope of such agency or partnership at the

19   direction of the other Defendants.

### JURISDICTION AND VENUE

21        7.       This Court has subject matter jurisdiction over the action and personal jurisdiction

22   over the Defendants.

23        8.       Venue is proper in this Court pursuant to Code of Civil Procedure section 395(b)

24   because Defendants contracted to perform obligations in Sacramento County, and pursuant to

25   Code of Civil Procedure section 395(a) because Defendant AIR TOXICS is located in

26   Sacramento County.

---

[1] Eurofins Air Toxics, Inc. was formerly named "Airtox, Inc." and was doing business as "Air Toxics."  Its principal place of business was located in California.  For the sake of clarity, this corporation is referred to as "AIR TOXICS" throughout the First Amended Complaint.

1382158.2

2

1       9.    Furthermore, the contract at issue ("Stock Purchase Agreement")[2] contains a

2   Venue Provision requiring that "any legal suit, action, or proceeding arising out of or based upon

3   this agreement or the transactions contemplated hereby may be instituted in the federal courts of

4   the United States of America or the courts of the state of California, in each case located in

5   Sacramento California, and each party irrevocably submits to the exclusive jurisdiction of such

6   courts in any suit, action, or proceeding."

7                               **FACTUAL BACKGROUND**

8       10.    Plaintiffs formed Airtox, Inc., the predecessor to AIR TOXICS, in 1989.  The

9   business of Airtox, Inc., now AIR TOXICS, includes providing and performing source emissions

10  and ambient air testing using a wide range of methods; developing, evaluating, and adopting new

11  sampling and analytical techniques; and maintaining inventories for canisters, sorbent tubes and

12  passive samplers.

13      11.    AIR TOXICS also owned a subsidiary, AIRLAB HOME KIT ("AIRLAB"),

14  whose business included marketing and selling the AirLab Home Test Kit.  In 2009, AIRLAB

15  was merged with and into AIR TOXICS.

16      12.    FREEMAN, as Trustee for the Linda Freeman Trust, and MASTERSON were the

17  shareholders of AIR TOXICS.  MASTERSON owned 10.10% of the shares, and FREEMAN, as

18  Trustee of the Linda Freeman Trust, owned 89.90% of the shares.

19      13.    In the early 2000s, FREEMAN served as President and Chief Executive Officer of

20  AIR TOXICS.  However, in 2009, FREEMAN hired ROBERT MITZEL ("MITZEL") in various

21  roles relating to the business development of AIR TOXICS.

22      14.    Along with MITZEL, the other key person of the AIR TOXICS management team

23  was CHERILL DAYRIT ("DAYRIT") in her capacity as Financial Controller.

24      15.    In April of 2011, Joseph Dunham of EUROFINS contacted FREEMAN, and

25  informed FREEMAN that EUROFINS was interested in buying AIR TOXICS.

26      16.    Subsequent to the initial conversation, Mr. Dunham again contacted FREEMAN

27  and MITZEL to advise them of the great opportunity of becoming part of EUROFINS.

28  

---

[2] Attached to the First Amended Complaint as Exhibit A, without exhibits.
1382158.2

FIRST AMENDED COMPLAINT

1   FREEMAN AND MITZEL were impressed with Mr. Dunham's presentation, and based on Mr.

2   Dunham's representations, MITZEL and FREEMAN agreed that it would be a good time,

3   economically, for a small business to be acquired by a large international business.  As a result of

4   their conversation with Mr. Dunham and subsequent discussions with MITZEL, FREEMAN

5   agreed to sell AIR TOXICS.

6        17.     FREEMAN decided to put AIR TOXICS up for auction after further discussions

7   with MITZEL and MASTERSON, and invited only certain selected global players to bid.

8   EUROFINS ultimately won, and AIR TOXICS began negotiations with EUROFINS and

9   LANCASTER regarding the sale.

10        18.     During negotiations, FREEMAN requested employment agreements for several of

11   her key employees to ensure that her management team was held in place following the

12   acquisition.  It was agreed that the team, consisting of FREEMAN, MITZEL, and DAYRIT,

13   would be kept in place for two years to ensure the continued strength and stability of AIR

14   TOXICS.

15        19.     The Stock Purchase Agreement was duly executed and signed on January 31,

16   2012, by the following parties: AIRTOX, INC. (signed for by FREEMAN); the Linda Freeman

17   Trust (signed for by FREEMAN) and MASTERSON as shareholders of AIRTOX, INC.;

18   FREEMAN, individually; and LANCASTER and EUROFINS (signed for by the president of

19   both companies, J. WILSON HERSHEY ("HERSHEY")).

20        20.     Pursuant to the Stock Purchase Agreement, the shares held by FREEMAN, as

21   Trustee for the Linda Freeman Trust, and MASTERSON were transferred to EUROFINS for the

22   purchase price of the "Initial Element," plus the "Deferred Element" if any.

23        21.     The Stock Purchase Agreement defines the Initial Element as: (1) Eight Million

24   Five Hundred Thousand Dollars ($8,500,000) plus or minus the Estimated Balance Sheet

25   Adjustment; plus (2) the "338 Tax Gross Up Advance," which totaled One Hundred Sixty Five

26   Thousand Dollars ($165,000).

27        22.     The Stock Purchase Agreement defines the Deferred Element as an amount up to

28   Four Million Dollars ($4,000,000).  The amount of the Deferred Element is based upon AIR

1    TOXICS and AIRLAB achieving "Trigger Values," with the amount of the Deferred Element

2    actually payable based on the lower level of the Trigger Values achieved by the two companies.

3        23.    The Stock Purchase Agreement sets forth the Trigger Values in Schedule 2.5,

4    which is reproduced below.[3]

| Trigger Values | | Deferred Element Payable |
|---|---|---|
| Cumulative Net Revenues | Cumulative EBITDA | |
| ≤ $15,000,000 | < $2,500,000 | $0 |
| $15,000,000 to $15,999,999 | $2,500,000 to $2,699,999 | $750,000 |
| $16,000,000 to $17,899,999 | $2,700,000 to $3,199,999 | $1,250,000 |
| $17,900,000 to $19,099,999 | $3,200,000 to $3,749,999 | $3,000,000 |
| ≥ $19,100,000 | ≥ $3,750,000 | $4,000,000 |

13   

14       24.    The Stock Purchase Agreement defines EBITDA as the consolidated earnings

15   from operations of AIR TOXICS and AIRLAB, determined in accordance with certain

16   accounting methods laid out in the Stock Purchase Agreement, during the "Measurement Period"

17   before interest, taxes, depreciation, and amortization, adjusted as set forth in the Stock Purchase

18   Agreement.

19       25.    The Stock Purchase Agreement defines the "Measurement Period" as the two

20   calendar year period from January 1, 2012 through December 31, 2013.

21       26.    In sum, the Stock Purchase Agreement provided that as part of the purchase price

22   of AIR TOXICS, Plaintiffs were entitled to an initial payment and a deferred payment.  The

23   amount of the deferred payment was to be calculated by reference to (1) the cumulative net

24   revenues of AIR TOXICS and AIRLAB during the calendar years 2012 and 2013, and (2) the

25   consolidated earnings of AIR TOXICS and AIRLAB during the calendar years 2012 and 2013.

26       27.    The Stock Purchase Agreement further provides that an audit of AIR TOXICS and

27   AIRLAB's consolidated financial statements, prepared in accordance with the accounting

28   

[3] Schedule 2.5 is attached to the Complaint as Exhibit B.
1382158.2                                                          5

1    methods set forth in the Stock Purchase Agreement, would be performed within ninety (90) days

2    after the end of the fiscal years ending December 31, 2012, and December 31, 2013. The

3    tentative Deferred Element would then be calculated by EUROFINS and delivered to Plaintiffs no

4    later than thirty (30) business days after the finalization of the audit of AIR TOXICS and

5    AIRLAB. Thereafter, if Plaintiffs disputed the calculation of the Deferred Element, Plaintiffs

6    were required to deliver a Trigger Dispute Notice containing such disputes within sixty (60) days

7    after receipt of the tentative Deferred Element.

8        28.    The Stock Purchase Agreement further provides that the Deferred Element would

9    be computed on the date that all items are finally determined, whether by the Parties, final

10    determination by a neutral accountant, or failure to deliver a Trigger Dispute Notice. This date is

11    referred to as the "Determination Date."

12        29.    According to the Stock Purchase Agreement, within ten (10) days after the

13    Determination Date, EUROFINS and LANCASTER were contractually required to pay the

14    Deferred Element to Plaintiffs, in proportion with their respective sharing ratios.

15        30.    Pursuant to the Stock Purchase Agreement, EUROFINS and LANCASTER made

16    certain covenants, including but not limited to those listed below. These covenants included that

17    from the Closing Date to the end of the Measurement Period (December 31, 2013) EUROFINS

18    and LANCASTER would:

19           (a) Maintain the separate legal existence of AIR TOXICS and AIRLAB and

20           maintain the Business and Assets within those respective companies;

21           (b) Cause AIR TOXICS and AIRLAB to conduct the Business in the Ordinary

22           Course of Business;

23           (c) Not take any action or omit to take any action (or permit any action to be taken

24           or omitted) where such action or omission is made with purpose or the intent (or

25           one of the purposes or intent of which) to prevent, interfere with, or have an

26           adverse effect on AIR TOXICS and AIRLAB's ability to achieve the Trigger

27           Values;

28

1           (d) Act in good faith and with fair dealing so as to provide Plaintiffs with a

2           reasonable opportunity, subject to the terms of the Stock Purchase Agreement, to

3           cause AIR TOXICS and AIRLAB to achieve the Trigger Values;

4           (e) Assist AIRTOX and AIRLAB in obtaining and maintaining the Credit Facility,

5           to which CREDIT FACILITY will be available from and after the Closing Date

6           and throughout the Measurement Period, and will provide the lender under the

7           Credit Facility with a first priority security interest in AIRTOX and AIRLAB's

8           assets if requested by such lender; provided, that EUROFINS and LANCASTER

9           shall not be obligated to provide, jointly or severally, a guaranty of the Credit

10          Facility; and

11          (f) Not cause AIRTOX to make dividends or distributions.

12      31.    The Stock Purchase Agreement defines the "ordinary course of business" as the

13 ordinary course of AIR TOXICS and AIRLAB's "Business" consistent with past custom and

14 practice of AIR TOXICS and AIRLAB and in a manner consistent with reasonable business

15 practices and the historical business objectives and functions of AIR TOXICS and AIRLAB prior

16 to the Closing Date, including reasonable levels of staffing, working capital, and other resources

17 reasonably necessary to conduct the "Business."

18      32.    The Stock Purchase Agreement defines "Business" as AIR TOXICS' business of

19 providing and performing both source emissions and ambient air testing using a wide range of

20 methods; developing, evaluating, and adopting new sampling and analytical techniques; and

21 maintaining inventories for canisters, sorbent tubes and passive samplers; and AIRLAB's

22 business of marketing and selling the AirLab Home Test Kit; and such other services as are

23 provided by either AIR TOXICS or AIRLAB as of the closing date of the Stock Purchase

24 Agreement.

25      33.    Based on the covenants made by EUROFINS and LANCASATER, as well as the

26 discussions FREEMAN had with representatives of EUROFINS and LANCASTER prior to

27 EUROFINS' acquisition of AIR TOXICS, it was Plaintiffs' expectation, and the expectations of

28 AIR TOXICS and AIRLAB, that AIR TOXICS would remain an air testing company and would

1382158.2                   7

1    continue to operate with its team of managers including MITZEL, DAYRIT, and FREEMAN

2    working together with their energy focused on AIR TOXICS air testing business, to ensure high

3    revenues and a high Deferred Element payout to Plaintiffs.

4        34.    After EUROFINS acquired AIR TOXICS, it became clear that EUROFINS did not

5    intend to keep these promises, but instead intended to use AIR TOXICS' resources to develop

6    AIR TOXICS into a materials testing company—a new business and a new course of action that

7    was inconsistent with the historic Business of AIR TOXICS and outside of its historic ordinary

8    course of business.  After the closing of the acquisition, Plaintiff's learned that EUROFINS had

9    long been interested in entering the materials testing market, but had not yet acquired a laboratory

10    or company that was able to successfully enter the United States market.  As Plaintiffs learned

11    after acquisition, EUROFINS had planned all along that AIR TOXICS would be that company.

12        35.    Prior to closing, FREEMAN was forwarded an email from HERSHEY.  The email

13    to FREEMAN from HERSHEY inadvertently attached a string of emails between HERSHEY and

14    MATTHIAS-WILBUR WEBER ("WEBER"), the EUROFINS Group Executive Vice President

15    of Asia Pacific/Global Product Testing.  Buried in the string of emails between WEBER and

16    HERSHEY was an email from WEBER, instructing HERSHEY with language to the effect of:

17    "Make sure they don't find out about the materials testing."  Although FREEMAN saw this

18    email, she did not know what to make of it and did not, at the time, think it was a cause for

19    concern because she had been assured, and the Stock Purchase Agreement contained promises

20    that, AIR TOXICS would continue to operate in its ordinary course of business.

21        36.    On January 31, 2012, the parties signed and executed the Stock Purchase

22    Agreement.

23        37.    On or about February 2, 2012, MITZEL and FREEMAN flew to Lancaster,

24    Pennsylvania, to meet the EUROFINS and LANCASTER teams.

25        38.    In Pennsylvania, FREEMAN was told that WEBER was flying from Belgium to

26    meet privately with her.  HERSHEY informed her that the meeting could not be avoided because

27    WEBER was very high up in the company and because WEBER wanted to meet with FREEMAN

28    personally.

39.     On or about February 6, 2012, FREEMAN met with WEBER and Per Holst Hansen, the European head of materials testing. Hansen presented information to FREEMAN on the global materials testing market, along with in depth technical details on materials testing analysis and the unique chamber room facility needs for materials testing. WEBER also presented a PowerPoint to FREEMAN on materials testing. WEBER informed FREEMAN that one hundred chambers for material testing had already been ordered for use by AIR TOXICS. Notably, constructing these chambers takes six months, and thus, EUROFINS had ordered the materials testing chambers for use by AIR TOXICS long before the Stock Purchase Agreement was finalized without disclosing this to FREEMAN prior to the closing. In this meeting, WEBER and Hansen informed FREEMAN that EUROFINS' original plan was to set up materials testing operations at LANCASTER, but Hansen found that LANCASTER's lab was not technically competent enough to perform materials testing, which caused EUROFINS to look for another materials testing lab in the United States.

40.     At no point during the meetings in Pennsylvania was there meaningful discussion regarding growing AIR TOXICS as a company or to build the air testing operations of AIR TOXICS. Instead, plans were presented to grow materials testing operations at AIR TOXICS.

41.     WEBER then came to California, to tour the AIR TOXICS laboratory and meet the AIR TOXICS team. WEBER met with FREEMAN and asked FREEMAN to review her management team with him, and to assess the strengths and weaknesses of each person on the management team. On information and belief, WEBER was attempting to hand-pick his team to grow materials testing operations and form other EUROFINS companies. FREEMAN informed WEBER, in no uncertain terms, that her strength was in the partnership between her, MITZEL, and DAYRIT. FREEMAN further made clear that it would be a huge problem, for her and for AIR TOXICS, if WEBER took MITZEL or DAYRIT away from air testing operations to use them for growing materials testing operations.

42.     On WEBER's last day in California, WEBER told FREEMAN that he needed a decision from FREEMAN as to whether AIR TOXICS would take on materials testing

///

1   operations. FREEMAN asked WEBER to promise that he would protect her payout of the

2   Deferred Element. WEBER promised that he would.

3        43.    It was clear to FREEMAN that WEBER would not take no for an answer, and that

4   materials testing operations were going to commence whether she agreed to it or not, and thus

5   FREEMAN consented to developing EUROFINS and LANCASTER's materials testing

6   operations at AIR TOXICS based on WEBER'S promise to protect the payout of the Deferred

7   Element.

8        44.    EUROFINS and LANCASTER caused the revenue and resources of AIR

9   TOXICS' air testing operations to be diverted to the materials testing operations, for the purpose

10  of growing the materials testing operations. The materials testing operations of AIR TOXICS

11  was not profitable at this time, and the air testing operations lost revenue and resources.

12  However, on information and belief, Plaintiffs allege that the air testing operations would have

13  been substantially more profitable and earned more revenue than it otherwise did had Defendants

14  not diverted those resources to materials testing operations.

15       45.    Unfortunately, EUROFINS and LANCASTER's abuses of AIR TOXICS' air

16  testing operations, and of Plaintiffs' trust, did not stop there. EUROFINS and LANCASTER also

17  diverted the time and energy of MITZEL, DAYRIT, and others of the AIR TOXICS team to

18  starting new EUROFINS companies. Because EUROFINS required that MITZEL and

19  DAYRIT's attention, time, and energy were focused away from AIR TOXICS, the sales and

20  earnings of the air testing operations of AIR TOXICS were not as robust as they otherwise would

21  have been, and AIR TOXICS was not able to carry on its historic Business in ordinary course of

22  business.

23       46.    The pressure on FREEMAN to successfully grow the materials testing operations

24  of AIR TOXICS, to maintain profitable air testing operations, and to help fund operations for

25  LANCASTER and other EUROFINS companies, eventually became too much for her. On April

26  17, 2012, FREEMAN suffered a mental and emotional collapse. Thereafter, FREEMAN left AIR

27  TOXICS on medical leave, and FREEMAN ultimately resigned from AIR TOXICS.

28  ///

1    47.    To date, Plaintiffs have not received their payout under the Deferred Element

2  clause of the Stock Purchase Agreement.

3  <center>**FIRST CAUSE OF ACTION**</center>

4  <center>**(Fraud - Misrepresentation)**</center>

5  <center>**As to Defendants EUROFINS and LANCASTER**</center>

6    48.    Plaintiffs reallege and incorporate by reference each and every allegation of the

7  above Paragraphs 1 through 47, inclusive, as if fully set forth herein.

8    49.    In the discussions that took place prior to the acquisition of AIR TOXICS by

9  EUROFINS and LANCASTER, and in the Stock Purchase Agreement, EUROFINS and

10 LANCASTER affirmatively represented to Plaintiffs, in their individual capacities, that

11 EUROFINS and LANCASTER would not interfere with AIR TOXICS' business and would

12 allow AIR TOXICS' business to be conducted in the ordinary course of business so that Plaintiffs

13 could achieve their highest possible payout amount under the Deferred Element.  No mention of

14 using AIR TOXICS for developing a materials testing business for EUROFINS was ever made,

15 but in fact the Defendants actively suppressed disclosure of this plan.

16    50.    EUROFINS and LANCASTER were aware that AIR TOXICS would be used to

17 develop materials testing operations for EUROFINS and LANCASTER, and that, as a necessary

18 result of developing the materials testing operations, AIR TOXICS' business would not be

19 conducted in the ordinary course of business during the "Measurement Period."  EUROFINS and

20 LANCASTER intended Plaintiffs to rely on their misrepresentations in deciding whether to sell

21 AIR TOXICS to EUROFINS.

22    51.    Plaintiffs were not aware of the falsity of EUROFINS and LANCASTER's

23 representations and did, in fact, rely on these representations regarding the ordinary course of

24 business in deciding to enter into the Stock Purchase Agreement and in deciding whether to sell

25 AIR TOXICS to EUROFINS and/or in deciding whether to sell AIR TOXICS for a purchase

26 price that included the Deferred Element payment.

27    52.    As a result of the fraudulent conduct by EUROFINS and LANCASTER, Plaintiffs

28 have sustained damages including, but not limited to, loss of a higher payout amount as a result of

1382158.2

<center>11</center>

1    a diminished Trigger Value.  Plaintiffs are therefore entitled to damages including, but not limited

2    to, lost profits and distributions that Plaintiffs should have been paid, as well as attorneys' fees

3    incurred Plaintiffs.

4         53.    The aforementioned conduct of EUROFINS and LANCASTER constitutes

5    "malice," "oppression," and "fraud," in that the conduct was fraudulent, intended by EUROFINS

6    and LANCASTER to cause injury to Plaintiffs, was despicable conduct carried on by EUROFINS

7    and LANCASTER with a willful disregard of the rights of Plaintiffs, and was despicable conduct

8    that subjected Plaintiffs to unjust hardship in conscious disregard of their rights.  Plaintiffs are

9    therefore entitled to punitive and exemplary damages against EUROFINS and LANCASTER in

10   an amount according to proof at trial.

11        WHEREFORE, Plaintiffs seek relief as set forth in the prayer for relief.

12                          **SECOND CAUSE OF ACTION**

13                **(Fraud – Promise Made Without Intention to Perform)**

14                   **As to Defendants EUROFINS and LANCASTER**

15        54.    Plaintiffs reallege and incorporate each and every allegation of the above

16   Paragraphs 1 through 53, inclusive, as if fully set forth herein.

17        55.    In negotiations for the sale of AIR TOXICS to EUROFINS, and in the Stock

18   Purchase Agreement, EUROFINS and LANCASTER promised that they would cause AIR

19   TOXICS and AIRLAB to conduct the Business in the Ordinary Course of Business; that they

20   would not take any action or omit to take any action (or permit any action to be taken or omitted)

21   where such action or omission is made with purpose or the intent (or one of the purposes or intent

22   of which) to prevent, interfere with, or have an adverse effect on AIR TOXICS and AIRLAB's

23   ability to achieve the Trigger Values; and that they would act in good faith and with fair dealing

24   so as to provide Plaintiffs with a reasonable opportunity, subject to the terms of the Stock

25   Purchase Agreement, to cause AIR TOXICS and AIRLAB to achieve the Trigger Values.

26        56.    Plaintiffs are informed and believe, and based thereon allege, that these promises

27   were made by EUROFINS and LANCASTER with the intent to induce Plaintiffs to sell AIR

28   TOXICS to EUROFINS and LANCASTER, all so that EUROFINS and LANCASTER could

1382158.2                                    12

1    acquire a laboratory with the technical capabilities and revenue to become a competitive materials

2    testing lab for EUROFINS.

3        57.    Plaintiffs, at the time the promises were made by EUROFINS and LANCASTER,

4    and at the time Plaintiffs signed and executed the Stock Purchase Agreement, were ignorant of ·

5    EUROFINS and LANCASTER's intentions to interfere with AIR TOXICS' ordinary course of

6    business for the purpose of developing a EUROFINS materials testing company.

7        58.    In reliance on the promises of EUROFINS and LANCASTER, Plaintiffs were

8    induced to and did sign the Stock Purchase Agreement whereby AIR TOXICS was sold to

9    EUROFINS.  Had Plaintiffs known of EUROFINS and LANCASTER's true intentions, Plaintiffs

10   would not have agreed to sell AIR TOXICS to EUROFINS and/or would not have agreed to the

11   Deferred Element as part of the consideration for the sale of AIR TOXICS.

12       59.    EUROFINS and LANCASTER failed to abide by their promises because, as set

13   forth more fully above, they diverted resources from AIR TOXICS and from AIR TOXICS's air

14   testing side of the company to develop the materials testing side of the company; they interfered

15   with and altered AIR TOXICS' ordinary course of business to develop materials testing;

16   EUROFINS and LANCASTER took these actions knowing that such actions would interfere with

17   AIR TOXICS' ability to achieve the Trigger Values; and they failed to act in good faith and fair

18   dealing so as to provide Plaintiffs with a reasonable opportunity to cause AIR TOXICS to achieve

19   the Trigger Values.

20       60.    As a result of the fraudulent conduct by EUROFINS and LANCASTER, Plaintiffs

21   have sustained damages including, but not limited to, loss of a higher payout amount as a result of

22   a diminished Trigger Value.  Plaintiffs are therefore entitled to damages including, but not limited

23   to, lost profits and distributions that Plaintiffs should have been paid, as well as attorneys' fees

24   incurred Plaintiffs.

25       61.    The aforementioned conduct of EUROFINS and LANCASTER constitutes

26   "malice," "oppression," and "fraud," in that the conduct was fraudulent, intended by EUROFINS

27   and LANCASTER to cause injury to Plaintiffs, was despicable conduct carried on by EUROFINS

28   and LANCASTER with a willful disregard of the rights of Plaintiffs, and was despicable conduct

1382158.2

13

1   that subjected Plaintiffs to unjust hardship in conscious disregard of their rights.  Plaintiffs are

2   therefore entitled to punitive and exemplary damages against EUROFINS and LANCASTER in

3   an amount according to proof at trial.

4          WHEREFORE, Plaintiffs seek relief as set forth in the prayer for relief.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

### As to Defendants EUROFINS and LANCASTER

7          62.     Plaintiffs reallege and incorporate each and every allegation of the above

8   Paragraphs 1 through 61, inclusive, as if fully set forth herein.

9          63.     On or about January 31, 2012, EUROFINS, LANCASTER, AIR TOXICS, and

10  Plaintiffs entered into the Stock Purchase Agreement, whereby EUROFINS agreed to purchase

11  AIR TOXICS from Plaintiffs.

12         64.     The contract imposes specific obligations on EUROFINS and LANCASTER.

13  Specifically, EUROFINS and LANCASTER had obligations, during the Measurement Period,

14  including but not limited to their obligations to:

15          (a) Maintain the separate legal existence of AIR TOXICS and AIRLAB and

16          maintain the Business and Assets within those respective companies;

17          (b) Cause AIR TOXICS and AIRLAB to conduct the Business in the Ordinary

18          Course of Business;

19          (c) Not take any action or omit to take any action (or permit any action to be taken

20          or omitted) where such action or omission is made with purpose or the intent (or

21          one of the purposes or intent of which) to prevent, interfere with, or have an

22          adverse effect on AIR TOXICS and AIRLAB's ability to achieve the Trigger

23          Values; and

24          (d) Act in good faith and with fair dealing so as to provide Plaintiffs with a

25          reasonable opportunity, subject to the terms of the Stock Purchase Agreement, to

26          cause AIR TOXICS and AIRLAB to achieve the Trigger Values.

27

28

1382158.2

14

FIRST AMENDED COMPLAINT

65.    EUROFINS and LANCASTER breached these promises by executing their plan to use AIR TOXICS to develop materials testing operations in the United States; by causing MITZEL and DAYRIT to divert their attention and energies away from AIR TOXICS, causing AIR TOXICS' revenues to decline; by diverting money from the successful air testing operations of AIR TOXICS to the new and financially struggling materials testing operations of AIR TOXICS business; and by failing to act in good faith and deal fairly with Plaintiffs and depriving them of a reasonably opportunity to achieve the Trigger Values.

66.    Plaintiffs have performed all conditions, covenants, and promises that the Stock Purchase Agreement requires Plaintiffs to perform.

67.    As a result of EUROFINS and LANCASTER's breach of the Stock Purchase Agreement, Plaintiffs have sustained damages including, but not limited to, receiving a lower payout amount under the Deferred Element than they otherwise would have, because EUROFINS and LANCASTER's breach materially and negatively affected the cumulative net revenues and cumulative EBITDA of AIR TOXICS.  These damages are in addition to prejudgment interest at the legal rate on such amount from and after January 31, 2012, and in addition to reasonable attorneys' fees as permitted by law.

WHEREFORE, Plaintiffs seek relief as set forth in the prayer for relief.

## FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

### As to Defendant AIR TOXICS

68.    Plaintiffs reallege and incorporate each and every allegation of the above Paragraphs 1 through 67, inclusive, as if fully set forth herein.

69.    As set forth above, Plaintiffs and AIR TOXICS were parties to the contractual relationship created by the Stock Purchase Agreement.

70.    Plaintiffs reasonably expected that AIR TOXICS would not interfere with Plaintiffs' ability to achieve the highest possible payout amount under the Deferred Element, and would not interfere with the resources and revenues of the air testing operations of AIR TOXICS.

///

1382158.2

15

71.    AIR TOXICS had a good faith duty not to interfere with the revenues and resources of the air testing operations of AIR TOXICS, and had a good faith duty not to interfere with Plaintiffs' ability to achieve their highest potential payout under the Deferred Element.

72.    Had Plaintiffs and Defendants contemplated that AIR TOXICS would interfere with the resources and revenues of the air testing operations of AIR TOXICS and would materially interfere with Plaintiffs' ability to achieve the highest maximum payout under the Deferred Element, Plaintiffs and Defendants, as parties to the contract, would have written a clause into the contract requiring that AIR TOXICS not interfere with the revenues of the air testing operations of AIR TOXICS and not interfere with Plaintiffs' ability to achieve the highest possible payout under the Deferred Element.

73.    AIR TOXICS breached its good faith duty not to interfere with the revenues, resources, and business of the air testing operations of AIR TOXICS. In doing so, AIR TOXICS also breached its good faith duty not to interfere with Plaintiffs' ability to achieve the highest possible payout under the Deferred Element. AIR TOXICS therefore failed to deal fairly and in good faith with Plaintiffs.

74.    AIR TOXICS acted in bad faith because it knew, by virtue of its relationship with LANCASTER and EUROFINS, and by virtue of its knowledge of the funds and resources available to AIR TOXICS as a whole, that diverting resources from the air testing operations of the company to the materials testing operations of the company would cause the company to lose revenue and would prevents Plaintiffs from achieving a higher payout level under the Deferred Element.

75.    As a result of AIR TOXICS' breach of its duty of good faith and fair dealing, Plaintiffs have sustained damages including, but not limited to, receiving a lower payout amount under the Deferred Element than they otherwise would have, because AIR TOXICS' breach materially and negatively affected the cumulative net revenues and cumulative EBITDA of AIR TOXICS. These damages are in addition to prejudgment interest at the legal rate on such amount from and after January 31, 2012, and in addition to reasonable attorneys' fees as permitted by law.

1    WHEREFORE, Plaintiffs seek relief as set forth in the prayer for relief.

2    ## FIFTH CAUSE OF ACTION

3    ### (ACCOUNTING)

4    **As to Defendants AIR TOXICS, EUROFINS, and LANCASTER**

5    76.    Plaintiffs reallege and incorporate each and every allegation of the above

6    Paragraphs 1 through 75, inclusive, as if fully set forth herein.

7    77.    Plaintiffs are informed and believe, and based thereon allege, that Defendants owe

8    Plaintiffs a sum which can only be ascertained by a full and complete accounting for the reason

9    that Defendants diverted resources from the air testing operations of AIR TOXICS to the

10   materials testing operations of AIR TOXICS, ultimately resulting in a loss of revenue and making

11   AIR TOXICS less profitable than it otherwise would have been.

12   78.    It is therefore necessary for Plaintiffs to have a full accounting of how AIR

13   TOXICS' employees' time was divided between AIR TOXICS air testing operations and the

14   materials testing operations, as well as the operations of the other companies that EUROFINS

15   started and required DAYRIT and MITZEL to work for. Plaintiffs must also have a full

16   accounting of how resources, monies and employee time, were diverted by Defendants from the

17   air testing operations of AIR TOXICS to the materials testing operations of AIR TOXICS and

18   other companies started by EUROFINS.

19   79.    Plaintiffs do not contend that their payout under the Deferred Element clause of

20   the contract was improperly calculated. Rather, Plaintiffs contend that, because of Defendants'

21   fraud, breaches of contract, and breaches of good faith and fair dealing, AIR TOXICS' revenues

22   were lower than they otherwise would have been, and thus Plaintiffs received a payout under the

23   Deferred Element clause of the Stock Purchase Agreement that was lower than it would have

24   been had Defendants not engaged in the aforementioned conduct.

25   80.    As a result of the foregoing, Plaintiffs are informed and believe, and based thereon

26   allege, that Plaintiffs have not received a complete and detailed accounting, let alone any account,

27   of AIR TOXICS assets and/or profits and/or revenues and/or resources, from AIR TOXICS or the

28   other Defendants.

1382158.2

17

1    81.    Without a complete and detailed accounting of AIR TOXICS of the assets and/or

2    profits and/or revenues and/or resources of AIR TOXICS, Plaintiffs cannot ascertain the true

3    balance that is owed to Plaintiffs.

4    82.    The equitable remedy of an accounting is proper due to Defendants' concealment

5    of the improper diversion of the assets and/or profits and/or revenues and/or resources of AIR

6    TOXICS' air testing operations to Defendants' materials testing operations and, on information

7    and belief, the operations of other EUROFINS companies.

8    WHEREFORE, Plaintiffs seek relief as set forth in the prayer for relief.

9    **PRAYER FOR RELIEF**

10    Plaintiffs pray for judgment against Defendants as follows:

11    83.    For compensatory damages against all Defendants in an amount according to proof

12    at trial;

13    84.    For punitive damages against Defendants EUROFINS and LANCASTER in an

14    amount sufficient to punish and deter such Defendants from engaging in the conduct set forth

15    herein in the future;

16    85.    For an accounting, at the expense of Defendants, of all AIR TOXICS profits,

17    expenses, and other monies and resources from and after the date the Stock Purchase Agreement

18    became effective, and for an accounting of all resources, including monies, employee time, and

19    other resources, diverted from the air testing operations of AIR TOXICS to the materials testing

20    operations of AIR TOXICS, and any monies and resources diverted from AIR TOXICS to third

21    parties;

22    86.    For reasonable attorneys' fees and costs of suit allowed by law;

23    87.    For prejudgment interest at the legal rate on all damages and other sums to be due

24    to Plaintiffs; and

25    88.    For such other and further relief as the Court deems just and proper.

26

27

28

1382158.2

18

1    DATED: August 21, 2014.                     DOWNEY BRAND LLP

2

3                                                By

4                                                     ANTHONY L. VIGNOLO
                                                     Attorneys for Plaintiffs
5                                                RONALD MASTERSON, an individual; LINDA
                                                L. FREEMAN, individually and as Trustee of the
6                                                     LINDA FREEMAN TRUST

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1382158.2

FIRST AMENDED COMPLAINT

# EXHIBIT A

*Execution Version*

STOCK PURCHASE AGREEMENT

BY AND AMONG

AIRTOX, INC., D/B/A AIR TOXICS LTD.,

LINDA L. FREEMAN AND RONALD MASTERSON,

LANCASTER LABORATORIES, INC.

AND

EUROFINS ENVIRONMENT TESTING US HOLDINGS, INC.

January 31, 2012

# TABLE OF CONTENTS

Page

ARTICLE I. SALE OF SHARES ........................................................................................ 1
    **Section 1.1**   Sale of Shares ............................................................................... 1
    **Section 1.2**   Transfer of Shares ......................................................................... 1
ARTICLE II. CONSIDERATION ...................................................................................... 1
    **Section 2.1**   Purchase Price .............................................................................. 1
    **Section 2.2**   Initial Element .............................................................................. 2
    **Section 2.3**   Estimated Balance Sheet; Estimated Balance Sheet Adjustment. .................... 2
    **Section 2.4**   Closing Balance Sheet; Balance Sheet Adjustment ......................................... 3
    **Section 2.5**   Deferred Element .......................................................................... 6
    **Section 2.6**   Final 338 Tax Gross Up ............................................................... 10
    **Section 2.7**   Escrow ....................................................................................... 10
ARTICLE III. REPRESENTATIONS AND WARRANTIES REGARDING THE
    COMPANIES ...................................................................................... 11
    **Section 3.1**   Organization and Qualification of Airtox and the Subsidiary; Authority ...... 11
    **Section 3.2**   Capitalization; Subsidiaries ......................................................... 11
    **Section 3.3**   Assets ......................................................................................... 12
    **Section 3.4**   Real Property ............................................................................... 13
    **Section 3.5**   Contracts and Commitments ....................................................... 14
    **Section 3.6**   Permits ....................................................................................... 16
    **Section 3.7**   No Conflict or Violation .............................................................. 16
    **Section 3.8**   Financial Statements .................................................................... 17
    **Section 3.9**   Absence of Certain Changes ....................................................... 17
    **Section 3.10**  Books and Records ...................................................................... 19
    **Section 3.11**  Litigation .................................................................................... 19
    **Section 3.12**  Undisclosed Liabilities; Indebtedness ......................................... 19
    **Section 3.13**  Compliance with Law .................................................................. 19
    **Section 3.14**  Intellectual Property .................................................................... 19
    **Section 3.15**  Employees .................................................................................. 21
    **Section 3.16**  Employee Benefit Plans .............................................................. 22
    **Section 3.17**  Labor Relations ........................................................................... 24
    **Section 3.18**  Environmental, Health, and Safety ............................................. 24

i

Section 3.19    Tax Matters ............................................................................... 25

Section 3.20    Insurance ................................................................................. 27

Section 3.21    Inventory ................................................................................. 27

Section 3.22    Brokers .................................................................................... 27

Section 3.23    Affiliate Transactions ............................................................. 27

Section 3.24    Certain Indebtedness .............................................................. 28

Section 3.25    Customers and Suppliers ........................................................ 28

Section 3.26    Warranties ............................................................................... 28

Section 3.27    Accounts Receivable ............................................................... 28

Section 3.28    Bank Accounts and Powers of Attorney ................................. 29

Section 3.29    Foreign Assets Control Regulations and Anti-Money Laundering ............... 29

Section 3.30    Disclosure ............................................................................... 29

ARTICLE IV. REPRESENTATIONS AND WARRANTIES REGARDING
    SHAREHOLDERS AND SHARES .................................................................. 29

Section 4.1     Title ......................................................................................... 29

Section 4.2     Authority; Enforceability ........................................................ 30

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYING PARTIES ............. 30

Section 5.1     Organization ............................................................................ 30

Section 5.2     Authorization .......................................................................... 30

Section 5.3     No Conflict or Violation ......................................................... 31

Section 5.4     No Finder's, Broker's or Consultant's Fees ........................... 31

Section 5.5     Investment Intent .................................................................... 31

ARTICLE VI. COVENANTS OF THE PARTIES .................................................... 31

Section 6.1     Operation of Business ............................................................. 31

Section 6.2     Access ...................................................................................... 32

Section 6.3     Confidential Information ......................................................... 32

Section 6.4     Further Assurances .................................................................. 33

Section 6.5     Litigation Support ................................................................... 33

Section 6.6     Tax Covenants and Indemnification ....................................... 33

Section 6.7     Administration of Accounts .................................................... 37

Section 6.8     Notification .............................................................................. 37

Section 6.9     Release by Shareholders ......................................................... 37

Section 6.10    Interim Financials ................................................................... 38

Section 6.11  Payoff Letters..................................................................................... 38

Section 6.12  Affiliate Payments: Post-Closing Obligations and Liabilities....................... 38

Section 6.13  No Solicitation of Transactions .............................................................. 38

Section 6.14  Employee Benefit Matters ..................................................................... 39

ARTICLE VII. CLOSING; CONDITIONS PRECEDENT TO CLOSING; POST-
CLOSING ACTS .................................................................................................... 39

Section 7.1  Closing ................................................................................................ 39

Section 7.2  Deliveries and Actions Taken at Closing................................................... 39

Section 7.3  Conditions Precedent To Closing ............................................................ 41

Section 7.4  Post-Closing Covenants.......................................................................... 43

ARTICLE VIII. INDEMNIFICATION............................................................................ 43

Section 8.1  Survival of Representations ..................................................................... 43

Section 8.2  Indemnifications .................................................................................... 44

Section 8.3  Third-Party Actions ............................................................................... 45

Section 8.4  Recoupment Against Escrow Fund........................................................... 46

Section 8.5  Exclusive Remedy ................................................................................. 46

Section 8.6  No Duplication of Losses; Impact on Closing Consideration ....................... 46

ARTICLE IX. TERMINATION.................................................................................... 47

Section 9.1  Termination.......................................................................................... 47

Section 9.2  Effect of Termination............................................................................. 47

ARTICLE X. MISCELLANEOUS ................................................................................ 48

Section 10.1  Assignment ......................................................................................... 48

Section 10.2  Notices ............................................................................................... 48

Section 10.3  Choice of Law; Venue and Forum........................................................... 49

Section 10.4  Entire Agreement; Amendments and Waivers ........................................... 49

Section 10.5  Counterparts......................................................................................... 49

Section 10.6  Expenses ............................................................................................. 49

Section 10.7  Severability .......................................................................................... 50

Section 10.8  Specific Performance ............................................................................. 50

Section 10.9  Publicity .............................................................................................. 50

Section 10.10 Construction......................................................................................... 50

Section 10.11 Joint Drafting ...................................................................................... 50

Section 10.12 Shareholders' Representative................................................................... 51

ARTICLE XI. DEFINITIONS...................................................................................... 52

   **Section 11.1**  Certain Defined Terms............................................................... 52

   **Section 11.2**  Other Defined Terms ................................................................. 58

*List of Exhibits and Schedules*

*Exhibits:*

*Exhibit A –*    Shareholders
*Exhibit B –*    Assignment Separate From Certificate (B-1 & B-2)
*Exhibit C –*    Form of Escrow Agreement
*Exhibit D-1 –* Noncompetition Agreement with Linda L. Freeman
*Exhibit D-2 –* Noncompetition Agreement with Ronald Masterson
*Exhibit E-1 –* Employment Agreement with Linda L. Freeman
*Exhibit E-2 –* Form of Employment Agreement
*Exhibit F –*    Acknowledgment of Changes in Compensation and Benefits
*Exhibit G –*    Form of Confidentiality and Invention Assignment Agreement
*Exhibit H –*    Form of Stock Option Termination Agreement

*Schedules:*

*Schedule 2.2(b)(iii) –* Equipment Leases
*Schedule 2.2(b)(iv) –* Transaction Expenses
*Schedule 2.3 –* Sample Calculation of Estimated Balance Sheet Adjustment
*Schedule 2.5 –* Deferred Element Payable based upon Trigger Values Achieved
*Schedule 3.1(a) –* Organization and Qualification of Airtox
*Schedule 3.1(b) –* Organization and Qualification of the Subsidiary
*Schedule 3.2 –* Capitalization; Subsidiaries
*Schedule 3.3 –* Assets; Permitted Encumbrances
*Schedule 3.4 –* Leased Real Property
*Schedule 3.5 –* Contracts and Commitments; Consents
*Schedule 3.6 –* Permits
*Schedule 3.7 –* Conflicts or Violations
*Schedule 3.8 –* Financial Statements
*Schedule 3.9 –* Absence of Certain Changes
*Schedule 3.11 –* Litigation
*Schedule 3.12 –* Undisclosed Liabilities; Indebtedness
*Schedule 3.13 –* Compliance with Law
*Schedule 3.14(b) –* Intellectual Property
*Schedule 3.14(f) –* Proprietary Software
*Schedule 3.15 –* Employees
*Schedule 3.16 –* Employee Benefit Plans
*Schedule 3.17 –* Labor Relations
*Schedule 3.18 –* Environmental, Health and Safety
*Schedule 3.19 –* Tax Matters
*Schedule 3.20 –* Insurance
*Schedule 3.21 –* Inventory
*Schedule 3.23 –* Affiliate Transactions
*Schedule 3.24 –* Certain Indebtedness
*Schedule 3.25 –* Customers and Suppliers
*Schedule 3.26 –* Warranties
*Schedule 3.28 –* Bank Accounts; Powers of Attorney

## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "*Agreement*") is entered into on January 31, 2012 (the "*Effective Date*") by and among Airtox, Inc., a California corporation doing business as Air Toxics Ltd. ("*Airtox*"), Linda L. Freeman, as Trustee of the Linda Freeman Trust ("*Trustee*"), Ronald Masterson, an individual ("*Masterson*"), Linda L. Freeman, an individual ("*Freeman*"), Eurofins Environment Testing US Holdings, Inc., a Delaware corporation (the "*Buyer*"), and Lancaster Laboratories, Inc., a Minnesota corporation ("*Lancaster*" and together with Buyer, the "*Buying Parties*"). Trustee and Masterson are together referred to herein as the "*Shareholders*," and each, a "*Shareholder*." Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Article XI.

## RECITALS

WHEREAS, the Shareholders are the record and beneficial owners of all of the issued and outstanding shares of common stock of Airtox (the "*Shares*"). The number and the relative percentages (the "*Sharing Ratios*") of the Shares held by each Shareholder is set forth opposite his or her name on attached *Exhibit A*; and

WHEREAS, the Shareholders desire to sell, transfer, convey, assign and deliver the Shares to the Buyer, and the Buyer desires to purchase, acquire and accept the Shares from the Shareholders;

NOW, THEREFORE, in consideration of the above and the mutual warranties representations, covenants and agreements set forth herein, the Parties agree as follows:

## ARTICLE I.
## SALE OF SHARES

**Section 1.1     Sale of Shares.**  Upon the terms and subject to the conditions of this Agreement, at the Closing, the Shareholders shall sell, transfer, convey, assign, and deliver to the Buyer, and the Buyer shall purchase, acquire and accept from each Shareholder the number of the Shares set forth opposite each Shareholder's name on *Exhibit A*.

**Section 1.2     Transfer of Shares.**  At the Closing, the Shareholders shall deliver the certificates evidencing their respective Shares to the Buyer, accompanied by duly executed stock transfer powers in the forms attached hereto as *Exhibits B-1* and *B-2*.

## ARTICLE II.
## CONSIDERATION

**Section 2.1     Purchase Price.**

(a)     In consideration for the purchase of the Shares, the Buying Parties jointly and severally agree to pay the Purchase Price in accordance with this Article II.  All payments made by the Buying Parties or the Shareholders pursuant to this Article II shall be by wire transfer of immediately available funds to an account designated by the recipient thereof.

1

(b)    For purposes hereof, the aggregate "*Purchase Price*" shall be equal to the sum of (i) the Initial Element, (ii) plus or minus the Final Balance Sheet Adjustment, (iii) plus the Final 338 Tax Gross Up and (iv) plus the Deferred Element (if any).

Section 2.2    **Initial Element**.    The "*Initial Element*" means (i) Eight Million Five Hundred Thousand Dollars ($8,500,000), plus or minus the Estimated Balance Sheet Adjustment, plus (ii) One Hundred Sixty Five Thousand Dollars ($165,000) (the "*338 Tax Gross Up Advance*").  The Initial Element shall be paid by the Buying Parties at the Closing as follows:

(a)    Eight Hundred Thousand Dollars ($800,000) of the Initial Element (the "*Escrow Amount*") shall be placed in escrow with the Escrow Agent in accordance with Section 2.7 below.

(b)    The remaining portion of the Initial Element consisting of (i) Seven Million Seven Hundred Thousand Dollars ($7,700,000), plus or minus the Estimated Balance Sheet Adjustment calculated in accordance with Section 2.3 below, and (ii) the 338 Tax Gross Up Advance, shall be paid in the amounts and to the Persons set forth below:

(i)    To Robert Mitzel the amount owed to him by Airtox pursuant to the termination of the Stock Option Termination Agreement (in the approximate amount of ($50,000) as of the Closing Date);

(ii)    To Wells Fargo Bank, N.A. and its Affiliates the amount necessary to payoff all of the outstanding balances under the existing credit agreement and the existing promissory notes (in the approximate amount of $1,560,000);

(iii)    To the leasing company the amount necessary to purchase the equipment subject to the operating leases set forth in **Schedule 2.2(b)(iii)** (in the approximate amount of $480,000);

(iv)    To those Persons and in those amounts to whom the Companies have unpaid obligations arising out of the transaction expenses of Shareholders and the Companies in accordance with Section 10.6 of this Agreement, which Persons and amounts will be identified in **Schedule 2.2(b)(iv)** delivered by the Shareholders to the Buyer no less than two (2) Business Days prior to the Closing; and

(v)    The remaining balance to the Shareholders in accordance with their respective Sharing Ratios.

Section 2.3    **Estimated Balance Sheet; Estimated Balance Sheet Adjustment**.

(a)    The "*Estimated Balance Sheet*" means Airtox's estimated consolidated balance sheet as of the Closing Date, provided by the Shareholders to Buyer at least five (5) Business Days prior to the Closing Date and prepared in accordance with GAAP, subject to the absence of notes, and on a basis consistent with Airtox's accounting methods, treatments, principles and procedures used in the preparation of the Financial Statements, consistently applied (together, the "*Accounting Methods*"), provided, that

2

(i)    all Taxes (other than state and local income Taxes imposed on the Companies solely incurred as a result of the Section 338(h)(10) Election (collectively, the "*338 California Obligation*") which shall be specifically excluded) shall be specifically included and shall be accrued as an expense or as a liability in determining the Estimated Balance Sheet;

(ii)    the Estimated Balance Sheet shall be prepared after taking into account the payments to be made pursuant to *Section 2.2(b)*; and

(iii)    the Estimated Balance Sheet shall not include any portion of the Deferred Element or the Success Bonuses as a liability or an expense.

(b)    If within two (2) Business Days following receipt of the Estimated Balance Sheet, Buyer does not object to the Estimated Balance Sheet, then such Estimated Balance Sheet shall be the basis for the Estimated Balance Sheet Adjustment. If Buyer gives such notice of its objection to the Shareholders, then Buyer and Shareholders shall work together in good faith to resolve the issues in dispute. If all disputed issues are resolved, the Estimated Balance Sheet as agreed upon by the Parties shall be the basis for the Estimated Balance Sheet Adjustment. If the Parties are not able to resolve all such disputed issues within two (2) Business Days following Shareholders' receipt of Buyers notice of objection, then the Estimated Balance Sheet Adjustment shall be based in Shareholders' sole discretion either on the Estimated Balance Sheet with Buyer's changes ("*Buyer's Estimated Balance Sheet*") or the Estimated Balance Sheet as submitted by Shareholders ("*Shareholders' Estimated Balance Sheet*"), subject to Section 2.4(j).

(c)    The "*Estimated Balance Sheet Adjustment*" is the sum of (i) Pre-Closing Net Cash / Net Debt plus (ii) the difference between the Pre-Closing Net Working Capital and the Targeted Net Working Capital. A sample calculation of the Estimated Balance Sheet Adjustment is set forth on *Schedule 2.3*.

**Section 2.4    Closing Balance Sheet; Balance Sheet Adjustment.**

(a)    The "*Closing Balance Sheet*" means Airtox's consolidated balance sheet as of the Closing Date, prepared by Buyer in accordance with the Accounting Methods; provided, that

(i)    all Taxes (other than the 338 California Obligation which shall be specifically excluded) shall be specifically included and shall be accrued as an expense or as a liability in determining the Closing Balance Sheet;

(ii)    the Closing Balance Sheet shall be prepared after taking into account the payments made pursuant to *Section 2.2(b)*; and

(iii)    the Closing Balance Sheet shall not include any portion of the Deferred Element or the Success Bonuses as a liability or an expense.

3

Buyer shall prepare and deliver the Closing Balance Sheet and its calculation of the Final Balance Sheet Adjustment (based on such Closing Balance Sheet) to the Shareholders within forty five (45) days after the Closing Date.

(b)    If the Shareholders' Representative disputes the Closing Balance Sheet or the Final Balance Sheet Adjustment prepared by the Buyer, the Shareholders' Representative shall deliver to the Buyer within thirty (30) days after receipt of the Closing Balance Sheet a notice (the *"Dispute Notice"*) setting forth the Shareholders' Representative's corrections to the Closing Balance Sheet and/or the Final Balance Sheet Adjustment and a detailed description of the basis for such corrections. The Parties shall use reasonable efforts to resolve such differences regarding the Closing Balance Sheet and the Final Balance Sheet Adjustment for a period of thirty (30) days after Buyer's receipt of the Dispute Notice. If the Parties resolve such differences, the Closing Balance Sheet agreed to by the Parties shall be deemed to be the *"Final Closing Balance Sheet"* and shall be the basis for the Final Balance Sheet Adjustment. The Buyer will provide the Shareholders' Representative and its advisors with full access to the books, records and facilities of the Companies and to appropriate personnel of the Buyer and the Companies as may be reasonably required to confirm or dispute the Closing Balance Sheet and the Final Balance Sheet Adjustment, and if necessary, prepare the Dispute Notice and to make a presentation to the Neutral Accountant.

(c)    If the Parties do not reach a final resolution on the Closing Balance Sheet and the Final Balance Sheet Adjustment within thirty (30) days after Buyer's receipt of the Dispute Notice, unless the Parties mutually agree to continue their efforts to resolve such differences, Deloitte & Touche LLP (who is not providing services to any Party or Affiliate of any Party, the *"Neutral Accountant"*) shall resolve such differences, pursuant to an engagement agreement executed by the Parties and the Neutral Accountant, in the manner provided below. The Parties shall each be entitled to make a presentation to the Neutral Accountant, pursuant to procedures to be agreed to among the Shareholders, the Buyer and the Neutral Accountant (or, if they cannot agree on such procedures, pursuant to reasonable procedures determined by the Neutral Accountant), regarding such Party's preparation of the Final Closing Balance Sheet and the Final Balance Sheet Adjustment, as applicable; and the Neutral Accountant shall be required to resolve the differences between the Parties and prepare the Final Closing Balance Sheet and Final Balance Sheet Adjustment thereafter. The Final Closing Balance Sheet and the Final Balance Sheet Adjustment prepared by the Neutral Accountant shall be deemed to be the Final Closing Balance Sheet and the Final Balance Sheet Adjustment. Such Final Closing Balance Sheet and Final Balanced Sheet Adjustment shall be conclusive and binding upon the Parties, absent fraud or manifest error.

(d)    The Neutral Accountant shall not be authorized or permitted to:

(i)    determine any questions or matters whatsoever under or in connection with this Agreement except for the resolution of differences between the Parties regarding (A) the Final Closing Balance Sheet and the Final Balance Sheet Adjustment in accordance with this <u>Section 2.4</u>, (B) the Deferred Element, the Excess Capital Expenditures, the Extraordinary Expenses, the Excess Audit Costs and the Trigger Values in accordance with <u>Section 2.5(b)(iv)</u> *or* (C) the Final 338 Tax Gross Up in accordance with <u>Section 2.6</u>;

4

(ii)    resolve any such differences by making any adjustment to the Closing Balance Sheet that is outside of the range of the changes proposed by the Parties;

(iii)    except as provided in this Section 2.4, apply any accounting methods, treatments, principles or procedures other than the Accounting Methods; or

(iv)    resolve differences between the Parties with respect to the determination of the Deferred Element that are based on actual or alleged violations of any of the covenants set forth in this Agreement ("*Deferred Element Covenant Claims*").

To resolve Deferred Element Covenant Claims, each Party may pursue any and all legal and equitable remedies available to them under this Agreement or under applicable Law, all of which are cumulative and not exclusive, and the prevailing party shall be entitled to recover its fees and costs, including reasonable attorneys' fees.

(e)    If the Neutral Accountant determines the Buyer's or the Shareholders' version of the Closing Balance Sheet to be correct, then the other Party shall promptly pay the entire amount of the fees and expenses of the Neutral Accountant. In any other case, the Parties shall share the fees and expenses of the Neutral Accountant in such proportion as the Neutral Accountant may determine appropriately reflects the relative accuracy of their respective determinations.

(f)    The Parties agree that the procedures set forth in this Section 2.4 for resolving disputes with respect to the Final Closing Balance Sheet and the Final Balance Sheet Adjustment shall be the sole and exclusive method for resolving any such disputes; provided that this provision shall not prohibit any Party from instituting litigation to enforce the ruling of the Neutral Accountant. The determination of the Neutral Accountant shall constitute an arbitration award for purposes of the Federal Arbitration Act and any comparable state laws.

(g)    Failure of the Shareholders to deliver a Dispute Notice within thirty (30) days after receiving the Closing Balance Sheet shall constitute acceptance of the Closing Balance Sheet, whereupon such Closing Balance Sheet shall be deemed to be the Final Closing Balance Sheet. Delivery by the Shareholders of the Dispute Notice shall constitute final and binding acceptance by the Shareholders of all portions of the Closing Balance Sheet other than those specifically identified in the Dispute Notice and other than those other portions of the Closing Balance Sheet that would necessarily be modified on account of a change in those items specified in the Dispute Notice, as being subject to dispute.

(h)    The "*Final Balance Sheet Adjustment*" is the sum of (i) Net Cash / Net Debt plus (ii) the difference between the Net Working Capital and the Targeted Working Capital. A sample calculation is set forth on *Schedule 2.3*.

(i)    If the Final Balance Sheet Adjustment is an amount greater than the Estimated Balance Sheet Adjustment, then the Buying Parties shall pay such amount to the Shareholders in accordance with their respective Sharing Ratios within thirty (30) days after finalization of the Final Closing Balance Sheet.

(j)    If the Final Balance Sheet Adjustment is an amount smaller than the Estimated Balance Sheet Adjustment, then the Buyer and the Shareholders' Representative shall instruct the Escrow Agent to release such amount to the Buyer in accordance with the Escrow Agreement. Notwithstanding the previous sentence, if the Estimated Balance Sheet Adjustment was based on Shareholders' Estimated Balance Sheet rather than on Buyer's Estimated Balance Sheet, then the Shareholders shall pay to Buyer such amount directly (and not from the Escrow Account) in accordance with their respective Sharing Ratios within thirty (30) days after finalization of the Final Closing Balance Sheet.

**Section 2.5    Deferred Element.**

(a)    Definitions.

(i)    "***Acceleration Amount***" shall mean the amount of Five Hundred Thousand Dollars ($500,000). The Parties agree that the Acceleration Amount, if any, will be considered additional consideration for the Shares and not compensation for services.

(ii)    The "***Deferred Element***" shall be an amount up to Four Million Dollars ($4,000,000), which is based upon the Companies achieving both Trigger Values, with the amount of the Deferred Element actually payable based on the lower level of the Trigger Values achieved in accordance with the levels set forth on ***Schedule 2.5***; provided, that any amount payable for the Deferred Element shall be reduced on a dollar for dollar basis by (A) Excess Capital Expenditures and Extraordinary Expenses, if any, proven by the Buyer, (B) the Acceleration Amount paid, if any, and (C) any Success Bonuses paid to Bing Wang, Cherill Dayrit, Heidi Hayes, Sepideh Saeed or Robert Mitzel as defined in and pursuant to the terms of their respective Employment Agreements (collectively, the "***Success Bonuses***"). The Parties agree that the Deferred Element, if any, will be considered additional consideration for the Shares and not compensation for services.

(iii)    "***EBITDA***" means the consolidated earnings from operations of the Companies, determined in accordance with the Accounting Methods, during the Measurement Period before interest, Taxes (including Taxes paid or accrued pursuant to intercompany tax sharing agreements), depreciation and amortization, adjusted as follows:

(A)    EBITDA shall not include any deduction or expense for Excess Audit Costs and Extraordinary Expenses, which will be added back to EBITDA;

(B)    EBITDA shall not include any deduction or expense related to payments made under the Stock Option Termination Agreement;

(C)    Costs and expenses of the Companies that have been included in calculating EBITDA shall be added back to EBITDA to the extent the Shareholders have indemnified the Buyer for such costs and expenses or Buyer has made a claim for indemnification therefor during the applicable survival claim period pursuant to the terms of this Agreement;

(D)    EBITDA shall not be reduced by post-closing impairment charges of the Companies relating to the goodwill and going concern value;

(E)    EBITDA shall not be reduced for any portion of the Deferred Element or any Success Bonuses paid or accrued for Bing Wang, Cherill Dayrit, Heidi Hayes, Sepideh Saeed or Robert Mitzel;

(F)    The purchase and sales prices of goods and services sold by the Companies to Buyer or Buyer's Affiliates or purchased by the Companies from the Buyer or Buyer's Affiliates, including the Back Office Services, shall be at fair value, adjusted to reflect the amounts that the Companies would have realized or paid if dealing with an independent party in an arm's-length commercial transaction, and EBITDA will be adjusted accordingly;

(G)    No deduction shall be made for management fees (including executive compensation expenses), operating costs (other than agreed upon Back Office Services), general overhead expenses or other intercompany charges, of any kind, by the Buyer (or any Affiliate of Buyer) unless otherwise agreed upon in writing by the Buyer and the Shareholders' Representative; and

(iv)    "*Measurement Period*" means the two calendar year period from and after January 1, 2012 through and including December 31, 2013.

(v)    "*Trigger Values*" means, during the Measurement Period, (a) the Companies' cumulative net revenues determined in accordance with the Accounting Methods, and (b) the Companies' cumulative EBITDA.

(b)    <u>Procedures and Timing of Calculation.</u>

(i)    An audit of the Companies' consolidated financial statements, prepared in accordance with the Accounting Methods, shall be performed and finalized within ninety (90) days after the end of the Companies' fiscal years ending on December 31, 2012 and December 31, 2013, respectively. The cost of these audits shall be an expense of and paid for by Airtox, but for the avoidance of doubt, any Excess Audit Costs will be added back to EBITDA as provided above.

(ii)    Buyer shall calculate the tentative Deferred Element, based on the Trigger Values, consistent with the terms of this <u>Section 2.5</u>, no later than thirty (30) Business Days after the finalization of the audit of the Companies' 2013 financial statements. Buyer shall concurrently deliver a true and correct copy of the Companies' audited financial statements and calculations of the Deferred Element to the Shareholders' Representative for review and approval. Buyer shall concurrently deliver to the Shareholders' Representative a detailed calculation and explanation of Excess Capital Expenditures (if any), Extraordinary Expenses (if any), and Excess Audit Costs (if any). If the Shareholders' Representative disputes such audited financial statements, the Deferred Element, the Trigger Values, the Excess Capital Expenditures, the Extraordinary Expenses and/or the Excess Audit Costs, the Shareholders shall deliver to the Buyer within sixty (60) days after receipt of the tentative Deferred Element a notice

7

(the "**Trigger Dispute Notice**") setting forth the Shareholders' Representative corrections to such items and a description of the basis for such corrections. The Parties shall use reasonable efforts to resolve such differences regarding such items for a period of sixty (60) days after Buyer's receipt of the Trigger Dispute Notice. If the Parties resolve such differences, such items as agreed to by the Parties shall be deemed to be final.

(iii)    During the Measurement Period and until the Deferred Element is finally and conclusively determined and, if applicable, paid, the Buying Parties will provide the Shareholders' Representative and its advisors with full access to the books, records and facilities of the Companies (including audit working papers of the auditors) and appropriate personnel of the Buyer, the Companies and the auditors as may be reasonably necessary to confirm or contest the audited financial statements of the Companies for the fiscal years ending December 31, 2012, and December 31, 2013, respectively, the Deferred Element, the Excess Capital Expenditures, the Extraordinary Expenses, the Excess Audit Costs and the Trigger Values.

(iv)    If the Parties do not reach a final resolution of the above-items within sixty (60) days after Buyer's receipt of the Trigger Dispute Notice, unless the Parties mutually agree to continue their efforts to resolve such differences, then the Neutral Accountant shall resolve such differences in accordance with the principles and procedures as set forth in Section 2.4(c) - (f) above.

(v)    Failure of the Shareholders' Representative to deliver a Trigger Dispute Notice within sixty (60) days after receiving the tentative Deferred Element shall constitute acceptance of the Deferred Element, the Excess Capital Expenditures, the Extraordinary Expenses, Excess Audit Costs, and the Trigger Values, whereupon all such items shall be deemed to be final.

(vi)    The Deferred Element shall be computed on the date (the "**Determination Date**") the above items are finally determined (whether by agreement of the Parties, final determination by the Neutral Accountant, or failure to deliver a Trigger Dispute Notice).

(c)    Payment of Deferred Element.

(i)    If Airtox terminates Freeman's employment agreement without cause (as such term is defined in Freeman's employment agreement with Airtox) prior to the end of the Measurement Period, then the Buyer shall pay the Acceleration Amount to the Shareholders in proportion to their respective Sharing Ratios.

(ii)    Within ten (10) days after the Determination Date, the Buying Parties shall pay the Deferred Element (plus interest at the then current prime rate as published in the Wall Street Journal, accruing from June 1, 2014 until paid). Payment shall be made to the Shareholders in proportion to their respective Sharing Ratios and/or any recipient(s) designated by either of the Shareholders in their sole discretion.

(iii)    If the Acceleration Amount, if any, paid during the Measurement Period exceeds the Deferred Element payable under Section 2.5(c)(ii) above, and (A) if

8

the Shareholders' Representative has not initiated a Deferred Element Covenant Claim, then the Buyer and the Shareholders' Representative shall instruct the Escrow Agent to release such amount to the Buyer in accordance with the Escrow Agreement, and to the extent the amount due to the Buyer exceeds the Escrow Amount available plus any interest accrued thereon, the Shareholders shall reimburse the excess payment to the Buyer in proportion to their Sharing Ratios; or (B) if the Shareholders' Representative has initiated a Deferred Element Covenant Claim, then the determination of whether the Buying Parties pay more to the Shareholders or whether the Shareholders reimburse the Buyer (or instruct the Escrow Agent to release funds) will be made once the Deferred Element Covenant Claim(s) have been finally resolved.

(d)    Covenants.  From the Closing Date through the end of the Measurement Period, the Buying Parties covenant and agree that:

(i)    They will assist the Companies in obtaining and maintaining the Credit Facility, which Credit Facility will be available from and after the Closing Date and throughout the Measurement Period, and will provide the lender under the Credit Facility with a first priority security interest in the Companies Assets if requested by such lender; provided, that the Buying Parties' shall not be obligated to provide, jointly or severally, a guaranty of the Credit Facility;

(ii)    They shall maintain the separate legal existence of the Companies and maintain the Business and the Assets within the Companies;

(iii)    They will cause the Companies to conduct the Business in the Ordinary Course of Business;

(iv)    They will not take any action or omit to take any action (or permit any action to be taken or omitted) where such action or omission is made with purpose or the intent (or one of the purposes or intent of which) to prevent, interfere with or have an adverse effect on the Companies' ability to achieve the Trigger Values;

(v)    They will act in good faith and with fair dealing so as to provide the Shareholders with a reasonable opportunity, subject to the terms of this Agreement, to cause the Companies to achieve the Trigger Values; and

(vi)    Will not cause Airtox to make dividends or distributions.

**Section 2.6**     **Final 338 Tax Gross Up.**

(a)     The Buying Parties agree to make a payment to the Shareholders in proportion to their Sharing Ratios such that on an after-Tax, grossed up basis, the Shareholders will receive the same present value after-Tax proceeds that they would have received if the Shareholders had sold their Shares to the Buyer for the Purchase Price (excluding, without duplication, the 338 Tax Gross Up Advance and the Final 338 Tax Gross Up), without making the Section 338(h)(10) Election (the "***338 Tax Gross Up***").

(b)     Within ten (10) Business Days after the final determination of the Allocations by Buyer in accordance with Section 6.6(g)(iii) below, Buyer shall deliver to Shareholders' Representative the schedules evidencing the Allocations, together with Buyer's calculation of the 338 Tax Gross Up. If Shareholders' Representative delivers to Buyer within thirty (30) days of receipt of the aforesaid schedules and calculation a notice setting forth corrections to the Allocations and/or the calculation, then the Neutral Accountant shall make a determination which shall be conclusive and binding on Buyer and Shareholders, using the same procedures and provisions of Section 2.4(c)-(f) as set forth for the establishment of the Final Closing Balance Sheet. If Shareholders' Representative does not deliver such notice to Buyer, Shareholders' Representative is deemed to have agreed to Buyer's schedules and calculations.

(c)     Within thirty (30) days after Buyer and Shareholders' Representative have agreed on Buyer's schedules and calculations, or after the conclusive and binding determination of the Neutral Accountant on such schedules and calculations, the Buying Parties, jointly and severally, shall pay to the Shareholders in proportion to their Sharing Ratios the 338 Tax Gross Up minus the 338 Tax Gross Up Advance (the "***Final 338 Tax Gross Up***"). If the Final 338 Tax Gross Up has not been finally determined and paid on or prior to June 10, 2012, Buying Parties will jointly and severally pay to the Shareholders in proportion to their Sharing Rations an additional amount equal to the 338 Tax Gross Up Advance, which additional amount shall be taken into account in determining the Final 338 Tax Gross Up. If the Final 338 Tax Gross Up is not paid when due, the Buying Parties shall also pay interest thereon at the rate of 4% per year until paid.

**Section 2.7**     **Escrow.** On the Closing Date, Buyer shall deliver the Escrow Amount to Escrow Agent by wire transfer of immediately available funds, which amount shall be deemed to be withheld from the Initial Element and shall be deposited with the Escrow Agent for the purpose of (a) satisfying any Final Closing Balance Sheet Adjustment in favor of Buyer in accordance with Section 2.4(j), and (b) securing Shareholders' indemnification obligations to Buyer as set forth in this Agreement. The Escrow Amount shall be held by the Escrow Agent under the Escrow Agreement pursuant to the terms thereof. The Escrow Amount shall be held as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Party, and shall be held and disbursed solely for the purposes and in accordance with the terms of the Escrow Agreement.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANIES

Freeman and Masterson, jointly and severally with respect to the Company and solely for each of Freeman or Masterson with respect to such Party, represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the Effective Date, except as set forth herein or in the Disclosure Schedule.

**Section 3.1    Organization and Qualification of Airtox and the Subsidiary; Authority.**

(a)    Organization and Qualification of Airtox.  Airtox is a corporation duly organized and validly existing under the laws of the state of California.  Airtox has full corporate power and authority to conduct the Business as it is presently being conducted by Airtox and to own and lease the Assets.  Airtox is duly qualified as a foreign corporation to do business, and is in good standing in those jurisdictions set forth on **Schedule 3.1(a)** which constitute all jurisdictions in which the conduct of the Business of Airtox or the Assets of Airtox require it to be so qualified.  Complete and correct copies of the Articles of Incorporation and Bylaws of Airtox, including all amendments, have previously been provided to Buyer.

(b)    Organization and Qualification of the Subsidiary.  The Subsidiary is a corporation duly organized and validly existing under the laws of the State of California.  The Subsidiary has full corporate power and authority to conduct the Business as it is presently being conducted by the Subsidiary and to own and lease the Assets.  The Subsidiary is duly qualified as a foreign corporation to do business, and is in good standing in those jurisdictions set forth on **Schedule 3.1(b)** which constitute all jurisdictions in which the conduct of the Business of the Subsidiary or the Subsidiary's Assets require it to be so qualified.  Complete and correct copies of the Articles of Incorporation and Bylaws of the Subsidiary, including all amendments, have previously been provided to Buyer.

(c)    Authority.  Airtox has the right, power and capacity to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement by Airtox, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Airtox.  This Agreement and the other agreements, instruments and certificates to be delivered by Airtox have been (or, if to be executed or delivered after the date of this Agreement, will be) duly and validly executed and delivered by Airtox and are (or, when executed, will be) legal, valid and binding obligations of Airtox, enforceable in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization and other similar laws affecting the enforceability of Creditors' Rights generally, general equitable principles and of courts in granting equitable remedies (collectively, for the purpose of this Article III, *"Creditors' Rights"*).

**Section 3.2    Capitalization; Subsidiaries.**

(a)    Shares.

(i)    The authorized capital stock of Airtox consists of one million (1,000,000) shares of common stock, no par value, of which ninety seven thousand (97,000) shares are issued and outstanding. There are no issued and outstanding shares of any class of stock of Airtox except the Shares, all of which are shown by the stock record book as owned by Shareholders and subject to conveyance pursuant to this Agreement. Except as set forth on ***Schedule 3.2***, there are no outstanding options, warrants, purchase rights, exchange rights or other contracts or commitments which require Airtox to issue, sell, or otherwise to cause to become outstanding any shares of capital stock of Airtox. Except as set forth on ***Schedule 3.2***, there are no outstanding contractual obligations of Airtox (i) restricting the transfer of, (ii) affecting the voting rights of, (iii) requiring the repurchase, redemption or disposition of, or containing any right of first refusal with respect to, (iv) requiring the registration for sale of, or (v) granting any preemptive or antidilutive right with respect to, any shares of capital stock of, or other equity interests in, Airtox. The Shares constitute all of the issued and outstanding shares of capital stock of Airtox, have been duly authorized and validly issued, are fully paid and nonassessable, and have not been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable Laws.

(ii)    The authorized capital stock of the Subsidiary consists of one hundred thousand (100,000) shares of common stock, no par value, of which one thousand (1,000) shares are issued and outstanding. There are no issued and outstanding shares of any class of stock of the Subsidiary except the shares of common stock which are shown by the stock record book as owned by Airtox. There are no outstanding options, warrants, purchase rights, exchange rights or other contracts or commitments which require the Subsidiary to issue, sell, or otherwise to cause to become outstanding any shares of capital stock of the Subsidiary. There are no outstanding contractual obligations of the Subsidiary (i) restricting the transfer of, (ii) affecting the voting rights of, (iii) requiring the repurchase, redemption or disposition of, or containing any right of first refusal with respect to, (iv) requiring the registration for sale of, or (v) granting any preemptive or antidilutive right with respect to, any shares of capital stock of, or other equity interests in, the Subsidiary. The shares of the Subsidiary owned by Airtox constitute all of the issued and outstanding shares of capital stock of the Subsidiary, have been duly authorized and validly issued, are fully paid and nonassessable, and have not been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable Laws.

(b)    <u>Subsidiaries</u>. With the exception of the issued and outstanding shares of capital stock of the Subsidiary owned by Airtox, neither of the Companies owns, and has ever owned, of record or beneficially, directly or indirectly, any shares of capital stock, any participating interest, any membership interest or other equity interest in any corporation, partnership, limited liability company, joint venture, trust or other Person, or securities convertible into any capital stock or other equity interest of any Person.

**Section 3.3**    <u>Assets</u>. Except as set forth in ***Schedule 3.3*** or otherwise disposed of in the Ordinary Course of Business, each of the Companies has, and at the Closing will have, good and marketable title (or in the case of leased personal property, a good and valid leasehold interest) to all of the Assets reflected in the most recent Financial Statement, subject to no Encumbrances,

except for Permitted Encumbrances (including those listed on *Schedule 3.3*). Except as set forth on *Schedule 3.3*, the Companies' material tangible Assets are, to the Knowledge of Shareholders, in good working order, repair and condition (ordinary wear and tear excepted) and have been maintained in accordance with normal industry practice. Except as set forth in *Schedule 3.3*, no Asset used in, or held for use in, the Business is leased from or owned by any Shareholder or by any Affiliate of either of the Companies or any Shareholder. The Assets include all of the assets and properties used to operate the Business as currently conducted and are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing.

Section 3.4    **Real Property.**

 (a)    Owned Real Property.  Neither of the Companies owns any real property.

 (b)    Leased Real Property. *Schedule 3.4* sets forth a true and complete list of all Leases (including all presently effective amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease document). The Companies have delivered to Buyer a true and complete copy of each such Lease document, and in the case of any oral Lease, a written summary of the material terms of such Lease. Except as set forth in *Schedule 3.4*, with respect to each of the Leases:  (i) such Lease is legal, valid, binding and enforceable (subject to laws governing Creditors' Rights) with respect to the Company party thereto and in full force and effect; (ii) the change in ownership of Airtox pursuant to this Agreement does not require the consent of any other party to such Lease, will not result in a breach of or default under such Lease, or otherwise cause such Lease to cease to be legal, valid, binding, enforceable (subject to laws governing Creditors' Rights) with respect to the Company party thereto and in full force and effect on identical terms following the Closing; (iii) the Companies' possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed and, to the Knowledge of Shareholders, there are no disputes with respect to such Lease; (iv) neither of the Companies, nor to the Knowledge of Shareholders such other party to the Lease are in breach or default under such Lease, and, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease; (v) no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (vi) neither of the Companies owes, nor will either of them owe in the future, any brokerage commissions or finder's fees with respect to such Lease; (vii) except as set forth on *Schedule 3.4*, the other party to such Lease is not an Affiliate of, and otherwise does not have any economic interest in, either of the Companies; (viii) neither of the Companies does currently or has in the past three (3) years subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (ix) neither of the Companies has collaterally assigned or granted any other security interest in such Lease or any interest therein; (x) there are no Encumbrances on the estate or interest created by such Lease that were created by either of the Companies; and (xi) all buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the applicable Leased Real Property are, to the Knowledge of Shareholders, in good condition and repair and sufficient for the operation of the Business as conducted thereon.

(c)    Real Property Used in The Business.  The Leased Real Property identified in **_Schedule 3.4_** comprises all of the real property currently used in the Business.

**Section 3.5    Contracts and Commitments.**

(a)    Except for the Contracts listed on **_Schedule 3.5_** (collectively, the "**_Material Contracts_**"), neither of the Companies is a party to, nor is either of the Companies or any of its Assets bound by, any:

(i)    Contract for the engagement, as an employee or independent contractor, of any officer, employee or other Person on a full-time, part-time, consulting or other basis in excess of $50,000 per annum;

(ii)    Contract relating to any severance, golden parachute, stay bonus or similar Contract with or for the benefit of any officer, employee, independent contractor, or other Person engaged on a full-time, part-time, consulting or other basis requiring payments by either of the Companies upon a change in control of Airtox or otherwise;

(iii)    Contract under which either of the Companies has advanced or loaned in excess of $25,000 to any other Person;

(iv)    Contract relating to Indebtedness in excess of $50,000 or the mortgaging, pledging or otherwise placing of an Encumbrance in excess of $50,000 on any Asset;

(v)    Contract under which either of the Companies is lessor of or permits any third Person to hold or operate any material Asset;

(vi)    Contract or group of related Contracts with the same parties or group of affiliated parties the performance of which involves annual consideration in excess of $50,000, or aggregate consideration in excess of $100,000;

(vii)    any material assignment, license, indemnification, joint development agreement or other Contract with respect to any of the Companies' material Intellectual Property;

(viii)    any material sales, distribution, dealer or manufacturer's representative or franchise Contract;

(ix)    any Contract prohibiting or restricting either of the Companies from freely engaging in any business or competing anywhere in the world or any Contract for either of the Companies' benefit prohibiting or restricting any other Person from freely engaging in any business or competing anywhere in the world;

(x)    Contract with any supplier containing any provision permitting any party other than either of the Companies to renegotiate the price or other terms, or containing any pay-back, retroactive adjustment or other similar provision, upon the occurrence of a failure by either of the Companies to meet its obligations under a

Contract when due or the occurrence of any other event if such Contract involves annual consideration in excess of $50,000, or aggregate consideration in excess of $100,000;

(xi)    Contract for the future purchase of fixed assets or the maintenance of Assets or for the future purchase of materials, supplies, equipment or services involving annual consideration of $50,000, or aggregate consideration in excess of $100,000;

(xii)    Contract with any customer for the provision of services if such Contract involves annual consideration in excess of $50,000, or aggregate consideration in excess of $100,000;

(xiii)    Contract relating to joint ventures or other agreements involving a sharing of profits;

(xiv)    Contract (other than Contracts in the Ordinary Course of Business of Airtox for its customers) involving annual consideration in excess of $25,000, or aggregate consideration in excess of $50,000 and relating to cleanup, abatement or other actions in connection with environmental liabilities;

(xv)    Contract relating to any "lock-box" with any financial institution;

(xvi)    guaranty, bond or similar Contract where the obligation guarantied or bonded against is in excess of $25,000;

(xvii)    Contract that requires the payment of royalties, commissions, finder's fees or similar payments which Contract involves in the aggregate annual consideration in excess of $25,000;

(xviii)    any Contract with any Person other than the Buyer or an Affiliate of the Buyer currently in effect limiting or restricting the disclosure of confidential information by either of the Companies;

(xix)    Contract, the consequences of a default, termination, non-renewal or acceleration thereof could reasonably be expected to have a Material Adverse Effect on Airtox or which involves annual consideration in excess of $50,000, or aggregate consideration in excess of $100,000; or

(xx)    Operating or capital lease involving annual consideration in excess of $25,000, or aggregate consideration in excess of $50,000.

(b)    Complete and correct copies of each written Material Contract, including all amendments, waivers and modifications, and a complete and accurate summary of the terms of any oral Material Contract have been delivered to Buyer by Shareholders. The Material Contracts are valid, binding and enforceable (subject to laws governing Creditors' Rights) against the Company party thereto and, to the Knowledge of Shareholders, the other party(ies) thereto in accordance with their terms and are in all material respects in full force and effect. Except as set forth on ***Schedule 3.5***, the Companies have fulfilled in all material respects all

15

material obligations required pursuant to each Material Contract to have been performed by either of the Companies. Except as set forth on *Schedule 3.5*, there has not occurred any material breach or default under any of the Material Contracts on the part of either of the Companies or, to the Knowledge of Shareholders, any other party to the Material Contracts. The Company party thereto has complied in all material respects with the insurance, bonding, licensing, permitting or other similar requirements set forth in each Material Contract. Neither of the Companies has received notice of any material breach or default under any of the Material Contracts from any other party to the Material Contracts, or given notice of any material breach or default under any of the Material Contracts to any other party to the Material Contracts. No event has occurred that, with the giving of notice or the lapse of time, or both, would constitute a material breach or default on the part of either of the Companies under any of the Material Contracts, nor to the Knowledge of Shareholders, has any event occurred which with the giving of notice or the lapse of time, or both, would constitute a material breach or default on the part of any other party to any of the Material Contracts. Assuming all consents set forth on *Schedule 3.5* (the "*Consents*") are obtained, each Material Contract will continue to be legal, valid, binding, enforceable (subject to laws governing Creditors' Rights) against the other parties to such agreements, and each Material Contract will remain in full force and effect on substantially identical terms immediately following the consummation of the Closing. Neither of the Companies nor, to the Knowledge of Shareholders, any other party has repudiated any material provision of any Material Contract. Each Material Contract that contains a change in control clause or otherwise requires the consent or approval of any Person in connection with the transactions contemplated by this Agreement is appropriately identified as such on *Schedule 3.5*.

Section 3.6    Permits.  All Permits held by the Companies are valid and in full force and effect and are listed on *Schedule 3.6*.  The Permits listed on *Schedule 3.6* collectively constitute all of the Permits necessary to permit the Companies to lawfully conduct and operate the Business in the manner currently conducted and operated and to permit the Companies to own and use their Assets in the manner in which the Companies currently own and use such Assets. The Companies are, and, except as otherwise set forth on *Schedule 3.6*, at all times have been, in compliance with all of the terms and requirements of such Permit in all material respects.  There is no Pending or, to the Knowledge of Shareholders, threatened Action by or before any Governmental Authority to revoke, cancel, rescind, modify, or refuse to renew in the Ordinary Course of Business any of such Permits.  Except as set forth on *Schedule 3.6* (collectively, the "*Permit Consents*"), no notice to, declaration, filing or registration with, or Permit from, any Governmental Authority, or, to the Knowledge of Shareholders, any other Person, is required to be made or obtained by either of the Companies or any Shareholder in connection with the execution, delivery or performance of this Agreement by Shareholders or the consummation of the transactions contemplated by this Agreement.

Section 3.7    No Conflict or Violation.  Except as set forth on *Schedule 3.7* and assuming receipt of the Consents and Permit Consents, none of the execution, delivery or performance of this Agreement, the consummation of the transactions contemplated by this Agreement, or compliance by any Shareholder with any of the provisions of this Agreement, will (a) violate or conflict with any provision of the Articles of Incorporation or Bylaws of either of the Companies; (b) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a

right of termination or acceleration under, any of the terms, conditions or provisions of any Material Contract or any material Permit or other instrument or obligation (i) to which either of the Companies or any Shareholder is a party, or (ii) by which either of the Companies, any Shareholder and/or the Assets are bound; (c) violate any statute, rule, regulation, ordinance, code, order, judgment, ruling, writ, injunction, decree or award; or (d) impose any Encumbrance on the Assets of either of the Companies.

**Section 3.8**    **Financial Statements**.  The Shareholders have previously delivered to the Buyer the Financial Statements, which are attached as ***Schedule 3.8***.  Except as set forth on ***Schedule 3.8***, the Financial Statements present fairly, in all material respects, the financial position and the results of operations, changes in shareholders' or partners' equity, and cash flow of the Companies as of the dates and for the periods referred to in the Financial Statements, in accordance with GAAP; provided however that the recent un-reviewed Financial Statements remain subject to normal and customary year-end adjustments and lack footnotes and other presentation items.  The Financial Statements reflect the consistent application of the Accounting Methods throughout the periods involved.  Except as set forth on ***Schedule 3.8***, no financial statements of any Person other than the Companies are required by GAAP to be included in the Financial Statements.

**Section 3.9**    **Absence of Certain Changes**.  Except as disclosed in ***Schedule 3.9***, since December 31, 2010, the Companies have conducted the Business only in the Ordinary Course of Business and there has not occurred:

(a)    Any Material Adverse Change with respect to either of the Companies;

(b)    any damage (whether or not covered by insurance) to, destruction or loss of any Asset of either of the Companies that would require expenditures in excess of $50,000 in the aggregate to repair or replace;

(c)    any change by Airtox in its Accounting Methods, except as required by any change in GAAP;

(d)    any revaluation by either of the Companies of any of its Assets, the effect of which revaluation results in the value of such Asset changing by greater than $25,000, including any writing down the value of inventory or writing off notes or Accounts Receivable;

(e)    any sale, disposition of or Encumbrance (other than Permitted Encumbrances) upon any Assets of either of the Companies, except (i) in the Ordinary Course of Business, and (ii) dispositions of obsolete or worthless assets;

(f)    any cancellation of any material Indebtedness owed to or held by either of the Companies;

(g)    any execution or implementation of any employment, bonus, deferred compensation, severance or similar arrangement or agreement (or amendment of any such agreement) the amount of which exceeds $25,000 individually or in the aggregate;

(h)    any increase in employee welfare or retirement benefits or salary or commission of any employee not in the Ordinary Course of Business, or any changes to an Employee Benefit Plan (other than those required by a change in Law);

(i)    any termination or written notice of termination of any Material Contract or material Permit;

(j)    any material failure to replenish either of the Companies' inventories and supplies in Companies' normal and customary manner, any failure to pay either of the Companies' creditors or to collect debt or obligations owed to either of the Companies, or any material change in either of the Companies selling, pricing or advertising practices inconsistent with Companies' prior practices;

(k)    other than the purchase of the operating lease equipment identified in *Schedule 2.2(b)(iii)*, any commitment for capital expenditures in excess of $25,000 that have not been paid for as of the date hereof;

(l)    any resignation, termination, death or material disability involving any officer, employee or independent contractor of either of the Companies, the result of which would be a Material Adverse Effect;

(m)    any material change in the amount, aging or collectability of either of the Companies' Accounts Receivable or other debts due to either of the Companies or the allowances with respect thereto or in either of the Companies' accounts payable from that reflected on the most recent Financial Statements;

(n)    any amendment of the Articles of Incorporation or By-Laws of either of the Companies;

(o)    any adjustment, split, combination or reclassification of any capital stock of either of the Companies (other than cancellation of treasury stock);

(p)    any declaration or payment of any dividend (other than tax distributions and distributions contemplated by the last sentence of Section 6.1) by either of the Companies, or any redemption, purchase or other acquisition of any shares of the capital stock of either of the Companies or any securities or obligations convertible into or exchangeable for any shares of either of the Companies' capital stock;

(q)    any grant to any Person of any right to acquire any shares of the capital stock of either of the Companies, other than to Buyer pursuant to this Agreement;

(r)    any issuance, sale or distribution of any additional shares of capital stock, of either of the Companies, or securities or obligations convertible into or exchangeable for any shares of capital stock of either of the Companies;

(s)    any receipt of any insurance proceeds outside of the Ordinary Course of Business; or

(t)     any commitment or agreement to undertake any of the foregoing.

**Section 3.10   Books and Records.**   The Companies have made and kept (and Shareholders have given Buyer access to all material portions thereof) their Books and Records. Shareholders have delivered to Buyer or its representative copies of the corporate minute books and stock records of the Companies, which are true, complete and correct in all material respects.

**Section 3.11   Litigation.**  Except as set forth in ***Schedule 3.11***, there is no action, order, writ, injunction, judgment or decree outstanding or any claim, complaint, inquiry, suit, litigation, proceeding, hearing, dispute, arbitration, audit or investigation (collectively, "***Actions***") Pending or, to the Knowledge of Shareholders, threatened or reasonably anticipated (a) involving, against, related to or affecting (i) either of the Companies, the Business or the Assets, or (ii) any officers, directors, employees or agents of either of the Companies or any Shareholder, as such, (b) seeking to delay, limit or enjoin the transactions contemplated by this Agreement, (c) involving the risk of criminal liability, or (d) involving either of the Companies as plaintiff, including any derivative suits brought by or on behalf of either of the Companies.  Neither of the Companies is in breach of or default under, in respect to, or subject to, any judgment, order, writ, injunction or decree of any court or other Governmental Authority, and there are no unsatisfied judgments against either of the Companies, the Business or the Assets.  ***Schedule 3.11*** contains a brief summary of all Actions involving, or related to, either of the Companies, the Assets, and/or the Business in the past three (3) years.

**Section 3.12   Undisclosed Liabilities; Indebtedness.**   Except as is disclosed in ***Schedule 3.12***, neither of the Companies has any material liabilities or obligations of any nature (whether known or unknown, and absolute, accrued, contingent, or otherwise), except liabilities (a) reflected on the face of the Financial Statements (rather than in the notes), or (b) incurred since the date of the most recent Financial Statements in the Ordinary Course of Business (but excluding any liabilities resulting from, arising out of, relating to, in the nature of, or caused by any breach by either of the Companies of contract, breach of warranty, tort, infringement or violation of law).  Except as set forth in the Financial Statements or on ***Schedule 3.12***, neither of the Companies has any Indebtedness as of the Effective Date.  Such scheduled Indebtedness will be paid off on the Closing Date pursuant to Section 6.11.

**Section 3.13   Compliance with Law.**  Except as set forth on ***Schedule 3.13***, neither of the Companies nor any Shareholder, in the conduct of the Business, has violated in any material respect, and each is in compliance with, all applicable laws, statutes, ordinances, regulations, rules, orders, judgments, decisions and decrees of Governmental Authorities in all material respects, relating to either of the Companies, the Assets or the Business.   Neither of the Companies has received any written notice to the effect that, or, to the Knowledge of Shareholders, otherwise been advised in writing that, it is not in compliance with any such statutes, regulations, rules, judgments, decrees, orders, ordinances or other laws.  Except as set forth on ***Schedule 3.13***, the Companies' operations are in compliance with all Laws in all material respects.

**Section 3.14   Intellectual Property.**

(a)  Intellectual Property.  For purposes of this Agreement, the term *"Intellectual Property"* shall mean:

(i)  the Proprietary Software, and

(ii)  all patents, patent rights, patent applications, registered trademarks and service marks, trademark rights (including but not limited to product names, logos, slogans and tag lines), trademark applications, service mark rights, service mark applications, trade names, registered copyrights, copyright rights, domain names and all intellectual, industrial or proprietary rights, rights of publicity and trade secrets, technology and know-how, owned or used by either of the Companies, which are used in connection with the Business, in each case together with any amendments, modifications, improvements, derivative works and supplements thereto.

(b)  Identification of Intellectual Property.  *Schedule 3.14(b)* contains a list and description of all material Intellectual Property.  With respect to any registrations of the Intellectual Property, *Schedule 3.14(b)* also sets forth, as to each such item of the Intellectual Property, the (i) relevant application or registration number, (ii) relevant filing, registration, issue or application date, (iii) record owner, (iv) country, (v) title or description, and (vi) current status and remaining life thereof.  In addition, *Schedule 3.14(b)* identifies for each listed item of the Intellectual Property whether the Companies own such item or possess and use such item under any license, contract, agreement or other commitment, as well as the identity of the parties to any such commitment, the term thereof and all amounts payable thereunder together with the payment terms therefor.

(c)  Ownership and Protection.  With respect to each item of Intellectual Property not licensed to either of the Companies: (i) either of the Companies owns all right, title and interest in and to such Intellectual Property, and has not encumbered any rights in same (other than Encumbrances released at Closing; (ii) either of the Companies has obtained an enforceable written assignment and, in the case of independent contractors, appropriate work for hire agreements and assignments, of all right, title and interest in and to each item of the Intellectual Property from each person or entity participating in the discover, development, invention, authorship or creation of such item and has provided to Buyer true and correct copies of each such assignment; (iii) neither of the Companies has any obligation to compensate, or to obtain the consent of, any third party for the use by the Companies of any such item of the Intellectual Property;  (iv) all employees , independent contractors, or other persons who have had access to or participated in the development, invention, creation or authorship in any of the Intellectual Property have signed appropriate confidentiality and non-disclosure agreements, sufficient to secure and protect the Companies' ownership rights in the Intellectual Property and to prevent the unauthorized use or disclosure of same; and (iii) all registrations and applications to register such Intellectual Property are valid and subsisting in all material respects.

(d)  Litigation and Claims.  There are no Actions Pending or, to the Knowledge of Shareholders, threatened against either of the Companies or their  contesting the validity of, or the Companies' right to use, any of the Intellectual Property.

(e)  Infringement.

(i)    To the Knowledge of Shareholders, no third party is infringing upon all or any portion of the Intellectual Property;

(ii)    there is no Action Pending or, to the Knowledge of Shareholders, threatened before any Governmental Authority in regard to any of the Intellectual Property,

(iii)    to the Knowledge of Shareholders, none of the Intellectual Property owned by either of the Companies infringes any copyright, trademark, patent, trade secret, or other intellectual property right of any third party;

(iv)    neither of the Companies has received notice of infringement upon, misappropriation of or conflict with, any asserted right of any third party related to the Intellectual Property, and, to the Knowledge of Shareholders, there is no basis for any such notice; and

(v)    to the Knowledge of Shareholders, the inception, development, use and reduction to practice of the Intellectual Property have not constituted or involved, and do not constitute or involve, the misappropriation of trade secrets or other rights of any other Person or entity (including, without limitation, any Governmental Authority).

(f)    _Proprietary Software._

(i)    Other than under a confidentiality or nondisclosure agreement or contractual provision relating to confidentiality and nondisclosure, there has been no disclosure to any third party of material confidential information or material trade secrets related to the Proprietary Software.  To the Knowledge of the Shareholders, other than employees, consultants and contractors who entered into work-made for hire agreements or otherwise assigned to the Companies all of their right, title and interest to the Proprietary Software in the course of their work for the Companies, no Person has made any contribution to the development of any components of any Proprietary Software

(ii)    Except as set forth in **_Schedule 3.14(f)_**, none of the Companies has granted nor is it obligated to grant access or a license to any source code relating to the Proprietary Software.  **_Schedule 3.14(f)_** includes, with respect to any grant or obligation to grant access or a license to any source code, a detailed description of such grant or obligation, including the source code to which it relates.

(iii)    No item of Open Source Code is contained, or was used, in the development of any Proprietary Software.

(iv)    **_Schedule 3.14(f)_** includes a complete and accurate, in all material respects, list of, to the Knowledge of Shareholders, all material bugs, defects, and errors in the Proprietary Software.  To the Knowledge of Shareholders, the Proprietary Software is free of all viruses, worms, Trojan horses and other material known contaminants.

**Section 3.15    Employees.**    **_Schedule 3.15_** contains a true and complete list of all employment, consulting, and independent contractor agreements and outstanding offer letters

that either of the Companies is a Party to, and a true and complete list of all Persons employed by the Companies, all Persons employed by others who are assigned to perform services for either of the Companies on a full-time or part-time basis, and all Persons providing services to either of the Companies as independent contractors. *Schedule 3.15* states, with respect to such Persons, their current hourly rates of compensation, base salaries or other basis for and amount of compensation, their total compensation, their accrued vacation and sick days and the commencement date of their employment. Except as set forth on *Schedule 3.15*, to the Knowledge of Shareholders, no management employee or group of employees (or independent contractors) have any plans to terminate employment with either of the Companies. There are no employment or severance or termination agreements, whether written or oral, accruing to the benefit of any director, officer, partner, employee or independent contractor of either of the Companies, except for agreements disclosed on *Schedule 3.15*.

**Section 3.16    Employee Benefit Plans.**

(a)      *Schedule 3.16* contains a true and complete, in all material respects, list of option or other equity based compensation, bonus, deferred compensation, incentive compensation, severance or other termination pay, change-in-control, health, disability, life, cafeteria, insurance, supplemental unemployment benefits, profit-sharing, pension or retirement plan, policy, program, agreement or arrangement, and each other employee benefit plan, program, agreement or arrangement, whether written or oral, sponsored, maintained, contributed to or required to be contributed to by either of the Companies, for the benefit of any current or former employee, officer, manager, director or consultant of either of the Companies (collectively, the *"Employee Benefit Plans"*). *Schedule 3.16* identifies each of the Employee Benefit Plans that is an "employee welfare benefit plan," or "employee pension benefit plan" as such terms are defined in Sections 3(1) and 3(2) of ERISA (the *"ERISA Plans"*). Except for amendments that are required for the Employee Benefit Plans to meet the requirements of applicable law, tax-qualified status under Section 401(a) of the Code, or regulatory guidance, neither of the Companies has any formal plan or commitment, whether or not legally binding, to create any additional Employee Benefit Plan or modify or change any existing Employee Benefit Plan that would affect any current or former employee, officer, manager or director of either of the Companies.

(b)      With respect to each Employee Benefit Plan, the Companies have delivered to Buyer a true, correct and complete copy of: (i) each writing constituting a part of such Employee Benefit Plan, including without limitation all plan documents, benefit schedules, trust agreements, and insurance contracts and other funding vehicles; (ii) the two (2) most recent Annual Reports (Form 5500 Series) and accompanying schedules, if any; (iii) the current summary plan description and any summary of material modifications thereto provided to employees, if any; (iv) the most recent annual financial report, if any; (v) the most recent actuarial report, if any; and (vi) the most recent determination letter from the IRS, if any.

(c)      Neither of the Companies nor any of the ERISA Plans, any trust created thereunder, or any trustee, administrator or "party in interest" or "disqualified person", as defined in Code Section 4975 and ERISA Section 406, respectively, thereof (i) has breached any fiduciary obligations imposed under Title I of ERISA, (ii) has engaged in a non-exempt "prohibited transaction" within the meaning of Code Section 4975 or ERISA Section 406 with

22

respect to any ERISA Plan or (iii) has otherwise engaged in a transaction or has taken or failed to take any action in connection with which either of the Companies could be subject to any liability for either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a tax imposed pursuant to Section 4975(a) or (b), 4976 or 4980B of the Code.

(d)     Neither of the Companies presently maintains, participates in or contributes to an Employee Benefit Plan or has previously maintained, participated in or contributed to an Employee Benefit Plan that is (i) a "multiemployer plan," as defined in ERISA Section 3(37), (ii) an "employee stock ownership plan," as defined in Code Section 4975(e)(7) or that otherwise invests in "employer securities" as defined in Code Section 409(l), (iii) a "defined benefit plan," as defined in ERISA Section 3(35) or (iv) a "voluntary employees' beneficiary association" as defined in Section 501(c)(9) of the Code.  Neither of the Companies has any liabilities under Title IV of ERISA, and neither of the Companies has ever fully or partially withdrawn from a multiemployer plan.

(e)     Each of the Employee Benefit Plans has been operated and administered in all respects in accordance with its terms and all applicable Laws, including, but not limited to, ERISA and the Code.  Each of the ERISA Plans that is intended to be "qualified" within the meaning of Code Section 401(a) has received a determination letter or the Companies have current reliance on an opinion, notification or advisory letter from the IRS, each such Plan has been timely amended as required to maintain its tax qualified status since the date of the most recent determination letter or opinion, notification or advisory letter, and no event has occurred that could be expected to adversely affect such qualified status.  All contributions required to be made to any Employee Benefit Plan by applicable Law or regulation or by any plan document or other contractual undertaking, and all premiums due or payable with respect to insurance policies funding any Employee Benefit Plan, for any period through the date hereof have been timely made or paid in full or, to the extent not required to be made or paid on or before the date hereof, have been fully reflected on the Financial Statements.

(f)     Each Employee Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code complies with Section 409A of the Code and all regulations promulgated thereunder.  No Employee Benefit Plan provides benefits, including death or medical benefits (whether or not insured) with respect to current or former employees of either of the Companies after retirement or other termination of service, except (i) coverage mandated by applicable Laws, (ii) death benefits or retirement benefits under any "employee pension benefit plan," as that term is defined in Section 3(2) of ERISA, (iii) deferred compensation benefits accrued as liabilities on the books of the Companies, or (iv) benefits, the full direct cost of which is borne by the current or former employee (or beneficiary thereof).

(g)     There are no pending or, to the Knowledge of Shareholders, threatened or anticipated, claims, suits, investigations, or administrative proceedings by or on behalf of any Employee Benefit Plan, by an employee or beneficiary under any such Employee Benefit Plan or otherwise involving any such Employee Benefit Plan (other than routine claims for benefits).  All contributions and payments required to be made under the terms of each Employee Benefit Plan have been timely made.

(h)     None of the transactions contemplated by this Agreement would result in the accelerated vesting, funding or delivery of, or increase the amount or value of, any payment or benefit under any of the Employee Benefit Plans.

(i)     All employee benefits required to be paid or provided pursuant to any Employee Benefit Plan now or formerly in effect with respect to employees or former employees of either of the Companies have been paid or provided (or adequate provision has been made to pay or provide the same, and the same will be paid or provided in full when due).

(j)     No employee of either of the Companies is contractually entitled to claim or receive severance pay or severance benefits in the event of his or her termination of employment.

**Section 3.17    Labor Relations.**   Except as set forth on ***Schedule 3.17***, the Companies have complied in all material respects with all applicable requirements of Governmental Authorities pertaining to the employment of labor, including those relating to wages, hours, collective bargaining, employment discrimination, sexual harassment, worker's compensation, immigration, and the payment of or withholding of taxes and there are no Actions Pending or, to the Knowledge of Shareholders, threatened against either of the Companies in connection therewith. There are no collective bargaining agreements relating to either of the Companies' relationships with any employee.  Neither of the Companies has recognized any labor organization, nor has any such organization been certified as the exclusive bargaining agent of any employees of either of the Companies. Except as set forth on ***Schedule 3.17***, the Companies have received no written demand on behalf of any labor organization to represent any employees of either of the Companies, and the Shareholders have no Knowledge of any present efforts of any labor organization for authorization to represent any employees of either of the Companies. There are no strikes, work stoppages or labor disputes Pending or, to the Knowledge of Shareholders, threatened against either of the Companies.

**Section 3.18    Environmental, Health, and Safety.**       Except as disclosed on ***Schedule 3.18***,

(a)     the operations of both Companies have been in compliance with all Environmental Laws in all material respects;

(b)     neither of the Companies has received any written notice from a Governmental Authority alleging that it is not in compliance with applicable Environmental Laws;

(c)     the Companies have obtained and have complied in all material respects with all Permits that are required pursuant to Environmental Laws for the occupation of the Leased Real Property and the operation of the Business; all such Permits are identified on ***Schedule 3.18***;

(d)     neither of the Companies has received any written order, notice, or other written communication from (nor to the Knowledge of Shareholders has any Action been threatened by) (i) any Governmental Authority or private citizen, or (ii) the current or prior owner or operator of the Leased Real Property, of any alleged obligation to undertake or bear the

cost of any Remediation Action with respect to the Leased Real Property or any other property, location, site or facility resulting from any transportation, treatment, storage, disposal or Release, or the arrangement therefore, in connection with the Business, of any Hazardous Substances by either of the Companies or any agent or contractor of either of the Companies;

(e)    there are no Pending or, to the Knowledge of Shareholders, threatened, claims, Encumbrances, or other restrictions, resulting from any violation or failure to comply with any applicable Environmental Law with respect to or affecting the Leased Real Property;

(f)    during the Companies' operations of the Business, the Companies have not Released any Hazardous Substances on or from the Leased Real Property in a manner in violation of any applicable Environmental Law;

(g)    the Companies' operations of the Business have not caused to occur or exist any Hazardous Substances present on or in the Leased Real Property, including any Hazardous Substances contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Leased Real Property in violation of any applicable Environmental Laws;

(h)    during the Companies' operations of the Business, neither of the Companies has sent or disposed of Hazardous Substances to or at a site which, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), or any similar state law, has been listed or proposed for listing on the "National Priorities List" or its state equivalent;

(i)    the Shareholders have delivered to the Buyer true and complete copies of all environmental studies in the possession of the Companies with respect to the Leased Real Property, if any;

(j)    during the Companies' operations of the Business, neither of the Companies has installed at the Leased Real Property, and, to the Knowledge of Shareholders, there has not existed at the Leased Real Property, (i) any underground storage tanks, regulated pursuant to 40 C.F.R. Part 280 or delegated state programs, (ii) dikes or impoundments containing Hazardous Substances, (iii) any friable asbestos containing building materials or (iv) any polychlorinated biphenyls, in violation of applicable Environmental Laws.

Section 3.19    **Tax Matters**. Except as set forth on ***Schedule 3.19***:

(a)    Filing of Tax Returns. Each of the Companies has timely filed or caused to be filed with the appropriate taxing authorities all income and employment tax returns (including information returns and other material information) and all other material tax returns in respect of Taxes required to be filed through the date hereof. Neither of the Companies is currently the beneficiary of any extension of time within which to file any such Tax return. Such Tax returns and other information filed are complete and accurate in all material respects.

(b)    Payment of Taxes. All Taxes payable by either of the Companies, in respect of the tax returns referenced in Section 3.19(a) above, for the periods ending on or before

the Effective Date, have been timely paid or an adequate reserve has been established for such, as set forth in the Financial Statements, and neither of the Companies has any liability for Taxes in excess of the amounts so paid or reserves so established with respect to such Tax returns.

(c)    <u>Adequate Reserves</u>.    Adequate reserves have been established by the Companies on their Financial Statements for all Taxes attributable to operations, events or passage of time for all periods following the date of the most recent applicable Tax returns, to and including the date of the Financial Statements; and as of the date of such Financial Statements, neither of the Companies has any liability for Taxes in excess of such reserves so established.

(d)    <u>Audits, Investigations or Claims</u>.    There are no Pending or, to the Knowledge of Shareholders, threatened Actions for or relating to any additional liability of either of the Companies in respect of Taxes, and there are no matters under discussion between either of the Companies and any Governmental Authority with respect to Taxes. There are no tax liens on any of the Assets, except for Permitted Encumbrances. Neither of the Companies has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a tax assessment or deficiency. Neither of the Companies has received any notice from a Governmental Authority in a jurisdiction where neither of the Companies files Tax returns or reports to the effect that either of the Companies is subject to Tax in that jurisdiction.

(e)    <u>Classification</u>.    All Persons engaged as employees and independent contractors by either of the Companies are properly classified as employees and independent contractors, as applicable, in accordance with the Code and applicable Laws and for employee benefits purposes. Either of the Companies has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder, or other third party.

(f)    <u>S-Corporation</u>.    Airtox is a validly electing S corporation, within the meaning of Code Sections 1361 and 1362, and will be an S corporation under the Code and California Law up to and including the day immediately prior to the Closing Date. Airtox has also validly elected to be an "S corporation" in California, and has maintained its status as an "S corporation" in California at all times since the date of such election. Subsidiary is a "qualified subchapter S subsidiary" within the meaning of Section 1361(b)(3)(B) of the Code and will be a qualified subchapter S subsidiary up to and including the day prior to the Closing Date. The Section 338(h)(10) election with respect to the sale of the Shares as contemplated by this Agreement is eligible to be made and, there will be no Tax imposed on the Companies under Section 1374 of the Code as a result of the transactions contemplated by the Agreement.

(g)    <u>Other</u>.    Neither of the Companies is a party to any tax sharing or tax allocation agreement with any other Person. Neither of the Companies has distributed stock of another Person, nor has their stock been distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code Sections 355 or 361.

**Section 3.20    Insurance.**

(a)    Each of the Companies maintains insurance coverage with respect to its properties and Business of such a nature and in such amounts as set forth on ***Schedule 3.20***.  All such policies are in full force and effect.  Neither of the Companies has received written notice of default under any such policy, nor has either of them received written notice of any pending or threatened, termination or cancellation, coverage limitation or reduction, or material premium or deductible increase with respect to any such policy.  The Companies' insurance policies provide, and have previously provided, coverage in amounts and on terms in compliance in all material respects with (i) applicable Law, and (ii) all Material Contracts and material Permits to which either of the Companies is a party.

(b)    ***Schedule 3.20*** contains a complete list of all insurance policies (including policies providing property, casualty, liability and workers' compensation coverage and bond and surety arrangements) carried by or for the benefit of either of the Companies, specifying the insurer, the amount of and nature of coverage, the risk insured against, the deductible amount (if any), the date through which coverage shall continue by virtue of premiums already paid, and a list and description of all claims made against such insurance policies for the three (3)-year period prior to the date hereof in excess of $50,000.  None of the policy limits of such insurance have been exhausted, nor has either of the Companies failed to give any notice or present any claim thereunder in due and timely fashion.  To the Knowledge of Shareholders, there are no facts which, if known by the Companies' insurers, would have a material adverse impact on the insurers' decisions to defend or indemnify any claim against either of the Companies.  Neither of the Companies has received any notice of the intent of any insurance company to not renew or to cancel any insurance policies or increase the premiums thereunder, and none of the insurance policies shall terminate as a result of the transactions contemplated hereby.  No letters of credit have been posted or cash restricted for the benefit of any such insurance policies.

**Section 3.21    Inventory.  *Schedule 3.21*** attached to this Agreement contains a complete and accurate list of all of the addresses at which all inventory of the Companies is located.  Except as set forth in ***Schedule 3.21***, such inventory is, to the Knowledge of Shareholders, usable or salable at not less than cost in the Ordinary Course of Business.

**Section 3.22    Brokers.**  With the exception of Fairmount Partners LP, no Person will be entitled to any brokerage commissions, finder's fees or similar compensation arising out of or due to any act of either of the Companies, Shareholders or their Representatives in connection with the transactions contemplated by this Agreement.  Any brokerage commissions, finder's fees or similar compensation due to Fairmount Partners LP in connection with the transactions contemplated by this Agreement are the sole and exclusive liability of Shareholders.

**Section 3.23    Affiliate Transactions.**  Except as set forth in ***Schedule 3.23***, other than for compensation and general welfare benefits received as employees, no Shareholder, officer or director of either of the Companies, or any Affiliate of any of them, no Person with whom any such Shareholder, officer, or director has any direct or indirect relation by blood, marriage or adoption and no entity in which any such Shareholder, officer, director or Person owns any beneficial interest (other than a publicly held entity whose equity is traded on a national securities exchange or in the over-the-counter market and less than five percent (5%) of the

27

equity of which is beneficially owned by all such Shareholders, officers, directors and Persons in the aggregate), has any interest in any contract, Asset, or has been involved in any material business relationship or arrangement with the Companies in the past twelve (12) months. *Schedule 3.23* sets forth a correct and complete, in all material respects, list of all accounts receivable, notes receivable and other receivables and accounts payable owed to or due from any Affiliate to either of the Companies as of December 31, 2011, other than wages and employee benefits incurred in the Ordinary Course of Business.

Section 3.24  **Certain Indebtedness**.  Except as set forth on *Schedule 3.24*, neither of the Companies has borrowed an amount in excess of $5,000 from any officer, director, Shareholder, employee or independent contractor of the Companies, except for (a) amounts due as normal salaries, wages, benefits or reimbursement of ordinary business expenses or (b) amounts that will be paid or otherwise satisfied at or prior to Closing and are listed on *Schedule 3.24*.  Except as set forth on *Schedule 3.24*, no officer, director, Shareholder, employee or independent contractor of either of the Companies is now, or on the Closing Date will be, indebted to either of the Companies for an amount in excess of $5,000, except for ordinary business expense advances due from employees or independent contractors of either of the Companies or amounts that will be paid or otherwise satisfied at or prior to Closing.

Section 3.25  **Customers and Suppliers**.  Attached as *Schedule 3.25* is a correct and complete, in all material respects, list of the top 25 customers and top 10 suppliers of each of the Companies for the fiscal years ending December 31, 2009, December 31, 2010 and for the eleven month period ending November 30, 2011 (in the case of customers, based on the amount of revenues recognized by either of the Companies and, in the case of suppliers, the dollar amount of payments made by either of the Companies).  Except as described on *Schedule 3.25*, neither of the Companies has received written notice of and Shareholders have no Knowledge that any such customer or supplier plans or has threatened to stop or materially decrease the rate of business done with either of the Companies.

Section 3.26  **Warranties**.  Except for express, implied and other warranties arising from a Material Contract in the Ordinary Course of Business or warranties arising pursuant to Law, neither of the Companies makes any other warranty or guaranty as to services or goods provided by either of the Companies.  There is no pending or, to the Knowledge of Shareholders, threatened claim alleging any breach of any warranty or guaranty other than as fully reserved for on the Financial Statements.  Neither of the Companies has any current liabilities under any such warranties that would reasonably be expected to result in a liability to the Companies, individually in excess of $25,000 or in the aggregate in excess of $100,000.  Neither of the Companies has been required to pay direct, incidental, or consequential damages to any Person in connection with any of such services or goods provided since January 1, 2009.

Section 3.27  **Accounts Receivable**.  All accounts receivable, net of allowance for doubtful accounts, of the Companies that are reflected in the most current Financial Statements (the "*Accounts Receivable*") represent valid receivables arising from sales actually made or services actually performed by the Companies in the Ordinary Course of Business.  Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible, subject to any reserve set forth in the Financial Statements.  Subject to reserves for bad debts (which reserves are calculated consistent with past practices of the Companies),

each of the Accounts Receivable either has been or will be collected in full (assuming normal and commercially reasonable efforts will be made by the Companies to collect the Accounts Receivable in full), without any set-off, in the Ordinary Course of Business. The Companies have received no written notice of any contest, claim, or right of set-off under any Material Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable.

Section 3.28    **Bank Accounts and Powers of Attorney.** *Schedule 3.28* is a list of all accounts and deposit boxes maintained by either of the Companies at any bank or other financial institution and the names of the individuals authorized to effect transactions in such accounts and with access to such boxes. Except as set forth on *Schedule 3.28,* there are no outstanding powers of attorney executed on behalf of either of the Companies. Except as may be authorized by Buyer following the Closing, Shareholders shall have no authority to effect transactions on any of the accounts set forth on *Schedule 3.28*.

Section 3.29    **Foreign Assets Control Regulations and Anti-Money Laundering.** Neither of the Companies nor any Shareholder (a) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (b) to the Knowledge of Shareholders, engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise, to the Knowledge of Shareholders, associated with any such Person in any manner violative of Section 2, or (c) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

Section 3.30    **Disclosure.** No representation or warranty by Shareholders contained in this Agreement, and no statement contained in the Disclosure Schedules or any other document, certificate or other instrument delivered to or to be delivered by or on behalf of either of the Companies or any Shareholder pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES REGARDING SHAREHOLDERS AND SHARES

Each Shareholder severally represents and warrants to Buyer that the statements contained in this Article IV are true and correct as of the date of this Agreement and, as of the Closing Date, except as set forth herein or in the Disclosure Schedule.

Section 4.1    **Title.** Each individual Shareholder is the sole record and beneficial owner of the Shares indicated in *Exhibit A* as being owned by such Shareholder. The Shares are owned free and clear of all Encumbrances (other than state and federal securities law restrictions, and the Shareholders Agreement between the Shareholders and Airtox in the form previously

delivered to Buyer). Except as noted in the parenthetical above, there are no outstanding options, calls, puts, subscriptions, preemptive rights, rights of first refusal or other agreements or commitments, other than this Agreement, obligating such Shareholder to sell or transfer his or her Shares to any Person or granting an option or right to any Person to purchase or acquire from such Shareholder his or her Shares. At the Closing, and subject to Buyer's satisfaction of its obligations thereunder, Buyer will acquire good and marketable title to and complete ownership of such Shares, free and clear of all Encumbrances (other than state and federal securities law restrictions), upon the delivery of the certificate(s) evidencing such Shares to Buyer duly endorsed for transfer. The certificates evidencing the Shares were not issued directly or indirectly in respect of any certificates issued in replacement of any lost, damaged, mutilated or destroyed certificates evidencing any shares of capital stock of Airtox.

**Section 4.2    Authority; Enforceability.** Each individual Shareholder now has, and at the Closing will have, full right and power and all authorizations and approvals required by applicable Law or any Governmental Authority, and by any agreement or instrument to which such Shareholder is a party, to sell, transfer and deliver to Buyer the Shares indicated in **_Exhibit A_** as being owned by such Shareholder, free and clear of any Encumbrances (other than state and federal securities laws restrictions). This Agreement and the other agreements, instruments and certificates to be delivered by such Shareholder have been (or, if to be executed or delivered after the date of this Agreement, will be) duly executed and delivered by such Shareholder and are (or, when executed, will be) legal, valid and binding obligations of such Shareholder enforceable against him or her in accordance with their terms except as such enforcement may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors rights generally and by equitable principles. The execution, delivery and performance of this Agreement, and the other agreements, instruments and certificates to be delivered by such Shareholder, and the consummation by such Shareholder of the transactions contemplated by such agreements do not violate or conflict with any applicable Law or any agreement, order, judgment, decree to which such Shareholder is a party or by which such Shareholder is bound.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYING PARTIES

Buyer and Lancaster, jointly and severally, hereby represent and warrant to Shareholders that the statements contained in this Article V are true and correct as of the date of this Agreement and as of the Closing Date, except as set forth herein:

**Section 5.1    Organization.** Buyer is a corporation which is duly incorporated and validly existing under the laws of the State of Delaware. Lancaster is a corporation which is duly incorporated and validly existing under the laws of the State of Minnesota.

**Section 5.2    Authorization.** Buying Parties have all requisite power and authority, and have taken all actions necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform their respective obligations under this Agreement. The execution and delivery of this Agreement by Buying Parties and the consummation by Buying Parties of the transactions contemplated by this Agreement have been duly approved by the Board of Directors of each of Buyer and Lancaster. No other proceedings

on the part of Buying Parties are necessary to authorize the Buying Parties' execution, delivery and performance under this Agreement or the other agreements, instruments and certificates to be delivered by Buying Parties under this Agreement or the transactions contemplated hereby or thereby. This Agreement and the other agreements, instruments and certificates to be delivered by Buying Parties under this Agreement have been (or, if to be executed or delivered after the date hereof, will be) duly executed and delivered by Buying Parties and are (or, when executed, will be) legal, valid and binding obligations of Buying Parties, enforceable against Buying Parties in accordance with their terms enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and other similar laws affecting the enforceability of Creditors' Rights generally, general equitable principles and of courts in granting equitable remedies.

**Section 5.3   No Conflict or Violation.** The execution, delivery or performance of this Agreement, the consummation of the transactions contemplated by this Agreement, or compliance by Buying Parties with any of the provisions of this Agreement, will not (a) violate or conflict with any provision of the Articles of Incorporation or Bylaws of the Buying Parties, (b) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, any of the terms, conditions or provisions of any material contract, Indebtedness, note, bond, indenture, security or pledge agreement, commitment, license, lease, franchise, permit, agreement, or other instrument or obligation (i) to which Buying Parties are a party or (ii) by which the assets of Buying Parties are bound, or (c) violate any statute, rule, regulation, ordinance, code, order, judgment, ruling, writ, injunction, decree or award.

**Section 5.4   No Finder's, Broker's or Consultant's Fees.** No broker or other Person is entitled to any commission or finder's fee in connection with transactions contemplated by this Agreement.

**Section 5.5   Investment Intent.** Buyer is acquiring the Shares for investment and not with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act of 1933, as amended.

<div align="center">

**ARTICLE VI.**
**COVENANTS OF THE PARTIES**

</div>

Shareholders, the Companies and Buying Parties covenant as follows:

**Section 6.1   Operation of Business.** Between the Effective Date and the Closing Date, Shareholders will cause the Companies to conduct the Business in the Ordinary Course of Business. Shareholders shall cause the Companies not to, directly or indirectly, do any of the following without the prior written consent of Buyer (which consent shall not be unreasonably delayed, conditioned or withheld):

(a)   split, combine or reclassify any of theirs capital stock or other equity securities or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for capital stock or any of their other securities; or purchase, redeem or otherwise

<div align="center">31</div>

acquire any capital stock or any of their other securities or any rights, warrants or options to acquire any such capital stock or other securities;

      (b)    issue, deliver, sell, grant, pledge or otherwise dispose of or encumber any capital stock, any other voting securities or any securities convertible into or exchangeable for, or any rights, warrants or options to acquire, any such capital stock, voting securities or convertible or exchangeable securities;

      (c)    sell, lease, license, pledge, or otherwise dispose of or encumber any properties or assets of either of the Companies other than in the Ordinary Course of Business;

      (d)    knowingly or irrevocably waive any right of either of the Companies under any Material Contract other than in the Ordinary Course of Business;

      (e)    make any changes in Accounting Methods, principles or practices, except insofar as may be required by a change in GAAP;

      (f)    enter into or amend any Material Contract other than in the Ordinary Course of Business or terminate any Material Contract or amend any of its terms (other than amendments designed to remedy defaults thereunder); and

      (g)    fail to maintain insurance at levels at least comparable to current levels or otherwise in a manner inconsistent with past practice.

Notwithstanding anything to the contrary in this <u>Section 6.1</u>, Airtox may and the Shareholders may cause Airtox to distribute cash and cash equivalents to its Shareholders at anytime between the Effective Date up to the Closing, it being understood that the Shareholders expect to cause Airtox to distribute to them all of its cash and cash equivalents in excess of One Hundred Fifty Five Thousand Seven Hundred and Five Dollars ($155,705) on or prior to the Closing Date.

**Section 6.2**    <u>Access</u>.  Between the Effective Date and the Closing Date, the Companies shall (a) provide Buyer and its designees (e.g., officers, counsel, accountants, actuaries, and other authorized representatives) with such information as Buyer or its designees may from time to time reasonably request with respect to the Companies and the transactions contemplated by this Agreement; (b) provide Buyer and its designees access during regular business hours and upon reasonable notice to the books, records, offices, personnel, counsel, accountants and actuaries of the Companies, as Buyer or its designees may from time to time reasonably request; and (c) permit Buyer and its designees to make such inspections thereof as Buyer may reasonably request. No such investigation shall limit or modify in any way Shareholders' or the Companies' obligations with respect to any breach of their representations, warranties, covenants or agreements contained herein.

**Section 6.3**    <u>Confidential Information</u>.  Between the date of this Agreement and the Closing Date, the Parties agree that they shall hold in strict confidence information relating to the Companies and Buyer and this transaction pursuant to the terms of the Confidentiality Agreement.

**Section 6.4**    **Further Assurances**. Between the Effective Date and the Closing Date:

(a)    Shareholders shall use their reasonable best efforts to cause the conditions in Section 7.3(a) to be satisfied on or before the Closing Date. Buying Parties shall use its reasonable best efforts to cause the conditions in Section 7.3(b) to be satisfied on or before the Closing Date.

(b)    Shareholders will cause each of the Companies to give any notices to third parties, and will cause each of the Companies to use their reasonable best efforts to obtain the Consents.

(c)    Each of the Parties will (and the Shareholders will cause each of the Companies) give any notices to, make any filings with, and use its reasonable best efforts to obtain the Permit Consents.

**Section 6.5**    **Litigation Support**. From and after the Closing, in the event, and for so long as, any Party actively is contesting or defending against any Action in connection with (a) any transaction contemplated under this Agreement or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel at reasonable times and upon reasonable notice, and provide such testimony and access to its books and records as will be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is entitled to indemnification for such under Article VIII).

**Section 6.6**    **Tax Covenants and Indemnification**. From and after the Closing:

(a)    Filing of Tax Returns. The Shareholders shall prepare and file, or cause the Companies to prepare, in a manner consistent with prior practice and at the Companies' expense, all Tax returns required to be filed by the Companies on or before the Closing Date, including, subject to Buyer's review and approval, which approval shall not be unreasonably withheld, the final Income Tax returns of the Companies for the period ending on the Closing Date on account of the Parties making the Section 338(h)(10) Election which returns will be prepared consistent with Section 6.6(g) hereof. Buyer shall prepare and file, or cause to be prepared and filed (i) all Tax returns required to be filed by the Companies on and after the Closing Date which Tax returns relate to Straddle Periods, and (ii) all Tax returns to be filed by the Companies for all periods beginning after the Closing Date. Buying Parties shall not amend any income Tax filing of the Companies with respect to income or franchise taxes for any period ending on or prior to the Closing Date.

(b)    Indemnification. Shareholders shall jointly and severally indemnify and hold Buyer and its Affiliates harmless for, from and against any and all Losses (without duplication) attributable to: (i) all Taxes (or the non-payment thereof) of the Companies for all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date (the "*Pre-Closing Tax Period*"), including any and all Taxes resulting from the reallocation of

income, deductions, allowances or credits of the Companies by any taxing authority, agency or service; and (ii) any and all Taxes of any Person (other than either of the Companies) imposed on either of the Companies as a transferee or successor, by contract or pursuant to any Law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing Date; *provided, however,* that with respect to clause (i) and (ii) above, (A) the Shareholders shall be liable only to the extent that such Taxes are in excess of the amount, if any, taken into account in determining the Final Closing Balance Sheet, (B) the Shareholders are not otherwise liable to the Buyer pursuant to Article VIII (i.e., no duplication of Losses), and (C) notwithstanding anything to the contrary in this Agreement, the Shareholders shall have no liability and shall not be required to defend, indemnify or hold the Buyer or its Affiliates harmless from the 338 California Obligation and transfer taxes allocated to the Buyer under Section 6.6(h), which shall be the sole responsibility of the Buying Parties. Buying Parties shall defend, indemnify and hold the Shareholders harmless from any and all Losses attributable to the 338 California Obligation and all other Taxes of the Companies not allocated to the Shareholders above. Shareholders shall reimburse Buyer for any Losses for Taxes that are the responsibility of the Shareholders pursuant to this Section 6.6(b) within fifteen (15) days after payment of such Taxes by Buyer; likewise, Buying Parties shall reimburse the Shareholders for any Losses for Taxes that are the responsibility of the Buying Parties pursuant to this Section 6.6(b) within fifteen (15) days after payment of such Taxes by the Shareholders.

(c)    Straddle Period. In the case of any taxable period that includes (but does not end on) the Closing Date (a "*Straddle Period*") the amount of ad valorem property Taxes of the Companies for a Straddle Period that relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

(d)    Refunds and Tax Benefits. Any Income Tax refunds that are received by Buying Parties or Airtox and are not related to or caused by the Section 338(h)(10) Election, and any amounts credited against Tax to which Buying Parties or Airtox become entitled, that relate to tax periods or portions thereof ending on or before the Closing Date shall be for the account of the Shareholders, and Buying Parties shall pay over to the Shareholders any such refund or the amount of any such credit within fifteen (15) days after receipt or entitlement thereto. In addition, to the extent that a claim for refund or a proceeding results in a payment or credit against Tax by a taxing authority to the Buying Parties or Airtox of any amount accrued on the Closing Balance Sheet, Buying Parties shall pay such amount to the Shareholders in proportion to their Sharing Ratios within fifteen (15) days after receipt or entitlement thereto. Any Income Tax refunds received by the Shareholders that are related to or caused by the Section 338(h)(10) Election shall be for the account of the Buyer, and Shareholders shall pay over to Buyer any such refund (plus any tax gross up previously paid to the Shareholders by the Buying Parties for the amount of such refund) within fifteen (15) days after receipt, if and only if the items causing any such refund were included in determining the 338 Tax Gross Up and provided that the Buying Parties have complied with the terms of Section 2.6(a).

(e)    Contest Provisions.

(i)    In the event any Governmental Authority informs the Buying Parties or any Company of any notice of proposed audit, claim, assessment or other dispute concerning an amount of Taxes with respect to which the Shareholders may incur liability, the Buyer shall promptly notify the Shareholders of such matter. Such notice shall contain factual information (to the extent known) describing any asserted Tax liability in reasonable detail and shall be accompanied by copies of any notice or other documents received from any Governmental Authority with respect to such matter. If the Buying Parties have knowledge of an asserted Tax liability with respect to a matter for which they are to be indemnified by the Shareholders hereunder and fail to provide the Shareholders prompt notice of such asserted Tax liability, if the Shareholders are precluded from contesting the asserted Tax liability in any forum as a result of the failure to give prompt notice, then to such extent the Shareholders shall have no obligation to indemnify the Companies, the Buyer or any Affiliate of the Buyer for Taxes arising out of such asserted Tax liability, and to the extent the Shareholders are damaged thereby, the Buying Parties shall be liable to the Shareholders for such resulting Loss.

(ii)    The Shareholders shall control any audits, disputes, administrative, judicial or other proceedings related to Taxes with respect to which they may incur liability to a Governmental Authority. Subject to the preceding sentence, in the event an adverse determination may result in the Buyer having responsibility for an amount of Taxes under this Agreement, the Buyer shall be entitled to fully participate in that portion of the proceeding relating to the Taxes with respect to which it may incur liability hereunder and shall have the right to consent to any settlement (provided such consent cannot be unreasonably withheld, delayed or conditioned). For purposes of this Section, the term "participation" shall include (i) participation in conferences, meetings or proceedings with any Governmental Authority, the subject matter of which includes an item for which such Party may have liability hereunder, (ii) participation in appearances before any court or tribunal, the subject matter of which includes an item for which a Party may have liability hereunder, and (iii) with respect to the matters described in the preceding clauses (i) and (ii), participation in the submission and determination of the content of the documentation, protests, memorandum of fact and law, briefs, and the conduct of oral arguments and presentations.

(iii)    Buyer shall not agree to settle any Tax liability or compromise any claim with respect to Taxes, which settlement or compromise may affect the liability of the Shareholders for Taxes, without the Shareholders' written consent (which consent shall not be unreasonably withheld, delayed or conditioned).

(iv)    The Buyer shall bear the expenses incurred in connection with audits and other administrative and judicial proceedings relating to Taxes for which the Buyers and/or its Affiliates are liable under this Agreement. Likewise, the Shareholders shall bear such expenses relating to Taxes for which they are liable.

(f)    Cooperation.    The Buyer, the Companies, and the Shareholders shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with

the filing of Tax returns pursuant to this Section 6.6 and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Companies and the Shareholders agree to retain all Books and Records with respect to Tax matters pertinent to the Companies relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer or Shareholders, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority. Shareholders, Buyer and their Affiliates shall make their employees reasonably available on a mutually convenient basis at their cost to provide explanation of any documents or information so provided; provided, however, to the extent that the cost of complying with this Section 6.6 is more than de minimis with respect to the Tax return of another party, the Party providing assistance can seek reasonable reimbursement of its costs from the Party whose Tax return is being prepared. Buyer and Shareholders further agree, upon request, to use their best efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

(g)    Section 338 (h)(10) Election.

(i)    The Shareholders and the Buyer agree to cooperate fully to the extent permissible under applicable Law, with the Buyer in making an election under Section 338(h)(10) of the Code (and any corresponding elections under state, local, or foreign tax Law) (collectively, a *"Section 338(h)(10) Election"*) with respect to the acquisition of the Shares pursuant to the terms of this Agreement. The provisions of this Section 6.6(g) shall apply to any Section 338(h)(10) Election.

(ii)    The Buyer shall be responsible for the preparation and filing of all Section 338 Forms (as hereinafter defined) in accordance with applicable Tax Laws and the terms of this Agreement. The Shareholders shall execute and deliver to the Buyer such documents or forms (including executed Section 338 Forms) as are requested and are required by any Laws in order properly to complete Section 338 Forms at least twenty (20) days prior to the date such Section 338 Forms are required to be filed. The Shareholders shall provide the Buyer with such information as the Buyer reasonably requests in order to prepare the Section 338 Forms within thirty (30) days after the Buyer's request for such information.

(iii)    Within 60 days after the Closing Date, the Buyer shall determine (i) the amount of the "aggregate deemed sales price" (as defined in Treasury Regulation § 1.338-4) and (ii) the allocations of such amount among the assets of the Company (collectively, the *"Allocations"*) in a manner consistent with Sections 338 and 1060 of the Code and the Treasury Regulations thereunder. The Shareholders and the Buyer agree to file all Tax Returns that are affected by any Section 338(h)(10) Election, if applicable, in accordance with the Allocations. The Parties agree that no portion of the Purchase Price

(or any portion of the aggregate deemed sales price) will be allocated to any covenant not to compete.

(iv) "*Section 338 Forms*" means all returns, documents, statements, and other forms that are required to be submitted to any federal, state, county or other local Tax authority in connection with a Section 338(h)(10) Election. Section 338 Forms shall include, without limitation, any "statement of Section 338 election" and IRS Form 8023 (together with any schedules or attachments thereto) that are required pursuant to Treas. Reg. section 1.338-2 or any successor provisions.

(h) Any documentary, transfer, sales, use or other similar taxes imposed solely by reason of the transfer of the Shares provided by this Agreement and any related deficiency, interest or penalty will be paid by the Shareholders, provided, that the Buying Parties shall be solely responsible for the 338 California Obligation and any sales, use, documentary, transfer or other similar taxes imposed solely by reason of the Section 338 Election.

Section 6.7  **Administration of Accounts**.  From and after the Closing, all payments and reimbursements received by any Shareholders or any Affiliate of a Shareholder after the Closing Date from any third party in the name of either of the Companies, for the benefit of either of the Companies or in connection with either of the Companies or the Business shall be held by such Shareholder or such Affiliate in trust for the benefit of the Companies. Immediately upon receipt of such payment or reimbursement, such Shareholder shall pay to the applicable Company the amount of such payment or reimbursement without right of set-off, offset, or reduction of any kind.

Section 6.8  **Notification**.  Between the date of this Agreement and the Closing Date, Shareholders and the Companies, on the one hand, and Buyer on the other hand, shall promptly notify the other in writing of any change, circumstance, fact, condition or event which would cause any of the representations or warranties made by such Parties pursuant to this Agreement to be untrue as of the date hereof or at the Closing or which prevents such parties from complying with any of their obligations hereunder. Notwithstanding the foregoing, no such disclosure pursuant to this Section 6.8 shall be deemed to prevent or cure any breach of a representation or warranty or failure to perform any covenant or agreement hereunder.

Section 6.9  **Release by Shareholders**.  Effective upon the Closing, each Shareholder, on behalf of the Shareholder and the Shareholder's respective Affiliates, agents, attorneys, representatives, successors, assigns and heirs (collectively, the "*Shareholder Releasing Parties*"), hereby, irrevocably and unconditionally, fully and forever acquits, releases, covenants not to sue and discharges and agrees to hold harmless the Companies and their respective Affiliates, officers, directors, shareholders, members, managers, employees, agents, attorneys, representatives, predecessors, successors and assigns (collectively, the "*Shareholder Releasees*") from any and all actions, claims, charges, demands, damages, losses, obligations, liabilities, costs, expenses (including, without limitation, attorneys' fees and court costs), causes of action, debts, contracts, torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity, of every nature and kind that such Shareholder or any of the other Shareholder Releasing Parties have, may have had or may have in the future against the Shareholder Releasees, whether known or unknown, for all matters relating to, arising out of or in connection

with the status of such Shareholder as a shareholder, employee, officer and/or director of either of the Companies from the beginning of time through the Closing Date, except obligations arising (i) pursuant to this Agreement, the Exhibits and the related agreements, (ii) under any qualified pension plan, (iii) employee welfare benefits provided to employees generally, (iv) indemnification and defense rights under the Companies' insurance policies or under their Articles or Bylaws, (v) California Labor Code Section 2802, or (vi) California Corporations Code. The release set forth in this Section 6.9 shall be binding upon such Shareholder, the other Shareholder Releasing Parties and their respective successors and assigns and shall inure to the benefit of the Shareholder Releasees and their respective successors and assigns.

Section 6.10    **Interim Financials**.  Within ten (10) days following each calendar month prior to the Closing Date, Airtox shall deliver to Buyer periodic consolidated financial reports in the form that it customarily prepares for the Companies as of the last day of such calendar month that include a balance sheet and a statement of income of the Companies for the calendar month then ended.  Such interim statements will be prepared in conformity with the Accounting Methods and will present fairly in all material respects the financial position of the Companies as of their respective dates and for the respective calendar month, subject to normal and customary year-end adjustments.

Section 6.11    **Payoff Letters**.  At least five (5) days prior to the Closing Date, Shareholders shall cause the Companies to deliver either (a) payoff letters in form acceptable to Buyer that will pay off in full the Indebtedness, if any, of the Companies as of the Closing Date and release all Encumbrances related thereto upon payment of the amounts set forth in the payoff letters at the Closing, or (b) consents to the transactions contemplated by this Agreement in form acceptable to Buyer by the other parties to any Indebtedness.

Section 6.12    **Affiliate Payments: Post-Closing Obligations and Liabilities**.

(a)    Immediately prior to the Closing Date, Shareholders shall cause any Affiliates of the Companies to pay off any outstanding accounts receivable owed to either of the Companies or other payment obligations owed to either of the Companies (the "*Affiliate Payments*").

(b)    Immediately subsequent to the Closing Date, the obligations and liabilities of the Companies: (i) will not be in default or overdue; (ii) will not include any Indebtedness; and (iii) will consist only of a customary level of post-Closing obligations and liabilities (including trade payables) to non-Affiliates under customary commercial Contracts entered into by the Companies in the Ordinary Course of Business.

Section 6.13    **No Solicitation of Transactions**.  Until the earlier of the Closing or the termination of this Agreement pursuant to Article IX, Shareholders and the Companies shall not, directly or indirectly, through any officer, director, manager or agent of any of them or otherwise, initiate, solicit or encourage (including by way of furnishing information or assistance), or enter into negotiations of any type, directly or indirectly, or enter into a confidentiality agreement, letter of intent or other similar agreement with any Person other than Buyer with respect to a sale of all or any substantial portion of the assets or properties of either of the Companies, or a merger, consolidation, business combination, sale of all or any substantial

38

portion of the capital stock of either of the Companies, or the liquidation or similar extraordinary transaction with respect to either of the Companies.

Section 6.14   **Employee Benefit Matters.**   The Employee Benefit Plans and payroll practices of the Companies shall continue pursuant to their terms through December 31, 2012, at which time the employees of the Companies may be transitioned to Employee Benefit Plans of the Buying Parties.

## ARTICLE VII.
## CLOSING; CONDITIONS PRECEDENT TO CLOSING; POST-CLOSING ACTS

Section 7.1   **Closing.**   The closing of the transactions contemplated by this Agreement (the "*Closing*"), will take place at the offices of Fredrikson & Byron, P.A., located at 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota, commencing at 9:00 a.m. local time on a date to be specified by Buyer and Shareholders which shall be no later than the fifth (5th) Business Day after satisfaction or waiver of each of the conditions set forth in Section 7.3, or on such other date and at such other time as the Parties shall agree. The date of the Closing is referred to as the "*Closing Date.*" The effective time of the Closing is 11:59 p.m. on the Closing Date.

Section 7.2   **Deliveries and Actions Taken at Closing.**

(a)   **Deliveries by Shareholders.**   To effect the transactions contemplated herein, the Shareholders will, at the Closing, deliver to the Buyer:

(i)   original certificates representing all of the Shares accompanied by duly executed stock powers in the forms attached hereto as *Exhibits B-1* and *B-2*, together with any required transfer or documentary stamps attached;

(ii)   instruments evidencing the release and/or pay off amounts and payees of all Indebtedness and the release of all guarantees made by either of the Companies on behalf of any other Person, in each case, in form and substance reasonably satisfactory to Buyer;

(iii)   appropriate termination statements under the Uniform Commercial Code or comparable payoff letters to release all security interests of the Companies to the extent directed by Buyer or any of Buyer's lenders in connection with the transactions contemplated herein, in each case, in form and substance reasonably satisfactory to Buyer;

(iv)   Articles of Incorporation certified by the California Secretary of State and dated within ten (10) days prior to the Closing Date for each of the Companies;

(v)   good standing certificates issued by the California Secretary of State for each of the Companies, and good standing certificates issued by any other jurisdiction where either of the Companies is qualified to do business as a foreign corporation, each such certificate dated within ten (10) days prior to the Closing Date;

(vi)    a Secretary's Certificate for each of the Companies certifying (a) the Articles of Incorporation of the Companies, (b) the Bylaws of the Companies, and (c) resolutions of Shareholders and directors of Airtox ratifying all past corporate actions and approving the transactions contemplated hereunder;

(vii)    the original corporate record and minute books, stock ledgers and corporate seals, if any, for each of the Companies;

(viii)    written resignations of each director and officer of each of the Companies, in form and substance reasonably satisfactory to Buyer;

(ix)    the Escrow Agreement between Shareholders, Buyer and the Escrow Agent, executed by Shareholders and the Escrow Agent;

(x)    Noncompetition Agreements in the form attached hereto as *Exhibits D-1 and D-2* (the "*Noncompetition Agreements*") between Airtox, the Buyer, and Freeman or Masterson, respectively, executed by Airtox and Freeman or Masterson;

(xi)    An Employment Agreement in the form attached hereto as *Exhibit -1* between Airtox and Freeman, duly executed by Airtox and Freeman;

(xii)    An Acknowledgment of Changes in Compensation and Benefits in the form attached hereto as *Exhibit F* (the "*Acknowledgment of Changes*") between Airtox and Ronald Masterson, executed by Airtox and Ronald Masterson;

(xiii)    documentation evidencing changes or modifications to Employee Benefit Plans/deferred compensation arrangements pursuant to Section 6.14, in each case, in form and substance reasonably satisfactory to Buyer; and

(xiv)    evidence that the Affiliate Payments have been paid in full and a certification by the Companies that no additional amounts are payable in form reasonably acceptable to Buyer.

(b)    Deliveries by Buyer.  To effect the transactions contemplated herein, Buying Parties will, at the Closing, deliver to the Shareholders or cause to be delivered to the Shareholders, as applicable:

(i)    the cash payments, by wire transfer, to those Persons and in the amounts specified in Section 2.2;

(ii)    a copy of Buyer's Certificate of Incorporation certified by the Secretary of State of the State of Delaware and Lancaster's Articles of Incorporation certified by the Secretary of State of the State of Minnesota, each of the copies dated within ten (10) days prior to the Closing Date;

(iii)    a good standing certificate for Buyer issued by the Secretary of State of the State of Delaware and a good standing certificate for Lancaster issued by the

Secretary of State of the State of Minnesota, each of the certificates dated within ten (10) days prior to the Closing Date;

(iv)    a Secretary's Certificate of Buyer and Lancaster certifying (a) the Certificate of Incorporation of Buyer, (b) the Bylaws of Buyer, and (c) resolutions of their respective Board of Directors authorizing the transactions contemplated hereunder;

(v)    the Escrow Agreement between Shareholders, Buyer and the Escrow Agent, executed by Buyer and the Escrow Agent;

(vi)    the Noncompetition Agreements, executed by Buyer;

(vii)    the Employment Agreement for Freeman executed by Airtox; and

(viii)    the Acknowledgment of Changes executed by Airtox.

**Section 7.3    Conditions Precedent To Closing.** The obligations of each of Buyer and Shareholders to consummate the transaction described in this Agreement shall be subject to the satisfaction on or before the Closing of the following conditions precedent (collectively, the *"Conditions Precedent to Closing"*):

(a)    Conditions Precedent to Buyer's Obligations. The obligation of Buyer to consummate the transactions contemplated by this Agreement is expressly subject to the satisfaction, on or prior to the Closing Date, of all of the following conditions (compliance with any of which or the occurrence of any of which may be waived in whole or in part by Buyer in writing):

(i)    Each and every representation and warranty of Shareholders contained in Article III and in Article IV shall have been accurate in all material respects as of the Effective Date, and shall be accurate in all material respects as of the Closing Date, in each case, other than representations and warranties that are expressly made as of a specific date, which shall be accurate in all material respects as of such specific date; provided that to the extent such warranties and representations are qualified by "material" or "Material Adverse Effect," in which case such warranties and representations (as so written, including the term "material" or "Material Adverse Effect") shall be true and correct in all respects;

(ii)    The Companies and the Shareholders shall have performed and complied with all of their covenants hereunder in all material respects through the Closing Date;

(iii)    There shall not have occurred a Material Adverse Change with respect to the Companies since December 30, 2010;

(iv)    A certificate executed by Shareholders with regard to the conditions set forth in Sections 7.3(a)(i)-(iii) shall have been delivered to Buyer;

(v)    No judgment, order, decree, stipulation or injunction by any Governmental Authority shall be in effect which prevents consummation of any of the transactions contemplated by this Agreement, and no Action shall have been instituted before any Governmental Authority to restrain, prohibit or rescind, or to obtain damages in respect of, this Agreement or the consummation of the transactions contemplated herein;

(vi)    All Permit Consents shall have been obtained;

(vii)    The equipment subject to the operating leases identified in Schedule 2.2(b)(iii) shall have been acquired;

(viii)    All Consents shall have been obtained;

(ix)    All deliveries required under Section 7.2(a) shall have been made;

(x)    Employment Agreements in the form attached hereto as *Exhibit E-2* between Airtox and each of Robert Mitzel, Heidi Hayes, Cherill Dayrit, Bing Wang and Sepideh Saeed, duly executed by Airtox and each of these employees, shall have been delivered to Buyer;

(xi)    Confidentiality and Invention Assignment Agreement in the form attached hereto as *Exhibit G*, executed by Airtox and John Stots, shall have been delivered;

(xii)    Termination of the Option Agreement between Airtox and Robert Mitzel dated as of the 19th of July, 2011 in the form attached hereto as *Exhibit H* (the "*Stock Option Termination Agreement*"), executed by Robert Mitzel and Airtox, shall have been delivered; and

(xiii)    All documents and instruments executed and delivered and all actions taken in connection with this Agreement and the transactions contemplated hereby shall be reasonably satisfactory to Buyer and its legal counsel.

(b)    Conditions Precedent to Shareholders' Obligations. The obligation of the Shareholders to consummate the transactions contemplated by this Agreement are expressly subject to the satisfaction, on or prior to the Closing Date, of all of the following conditions (compliance with which or the occurrence of which may be waived in whole or in part by Shareholders in writing):

(i)    Each and every representation and warranty of the Buying Parties contained in Article V shall have been accurate in all material respects as of the Effective Date, and shall be accurate in all material respects as of the Closing Date, in each case, other than representations and warranties that are expressly made as of a specific date, which shall be accurate in all material respects as of such specific date.

(ii)    The Buying Parties shall have performed and complied with all of their covenants in all material respects hereunder through the Closing Date;

42

(iii)    a certificate executed by Buyer with regard to the conditions set forth in Sections 7.3(b)(i)-(ii);

(iv)    No judgment, order, decree, stipulation or injunction by any Governmental Authority shall be in effect which prevents consummation of any of the transactions contemplated by this Agreement, and no Action shall have been instituted before any Governmental Authority to restrain, prohibit or rescind, or to obtain damages in respect of, this Agreement or the consummation of the transactions contemplated herein;

(v)    All Permit Consents shall have been obtained;

(vi)    All Consents shall have been obtained;

(vii)    All deliveries required under Section 7.2(b) shall have been made;

(viii)    The Credit Facility or alternative interim financing provided by Buying Parties is in place; and

(ix)    All documents and instruments executed and delivered and all actions taken in connection with this Agreement and the transactions contemplated hereby shall be reasonably satisfactory to Shareholders and their legal counsel.

**Section 7.4    Post-Closing Covenants.**  At any time, and from time to time after the Closing Date, without the payment of any further consideration, the Parties shall duly execute, acknowledge, and deliver all documents, agreements, and/or instruments and will take such other reasonable action consistent with the terms of this Agreement and the Ancillary Agreements, as may be necessary for the purpose of giving effect to this Agreement and the Ancillary Agreements.

**ARTICLE VIII.**
**INDEMNIFICATION**

**Section 8.1    Survival of Representations.**  The representations and warranties of the Shareholders and the Buying Parties contained in this Agreement will survive the Closing and shall be deemed to have been relied upon, irrespective of any investigation conducted by a Party or information received by any Party, for a period of thirty-six (36) months after the Closing Date; provided, however, that (i) the representations and warranties set forth in Section 3.18 (*Environmental, Health, and Safety*) (the "*Environmental Representations*") will survive for a period of six (6) years after the Closing Date; and (ii) the representations and warranties set forth in Sections 3.1(c) (*Authority*), 3.2 (*Capitalization; Subsidiaries*), 3.19 (*Tax Matters*), 4.1 (*Title*), 4.2 (*Authority; Enforceability*), 5.1 (Organization), 5.2 (Authorization) and 5.3 (No Conflict or Violation) (collectively, the "*Excluded Representations*") will survive until thirty (30) days after the expiration of the applicable statute of limitations.  Any claim (whether or not fixed as to liability or liquidated as to amount) pending on the expiration date of the applicable survival period set forth above for which a claim notice has been given in accordance with this Article VIII on or before such expiration date may continue to be asserted and indemnified against until

finally resolved. All covenants and agreements contained in this Agreement will survive the Closing in accordance with their terms.

**Section 8.2     Indemnifications**.

(a)     By Shareholders.    Provided that Buyer make a written claim for indemnification against the Shareholders pursuant to Section 10.2 below within the applicable survival period pursuant to Section 8.1 above, then the Shareholders, jointly and severally will indemnify, save and hold harmless Buyer and its respective Affiliates (including, after the Closing, the Companies) and their respective Representatives, successors and assigns (hereafter the *"Buyer Indemnitees"*), from and against any and all Losses, asserted, incurred in connection with, arising out of, resulting from or incident to (i) any breach or inaccuracy of any representation or warranty made by the Shareholders contained in Article III or Article IV of this Agreement; or (ii) any failure by any Shareholder to perform or observe any covenant or agreement to be performed or observed by any of them under this Agreement.

(b)     Limitation on Indemnification by Shareholders.    Notwithstanding anything to the contrary contained in this Agreement:

(i)     Shareholders will have no liability under Section 8.2(a)(i) unless and until the aggregate amount of all claims for Losses under Section 8.2(a)(i) exceeds $50,000 (the *"Basket"*) in which event the Buyer Indemnitees may claim indemnification for the full amount of all such claims (i.e., without reduction by the Basket);

(ii)     the maximum aggregate liability of the Shareholders under Section 8.2(a)(i):

(A)     will be unlimited for (aa) claims based on breaches of the Excluded Representations or (bb) claims based on fraud or intentional misrepresentation;

(B)     will not exceed fifty percent (50%) of the Purchase Price actually received by the Shareholders (less the liability of the Shareholders actually incurred under Clause C below) for claims based on breach of the Environmental Representations (and for purposes of this Section 8.2(b)(ii)(B) the amount of the 338 Tax Gross Up Advance and the Final 338 Tax Gross Up will not be included as part of the Purchase Price); and

(C)     will not exceed two million dollars ($2,000,000) for any other claims.

(c)     By Buying Parties.    Provided that the Shareholders' Representative makes a written claim for indemnification against the Buying Parties pursuant to Section 10.2 below within the applicable survival period pursuant to Section 8.1 above, the Buying Parties, jointly and severally, will indemnify and save and hold harmless Shareholders and their respective Representatives, successors and assigns, from and against any and all Losses asserted, incurred in connection with, arising out of, resulting from or incident to. (i) any breach of any representation or warranty made by Buyer or Lancaster in or pursuant to this Agreement or in

any certificate delivered under this Agreement; and (ii) any breach of any covenant or agreement made by Buyer or Lancaster in or pursuant to this Agreement or in any certificate delivered under this Agreement.

Section 8.3    **Third-Party Actions**.

(a)    Buyer or Shareholders, as the indemnified party or parties (the *"Indemnified Party"*), will give the Shareholders (through the Shareholders' Representative) or Buyer, as applicable, as the indemnifying party or parties (for this Section, the *"Indemnifying Party"*), prompt written notice of the commencement of any claim for indemnification under this Article VIII that involves a claim by a third-party (a "*Third-Party Action*"). The complaint or other papers pursuant to which the third party commenced such Third-Party Action will be attached to such written notice. The failure to give prompt written notice will not affect any Indemnified Party's right to indemnification under this Article VIII unless such failure has adversely affected the Indemnifying Party's ability to defend such Third-Party Action. Thereafter, the Indemnified Party shall promptly deliver to the Indemnifying Party copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third-Party Action.

(b)    The Indemnifying Party shall have the right, upon written notice described below, to contest, handle and defend such Third-Party Action on behalf of the Indemnified Party. Notice of the intention to so contest, handle and defend will be given by the Indemnifying Party to the Indemnified Party within twenty (20) Business Days after the Indemnified Party's notice of such Third-Party Action (but, in all events, at least five (5) Business Days prior to the date that a response to such Third-Party Action is due to be filed). Such contest, handling and defense will be conducted by attorneys reasonably acceptable to the Indemnified Party and retained by the Indemnifying Party. An Indemnified Party will be entitled at any time, at its own cost and expense, to participate in such contest, handling and defense and to be represented by attorneys of its own choosing. If the Indemnified Party elects to participate in such defense, the Indemnified Party will cooperate with Indemnifying Party in the conduct of such defense; however, the Indemnifying Party shall control the defense of such Third-Party Action. An Indemnified Party will cooperate with the Indemnifying Party to the extent reasonably requested by the Indemnifying Party in the contest, handling and defense of such Third-Party Action, including providing reasonable access (upon reasonable notice) to the books, records and employees of the Indemnified Party if and to the extent relevant to the defense of such Third-Party Action; provided, that such cooperation will not unduly disrupt the operations of the business of the Indemnified Party or cause the Indemnified Party to waive any statutory or common law privileges, breach any confidentiality obligations owed to third parties or otherwise cause any confidential information of such Indemnified Party to become public. The parties may enter into reasonable joint defense or similar agreements to facilitate such cooperation and access, if and as appropriate.

(c)    (i) If the Indemnifying Party does not contest, handle and defend a Third-Party Action or (ii) if any Indemnified Party reasonably determines that (A) the Indemnifying Party is not adequately representing, or, because of a conflict of interest, may not adequately represent, the interest of the Indemnified Party in such Third-Party Action, or (B) there is a reasonable probability that a Third-Party Action may adversely affect such Indemnified Party or

its Affiliates in any material respect other than solely as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the Indemnified Party will be entitled to conduct its own contest, handling and defense and to be represented by attorneys of its own choosing with respect to such Third-Party Action, all at the Indemnifying Party's cost and expense; provided, however, that in the case in which the Indemnified Party is entitled to conduct its own contest handling and defense pursuant to clause (ii) of this subsection (c), the attorneys chosen by the Indemnified Party shall be reasonably acceptable to the Indemnifying Party. The Indemnifying Party will pay, subject to the limitations described in <u>Section 8.2</u> and this <u>Section 8.3</u>, as incurred (no later than 30 days after presentation by the Indemnified Party) the reasonable fees and expenses of the counsel retained by the Indemnified Party. If the Indemnified Party is entitled to retain separate counsel under this subsection (c) in connection with a Third-Party Action, the Indemnifying Party shall not, in connection with such Third-Party Action or any related actions arising out of the same general allegations or circumstances from which such Third-Party Actions arose, be liable for the fees and expenses of more than one separate law firm, except in the event that the Indemnified Party reasonably determines to hire separate local counsel in connection with such Third-Party Action, in which case the Indemnifying Party shall be liable for the fees and expenses of two separate law firms.

**Section 8.4    <u>Recoupment Against Escrow Fund</u>.** Any indemnification to which Buyer is entitled under this Agreement as a result of any Losses it may suffer shall first be made as a payment to Buyer from the Escrow Account in accordance with the terms of the Escrow Agreement and, to the extent that the aggregate amount of such indemnification exceeds the Escrow Amount plus any interest accrued thereon, Buyer shall have the option, but not an obligation, in its sole and absolute discretion, to set off on a dollar-for-dollar basis Losses against any payment obligations for the Deferred Element to Shareholders under <u>Section 2.5</u>. Neither the exercise of nor the failure to exercise such right of set-off will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it under this Agreement to recoup all or any part of any remaining Losses to the extent permitted by this <u>Article VIII</u>.

**Section 8.5    <u>Exclusive Remedy</u>.** Except (i) in the case of intentional fraud, willful misconduct or intentional misrepresentation, (ii) for any dispute this Agreement submits to the conclusive and binding determination by the Neutral Accountant, (iii) for remedies provided in <u>Section 6.6</u> which are provided in addition to, but not in duplication of, the remedies provided by this <u>Article VIII</u>, (iv) Deferred Element Covenant Claims, and (v) for equitable remedies to be pursued under <u>Section 10.8</u>, the indemnification provisions of the Shareholders and the Buying Parties under this <u>Article VIII</u> shall constitute the sole and exclusive remedies of the Shareholders and Buying Parties, respectively, for the breach of any covenant, agreement, representation or warranty in this Agreement.

**Section 8.6    <u>No Duplication of Losses; Impact on Closing Consideration</u>.** Notwithstanding anything to the contrary contained in this Agreement, any Losses for which any Indemnified Party is entitled to indemnification under this <u>Article VIII</u> shall be determined without duplication of recovery (including recovery under <u>Article II</u> or <u>Section 6.6</u>) by reason of any event giving rise to such Losses constituting a breach of more than one representation, warranty, covenant or agreement. Any payments of indemnification under this <u>Article VIII</u> by Shareholders pursuant to <u>Section 8.2(a)</u> shall be deemed to be adjustments to the Purchase Price.

## ARTICLE IX.
## TERMINATION

**Section 9.1**    <u>Termination</u>.  This Agreement may be terminated prior to the Closing:

(a)    By the mutual written consent of the Shareholders and the Buyer.

(b)    By either the Buyer or the Shareholders if there has been a material breach of any material representation, warranty or covenant on the part of the other Party; provided, however, that (i) the Party claiming material breach or failure to perform on the part of the other Party shall serve notice thereof on the other Party as soon as practicable after it becomes aware of such material breach or failure; (ii) such material breach or failure shall not have been remedied within ten (10) days after notice thereof has been given to such other Party (it being agreed that where such ten (10) day notice period would extend beyond the Closing Date, the Closing Date will be postponed to such 10th day) and (iii) that the breach of any representation or warranty related to Subsidiary shall not be deemed a material breach for purposes of this <u>Section 9.1</u>.

(c)    By either Buyer or Shareholders in writing, without liability, if there shall be any order, writ, injunction or decree of any Governmental Authority binding on Buyer, either of the Companies or Shareholders, which prohibits or restrains Buyer, either of the Companies or Shareholders from consummating the transactions contemplated hereby, provided that Buyer and Shareholders shall have used their reasonable, good faith efforts to have any such order, writ, injunction or decree lifted and the same shall not have been lifted within thirty (30) days after entry, by any such court or governmental or regulatory agency.

(d)    (i) By Buyer if the Closing has not occurred on or before January 31, 2012, by reason of the failure of any condition precedent under <u>Section 7.3(a)</u> (unless the failure results primarily from the Buyer itself breaching any representation, warranty  or covenant contain in this Agreement), or (ii) by Shareholders Representative if the Closing has not occurred on or before January 31, 2012, by reason of the failure of any condition precedent under <u>Section 7.3(b)</u> (unless the failure results primarily from the Shareholders themselves breaching any representation, warranty  or covenant contain in this Agreement).

**Section 9.2**    <u>Effect of Termination</u>.  If any Party terminates this Agreement pursuant to <u>Section 9.1</u>, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party, except for any liability of any Party then in breach, in which case the non-breaching Party's right of termination under <u>Section 9.1</u> is in addition to any other rights it may have under this Agreement, and the exercise of a right of termination will not be an election of remedies.  If this Agreement is terminated pursuant to <u>Section 9.1</u>, all further obligations of the Parties under this Agreement will terminate, except that the obligations in <u>Section 10.6</u> and under the Confidentiality Agreement will survive; provided, however, that if this Agreement is terminated by a Party because of the breach of the Agreement by the other Party, the terminating Party's right to pursue all legal remedies available under this Agreement will survive such termination unimpaired.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.1    Assignment.** Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned by any Party without the prior written consent of the other Parties; provided, however, that Buyer may assign or delegate all or part of its rights and obligations under this Agreement to an Affiliate of Buyer, provided that Buyer and Lancaster remain primarily liable for their obligations hereunder. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, and no other Person will have any right, benefit or obligation under this Agreement as a third party beneficiary or otherwise.

**Section 10.2    Notices.** All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered upon the earlier of (a) actual receipt, regardless of the means of delivery, or (b) one Business Day after it is sent by a reputable courier service for delivery within one Business Day, certified mail, return receipt requested, in each case to the intended recipient as set forth below. A Party may change its address for notice by giving the other parties notice in the manner provided herein.

Shareholders' Representative:

Linda L. Freeman
180 Blue Ravine Road, Suite B
Folsom, CA 95630

with a copy to (which shall not constitute notice):
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Attention: Joseph G. De Angelis

Buyer:

Eurofins Environment Testing US Holdings, Inc.
2200 Rittenhouse Road, Suite 175
Des Moines, Iowa 50321
Attention: Joseph R. Dunham

with a copy to (which shall not constitute notice):
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Attention: Steven J. Dickinson

48

**Section 10.3**    **Choice of Law; Venue and Forum.**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF CALIFORNIA IN EACH CASE LOCATED IN SACRAMENTO, CALIFORNIA, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 10.4**    **Entire Agreement; Amendments and Waivers.**    This Agreement and the other agreements to be entered into by the Parties in accordance with this, together with all Exhibits and Schedules hereto and thereto (including the Disclosure Schedules), constitute the entire agreement among the Parties pertaining to the subject matter of such agreements and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties. No amendment, supplement, modification or waiver of this Agreement will be binding unless executed in writing by the Party to be bound thereby. No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision hereof (whether or not similar), nor will such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 10.5**    **Counterparts.**    This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or .pdf transmission, and a facsimile or .pdf of this Agreement or of a signature of a Party will be effective as an original.

**Section 10.6**    **Expenses.**    Except as otherwise expressly specified in this Agreement, each Party to this Agreement will pay its own legal, accounting, investment banker, out-of-pocket and other expenses incident to this Agreement and to any action taken by such Party in preparation for carrying this Agreement into effect, it being expressly understood and agreed among the Parties that any such fees and expenses relating to the transactions contemplated by this Agreement or the agreements executed or delivered pursuant to this Agreement incurred by

the Companies on or prior to the Closing shall be borne solely by Shareholders and, solely to the extent such fees and expenses are due and payable at the Closing as shown in Schedule 2.2(b)(iv), shall be paid on behalf of Shareholders out of the Initial Element pursuant to Section 2.2(b)(iv).

**Section 10.7    Severability**.    In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to in this Agreement, will, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement or any other such instrument.

**Section 10.8    Specific Performance**.    Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached and that money damages would not be an adequate remedy for such a breach.    Accordingly, each Party agrees that the other Party is entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in accordance with Section 10.3.

**Section 10.9    Publicity**.    No Party shall issue any press release or make any other public statement relating to the transactions contemplated hereby without the prior written approval of the other Parties; provided, however, that any Party may make any public disclosure it believes in good faith to be required by law, regulation, court order or stock exchange rule (in which case the disclosing Party shall advise the other Party and the other Party shall, if practicable, have the right to review such press release or public statement prior to its publication).

**Section 10.10   Construction**.    Except where expressly stated otherwise in this Agreement, the following rules of interpretation apply to this Agreement: (i) "either" and "or" are not exclusive and "include", "includes" and "including" are not limiting; (ii) "hereof", "hereto", "hereby", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (iii) "date hereof" refers to the date set forth in the initial caption of this Agreement; (iv) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; (v) definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; (vi) references to a contract or agreement mean such contract or agreement as amended or otherwise modified from time to time; (vii) references to a Person or entity are also to its permitted successors and assigns; (viii) references to an "Article", "Section", "Exhibit" or "Schedule" refer to an Article or Section of, or an Exhibit or Schedule to, this Agreement; (ix) references to "$" or otherwise to dollar amounts refer to the lawful currency of the United States; and (x) references to a law include any rules, regulations and delegated legislation issued thereunder.

**Section 10.11   Joint Drafting**.    The Parties have participated jointly in the negotiation and drafting of this Agreement and the other agreements and documents to be executed by the Parties in connection herewith.    In the event an ambiguity or question of intent or interpretation arises, this Agreement and the other agreements and documents to be executed by the Parties in connection herewith will be construed as if drafted jointly by the Parties and no presumption or

burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement and the other agreements and documents to be executed by the Parties in connection with this Agreement.

**Section 10.12  Shareholders' Representative.**

(a)     Each Shareholder hereby constitutes and appoints Linda Freeman as their representative (the *"Shareholders' Representative"*) and their true and lawful attorney in fact, with full power and authority in each of their names and on behalf of each of them:

(i)     to act on behalf of each of them in the absolute discretion of the Shareholders' Representative, but only with respect to the following provisions of this Agreement, with the power to: (A) designate the accounts for payment of the Purchase Price pursuant to Article II; (B) act pursuant to Sections 2.4, 2.5 and 2.6 with respect to any Purchase Price adjustment; (C) act under the Escrow Agreement; (D) consent to the assignment of rights under this Agreement in accordance with Section 10.1; (E) give and receive notices pursuant to Section 10.2; (F) terminate this Agreement pursuant to Section 9.1 or waive any provision of this Agreement pursuant to Article 7, Section 9.1 and Section 10.4; (G) accept service of process pursuant to Section 10.2; and (H) act in connection with any matter as to which the Shareholders, jointly and severally, have obligations, or are Indemnified Parties, under Article 8; and

(ii)     in general, to do all things and to perform all acts, including executing and delivering all agreements, certificates, receipts, instructions and other instruments contemplated by or deemed advisable to effectuate the provisions of this Section 10.12.

(b)     This appointment and grant of power and authority is coupled with an interest and is in consideration of the mutual covenants made herein and is irrevocable and shall not be terminated by any act of either of the Shareholders or by operation of law, whether by the death or incapacity of either Shareholder or by the occurrence of any other event. Each Shareholder hereby consents to the taking of any and all actions and the making of any decisions required or permitted to be taken or made by the Shareholders' Representative pursuant to this Section 10.12. The Shareholders agree that the Shareholders' Representative shall have no obligation or liability to any Person for any action or omission taken or omitted by the Shareholders' Representative in good faith hereunder, and the Shareholders shall, on a proportionate basis in accordance with their Sharing Ratios, indemnify and hold the Shareholders' Representative harmless from and against any and all loss, damage, expense or liability (including reasonable counsel fees and expenses) which the Shareholders' Representative may sustain as a result of any such action or omission by the Shareholders' Representative hereunder.

(c)     In the event that Shareholders' Representative is unable to serve, Shareholders shall unanimously designate to Buyer in writing a successor Shareholders'

Representative.  Any notice given by Buyer to Shareholders may be given through notice to the Shareholders' Representative.

(d)    Buyer and the Escrow Agent designated in the Escrow Agreement shall be entitled to rely upon any document or other paper delivered by the Shareholders' Representative as (i) genuine and correct and (ii) having been duly signed or sent by the Shareholders' Representative, and neither Buyer nor such Escrow Agent shall be liable to either of the Shareholders for any action taken or omitted to be taken by Buyer or such Escrow Agent in such reliance.

<div align="center">

**ARTICLE XI.**
**DEFINITIONS**

</div>

**Section 11.1    Certain Defined Terms**.  As used in this Agreement, the terms below will have the following meanings.  Any of such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person, whether such control is through voting securities, contract or otherwise; and in the case of Shareholders, includes any lineal relative or spouse of such individual, or any relative of such spouse, who has the same home as such individual.

"*Ancillary Agreements*" means the Escrow Agreement, the Noncompetition Agreements, Employment Agreement for Freeman, the Acknowledgment of Changes.

"*Assets*" means all properties, assets and rights of any nature or kind, whether tangible or intangible, real, personal or mixed, and constituting, or used or usable in connection with, or related to, the Business, wherever located, including, all Contracts; Fixtures and Equipment; inventory; Books and Records; Intellectual Property; Accounts Receivable; leasehold improvements; prepaid expenses, advance payments, security deposits, employee travel and expense advances and similar items; all cash and cash equivalents (including any bank deposits, marketable securities, certificates of deposit and checks and drafts received by the Companies for which the Companies have not received funds prior to the Closing); all rights under or pursuant to all warranties, representations and guarantees made by suppliers or other Persons in favor of either of the Companies; and all claims, causes of action, choses in action, rights of recovery ancid rights of set-off of any nature or kind, against any Person in favor of either of the Companies, including any rights to payment or to enforce payment in connection with products or services delivered by either of the Companies.

"*Back Office Services*" means (a) finance and accounting, (b) purchasing, (c) human resources and payroll, (d) information technology and infrastructure, and (e) marketing, in each case including only those services and expenses directly related to the Companies which may be provided by the U.S. Service Center.  Unless otherwise agreed upon by the Parties, Back Office Services shall not include costs or expenses (i) to the extent such services, at any point in time, are then being provided by the Companies (i.e., no duplicate expenses), (ii) to the extent the cost therefor is in excess of the cost of such services to the Companies prior to the Closing Date (i.e.,

no increased costs for similar services), and (iii) for any increment or allocation of overhead, interest, taxes, depreciation or amortization of the U.S. Service Center, the Buyer or any Affiliate of the Buyer.

"*Balance Sheet*" means the consolidated balance sheets of Airtox, together with any related notes, as attached to ***Schedule 3.8***.

"*Books and Records*" means (in whatever medium) (a) all records and lists of the Companies pertaining to the Assets, (b) all records and lists pertaining to the Business (including purchasing records) or to past, present or prospective customers, suppliers, distributors or personnel of the Business, (c) all past, present or prospective product, business and marketing plans, sales literature and promotional literature relating to the Business, (d) all books, ledgers, files, reports, plans, drawings and operating records of every kind maintained by the Companies in connection with the Business, and (e) the Companies' corporate charters, corporate seal, minute books, stock books, tax returns and other documents relating to the incorporation, organization, maintenance and existence of the Companies as corporations.

"*Business*" means (a) Airtox's business of (i) providing and performing both source emissions and ambient air testing using a wide range of methods; (ii) developing, evaluating and adopting of new sampling and analytical techniques; and (iii) maintaining of inventories for canisters, sorbent tubes and passive samplers; (b) Subsidiary's business of marketing and selling the AirLab Home Test Kit™; and (c) such other services as are provided by either of the Companies as of the Closing Date.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks in Sacramento, California are authorized or required by law to close.

"*Code*" means the Internal Revenue Code of 1986, as amended, and the rules and regulations under the Code.

"*Companies*" means Airtox and the Subsidiary.

"*Confidentiality Agreement*" means that certain correspondence by Buyer to Shareholders and Airtox dated as of June 1, 2011.

"*Contract*" means any agreement, contract, personal property lease, real property lease, capital lease, note, loan, evidence of Indebtedness, guaranty, purchase order, customer order, letter of credit, franchise agreement, undertaking, covenant-not-to-compete, employment, consulting or independent contractor agreement, license, instrument, obligation or commitment (a) to which either of the Companies is a party, or (b) by which either of the Companies or any of the Assets is bound, whether oral or written.

"*Credit Facility*" means a line of credit for the Companies on commercially reasonable terms in the approximate amount of eighty percent (80%) of the Companies' Accounts Receivable, on terms and conditions reasonably acceptable to Buyer.

"*Debt Liabilities*" means, as shown in the Final Closing Balance Sheet, the sum of the current and the long term portions of the Companies' (a) long term debt, (b) loans from a

Shareholder, (c) notes payable, (d) lines of credit, (e) credit card balances, and (f) any capital leases.

"*Disclosure Schedules*" means the schedules executed and delivered by Shareholders to Buyer as of the date of this Agreement that set forth the exceptions to the representations and warranties contained in Article III or Article IV of this Agreement and certain other information called for by this Agreement.

"*Encumbrance*" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"*Environmental Laws*" means all Laws relating to pollution or protection of the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including Laws relating to emission, discharge, Release, or to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances; and each individually, an "*Environmental Law*."

"*ERISA*" means the United States Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"*Escrow Agent*" means Regions Bank, or its successor as escrow agent under the Escrow Agreement.

"*Escrow Agreement*" means the Escrow Agreement by and among Buyer, Shareholders, and Escrow Agent in substantially the form attached as *Exhibit C*, dated as of the Closing Date.

"*Excess Audit Costs*" means the aggregate of all costs and expenses for the audit of the Companies' financial statements for the fiscal year 2012 and for the fiscal year 2013 pursuant to Section 2.5 which are in excess of Forty Thousand Dollars ($40,000) for each of these fiscal years.

"*Excess Capital Expenditures*" means any ordinary capital expenditures required by Airtox for the operation of the Business in the Ordinary Course of Business after the Closing Date and until December 31, 2013 in excess of the sum of ordinary capital expenditures financed (a) with aggregate capital contributions from Buyer of One Hundred Thousand Dollars ($100,000), (b) by the Credit Facility, and (c) by capital leases. The Parties agree that Airtox will incur ordinary capital expenditures of not more than Five Hundred Fifty Thousand Dollars ($550,000) annually.

"*Extraordinary Expenses*" means expenses incurred by Airtox after the Closing Date and until December 31, 2013, which relate to or arise out of events or transactions that (i) possess a high degree of abnormality and are of a type clearly unrelated to, or only incidentally related to, the conduct of the Business in the Ordinary Course of Business, or (ii) are of a type that are not reasonably expected as of the Closing Date to be incurred during such time period taking into account the environment in which Airtox operates. Extraordinary Expenses shall not

include (i) any such expenses for which Buyer is indemnified pursuant to <u>Article VIII</u>, and (ii) any such expenses that are not in excess of the Basket.

"*Federal Arbitration Act*" means Title 9 of the U.S. Code.

"*Financial Statements*" means (i) the reviewed balance sheet as of, and related statements of income, changes in shareholders or partners' equity (as applicable) and cash flow of Airtox for the twelve-month periods ended, December 31, 2010, December 31, 2009, and December 31, 2008, together with any related notes, and (ii) the un-reviewed balance sheet as of, and related statement of income for the twelve-month period ended, December 31, 2011, which remain subject to normal year-end adjustments and lack notes or other presentation items.

"*Fixtures and Equipment*" means all of the furniture, fixtures, furnishings, machinery, automobiles, trucks, spare parts, supplies, testing equipment, computer hardware (including servers and network infrastructure), tools, quality control equipment and gauges and other tangible personal property owned and/or used by either of the Companies in connection with the Business.

"*GAAP*" means United States generally accepted accounting principles, consistently applied.

"*Governmental Authority*" means any nation or government, province, state, county, municipality and any other political subdivision of any of the foregoing, and any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"*Hazardous Substances*" means all hazardous substances, as that term is defined in the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), solid waste, hazardous waste and any other individual or class of pollutants, contaminants, toxins, chemicals, substances, wastes or materials in their solid, liquid or gaseous phase, defined, regulated, classified or identified under any Environmental Law.

"*Income Taxes*" means any federal, state, local or non-US income tax (including franchise taxes in the nature of income taxes), including any interest, penalty, or addition thereto, whether disputed or not.

"*Indebtedness*" means, with respect to either of the Companies: (a) all indebtedness for borrowed money, whether current or funded, or secured or unsecured; (b) all indebtedness for the deferred purchase price of property or services represented by a note or other security; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (d) all indebtedness secured by a purchase money mortgage or other lien to secure all or part of the purchase price of property subject to such mortgage or lien; (e) all obligations under leases that have been or should be, in accordance with GAAP, recorded as capital leases; (f) any liability in respect of banker's acceptances or letters of credit, including any reimbursement obligations with respect thereto; (g) all interest, fees, prepayment penalties, and other penalties or expenses owed with respect to indebtedness described in the foregoing clauses (a), (b), (c), (d), (e) or (f); and

(vii) all indebtedness referred to in the foregoing clauses (a), (b), (c), (d), (e), (f) or (g) that is guaranteed by either of the Companies or that either of the Companies has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against any loss.

"*Knowledge*" means the actual knowledge of Freeman, Masterson, Heidi Hayes, and Cherill Dayrit, including the knowledge of facts each of them would have after due inquiry.

"*Law*" means any federal, state, local, municipal, or other administrative order, constitution, law, ordinance, regulation, statute, or treaty.

"*Leased Real Property*" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property which is used or intended to be used in, or otherwise relates to the Business.

"*Leases*" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which either of the Companies holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of either of the Companies thereunder.

"*Losses*" means any and all claims, demands, suits, proceedings, judgments, losses, liabilities, charges, penalties, and fees, Taxes, costs and expenses (including amounts paid in settlement, interest, court costs, costs of investigators, and reasonable attorneys' fees and expenses) sustained, suffered or incurred by any Party, but specifically excluding (a) any such items to the extent actually reduced by any recovery (net of any deductibles and other fees and expenses incurred by such Party in recovering such amounts) from insurance or from another Person whether by way of contribution, indemnity or otherwise, and (b) any consequential, special, incidental, indirect or punitive damages, lost profits, opportunity costs or similar items (except such items as a Party may be required to pay to a third party as a result of a third party claim subject to indemnification). Notwithstanding anything contained herein to the contrary, Buyer Losses shall not include any amounts for which any Final Balance Sheet Adjustment is made pursuant to Section 2.4, or any amounts which are otherwise recovered by Buyer pursuant to the terms of this Agreement.

"*Material Adverse Effect*" or "*Material Adverse Change*" means any material adverse effect on, or any material adverse change in, the business, assets, condition (financial or otherwise), operating results or operations of a Party, taken as a whole, or to the ability of a Party to consummate timely the transactions contemplated hereby, except to the extent such event, occurrence, fact, condition or change results from (A) changes in general local, domestic, foreign, or international economic conditions, (B) changes affecting generally the industries or markets in which the Companies operate, (C) acts of war, sabotage or terrorism, military actions or the escalation thereof, (D) any changes in applicable laws or accounting rules or principles, including changes in GAAP, (E) any action expressly required by this Agreement, and (F) the announcement of the transactions contemplated by this Agreement. Notwithstanding anything contained herein to the contrary, no event, occurrence, fact, condition or change with respect to Subsidiary shall be materially adverse to the Business or a Material Adverse Effect or Material Adverse Change, unless such event is materially adverse to the Business in its entirety.

"*Net Cash / Net Debt*" means the difference between all of the Companies' cash and cash equivalents as shown in the Final Closing Balance Sheet, minus the Companies' Debt Liabilities.

"*Net Working Capital*" means the difference between the Companies' current assets as shown in the Final Closing Balance Sheet (excluding cash and cash equivalents included in the calculation of Net Cash / Net Debt) and the Companies' current liabilities as shown in the Final Closing Balance Sheet (excluding any liabilities included in the calculation of Debt Liabilities).

"*Open Source Code*" means any software code that is distributed as "open source software" or is otherwise distributed or made generally available in source code form under license terms that permit modification and redistribution of such software in source code form. Open Source Code includes software code that is licensed under the GNU General Public License, GNU Lesser General Public License, Mozilla License, Common Public License, Apache License, BSD License, Artistic License, or Sun Community Source License.

"*Ordinary Course of Business*" or "*in the ordinary course*" means the ordinary course of the Companies' Business consistent with past custom and practice of the Companies and in a manner consistent with reasonable business practices and with the historical Business objectives and functions of the Companies prior to Closing Date, including reasonable levels of staffing, working capital and other resources reasonably necessary to conduct the Business.

"*Party*" and "*Parties*" shall mean and include all of the Persons executing this Agreement.

"*Pending*" means any Actions that have been asserted or commenced.

"*Permitted Encumbrances*" means (i) liens for current taxes not yet due or any taxes being contested in good faith by appropriate proceedings and as to which appropriate reserves have been established that are reflected on the Balance Sheet, and (ii) those Encumbrances identified as Permitted Encumbrances on ***Schedule 3.3***.

"*Permits*" means all licenses, permits, certifications, franchises, approvals, authorizations, consents or orders of, or filings with, any Governmental Authority, or any other Person.

"*Person*" and "*Persons*" means any individual, sole proprietorship, enterprise, firm, partnership, limited liability company, joint venture, trust, unincorporated association, corporation, entity or Governmental Authority.

"*Pre-Closing Debt Liabilities*" means, as shown in the Estimated Balance Sheet, the sum of the current and the long term portions of the Companies' (a) long term debt, (b) loans from a Shareholder, (c) notes payable, (d) lines of credit, (e) credit card balances, and (f) any capital leases.

"*Pre-Closing Net Cash / Net Debt*" means the difference between all of the Companies' cash and cash equivalents as shown in the Estimated Balance Sheet, minus the Companies' Pre-Closing Debt Liabilities.

"*Pre-Closing Net Working Capital*" means the difference between the Companies' current assets as shown in the Estimated Balance Sheet (excluding cash and cash equivalents included in the calculation of Pre-Closing Net Cash / Net Debt) and the Companies' current liabilities as shown in the Estimated Balance Sheet (excluding any liabilities included in the calculation of Pre-Closing Debt Liabilities).

"*Proprietary Software*" means all Software developed by either of the Companies, including the Software incorporated into Lumen Data Services® and the laboratory information management system "ATLAS".

"*Release*" shall have the meaning specified in 42 U.S.C. § 9601.

"*Remediation Action*" means any action to mitigate, remediate, monitor or otherwise respond to a Release of Hazardous Substances.

"*Representative*" means any officer, director, principal, agent, consultant, employee, advisor or other authorized representative.

"*Software*" means computer software, programs and databases in any form, including Internet web sites, web content and links, source code, object code, operating systems and specifications, data, databases, database management code, utilities, graphical user interfaces, menus, images, icons, forms, methods of processing, software engines, platforms and data formats, all versions, updates, corrections, enhancements and modifications thereof, and all related documentation, developer notes, comments and annotations.

"*Subsidiary*" means Airlab Home Kit.

"*Targeted Working Capital*" means Nine Hundred Eighteen Thousand Dollars ($918,000.00).

"*Tax*" means any tax, levy, impost, fee, assessment or other charge imposed by a Governmental Authority, including income, estimated income, business, occupation, franchise, property, payroll, personal property, sales, transfer, use, employment, commercial rent, occupancy, franchise or withholding taxes, any import duty or tariff, and any premium, including related interest, penalties and additions.

"*U.S. Service Center*" means Eurofins NSC US, Inc., an Affiliate of Buyer.

**Section 11.2   Other Defined Terms.**   The following terms will have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
|------|---------|
| "*338 California Obligation*" | 2.3(a)(i) |
| "*338 Tax Gross Up*" | 2.6(a) |
| "*338 Tax Gross Up Advance*" | 2.2 |
| "*Acceleration Amount*" | 2.5(a)(i) |
| "*Accounting Methods*" | 2.3(a) |
| "*Accounts Receivable*" | 3.27 |

| | |
|---|---|
| *"Acknowledgment of Changes"* | 7.2(a)(xiv) |
| *"Actions"* | 3.11 |
| *"Affiliate Payments"* | 6.12 |
| *"Agreement"* | Preamble |
| *"Airtox"* | Preamble |
| *"Allocations"* | 6.6(f)(iii) |
| *"Basket"* | 8.2(b)(i) |
| *"Buyer"* | Preamble |
| *"Buyer Indemnitees"* | 8.2(a) |
| *"Buyer's Estimated Balance Sheet"* | 2.3(b) |
| *"Buying Parties"* | Preamble |
| *"Closing"* | 7.1 |
| *"Closing Date"* | 7.1 |
| *"Closing Balance Sheet"* | 2.3(b) |
| *"Conditions Precedent to Closing"* | 7.3 |
| *"Confidentiality and Invention Assignment Agreements"* | 7.3(a)(xi) |
| *"Consents"* | 3.5(b) |
| *"Creditors' Rights"* | 3.1(c) |
| *"Deferred Element"* | 2.5(a)(ii) |
| *"Deferred Element Covenant Claim"* | 2.4(d)(iv) |
| *"Determination Date"* | 2.5(b)(vi) |
| *"Dispute Notice"* | 2.4(b) |
| *"EBITDA"* | 2.5(a)(iii) |
| *"Effective Date"* | Preamble |
| *"Employee Benefit Plans"* | 3.16(a) |
| *"Employment Agreements"* | 7.2(a)(xiii) |
| *"Environmental Representations"* | 8.1 |
| *"Excluded Representations"* | 8.1 |
| *"ERISA Plans"* | 3.16(a) |
| *"Escrow Amount"* | 2.2(b) |
| *"Estimated Balance Sheet"* | 2.3(a) |
| *"Estimated Balance Sheet Adjustment"* | 2.3(c) |
| *"Final 338 Tax Gross Up"* | 2.6© |
| *"Final Balance Sheet Adjustment"* | 2.4(h) |
| *"Final Closing Balance Sheet"* | 2.4(b) |
| *"Indemnified Party" / "Indemnified Parties"* | 8.3(a) |
| *"Indemnifying Party" / "Indemnifying Parties"* | 8.3(a) |
| *"Initial Element"* | 2.2 |
| *"Intellectual Property"* | 3.14(a) |
| *"Lancaster"* | Preamble |
| *"Material Contracts"* | 3.5(a) |
| *"Measurement Period"* | 2.5(a)(iv) |
| *"Neutral Accountant"* | 2.4(c) |
| *"Noncompetition Agreements"* | 7.2(a)(xii) |
| *"Permit Consents"* | 3.6 |
| *"Pre-Closing Tax Period"* | 6.6(b) |

*"Purchase Price"*                                    2.1(b)
*"Section 338 Forms"*                                 6.6(f)(iv)
*"Section 338(h)(10) Election"*                       6.6(f)(i)
*"Shareholder"* / *"Shareholders"*                    Preamble
*"Shareholders Estimated Balance Sheet"*              2.3(b)
*"Shareholder Releasees"*                             6.9
*"Shareholder Releasing Parties"*                     6.9
*"Shareholders' Representative"*                       10.12(a)
*"Shares"*                                            Recitals
*"Sharing Ratios"*                                    Recitals
*"Stock Option Termination Agreement"*                7.2(a)(xii)
*"Straddle Period"*                                   6.6(c)
*"Third-Party Action"*                                8.3(a)
*"Trigger Values"*                                    2.5(a)(v)
*"Trigger Dispute Notice"*                            2.5(b)(ii)

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered as of the day and year first above written.

LANCASTER

LANCASTER LABORATORIES, INC.

By: _____
Name: J. Wilson Hershey
Title: President

BUYER:

EUROFINS ENVIRONMENT TESTING
US HOLDINGS, INC.

By: _____
Name: J. Wilson Hershey
Title: President

COMPANY:

AIRTOX, INC.

By: _____
Name: Linda L. Freeman
Title: President

SHAREHOLDERS:

_____
Linda L. Freeman, as Trustee of the Linda
Freeman Trust

_____
Ronald Masterson

FREEMAN:

_____
Linda L. Freeman

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered as of the day and year first above written.

LANCASTER:

LANCASTER LABORATORIES, INC.

By:_____
Name: J. Wilson Hershey
Title:  President

BUYER:

EUROFINS ENVIRONMENT TESTING US HOLDINGS, INC.

By:_____
Name: J. Wilson Hershey
Title:  President

COMPANY:

AIRTOX, INC.

By: _Linda L. Freeman_
Name: Linda L. Freeman
Title:  President

SHAREHOLDERS:

_Linda L. Freeman_
Linda L. Freeman, as Trustee of the Linda Freeman Trust

_Ronald Masterson_
Ronald Masterson

FREEMAN:

_Linda L. Freeman_
Linda L. Freeman

# EXHIBIT 2

# NATIONAL CORPORATE RESEARCH, LTD.
### The Right Response at the Right Time, Every Time.

SP347444
Page 1 of 1

## Notice of Service of Process

Dover, DE • Los Angeles • Sacramento • Springfield, IL • Albany • New York

615 South DuPont Highway, Dover, Delaware  19901
(302) 734-1450  Toll Free (866) 621-3524
Fax (800) 253-5177  Email: sop@nationalcorp.com

**DATE:** August 29, 2014

**TO:** Daniel Dickinson
Eurofins US National Service Center, Inc.
2200 Rittenhouse St.
Ste. 175
Des Moines, IA 50321

**SENT VIA:**
☑ Email
☑ Federal Express
☐ Fascimile Transmission
☐ Other:
Tracking Number:
770998950384

**RE:** SERVICE OF PROCESS:

**EUROFINS LANCASTER LABORATORIES ENVIRONMENTAL LLC**

---

The enclosed Service of Process was received by the statutory agent in: **California**

on the date of: **August 29, 2014**

received via: **Personal Service**

TITLE OF ACTION:    Ronald Masterson, et al vs. EUROFINS LANCASTER LABORATORIES ENVIRONMENTAL LLC, et al

COURT AND CASE NO:    Sacramento County Superior Court

Case No.  34-214-00166921-CU-BC-GDS
Summons and First Amended Complaint

RESPONSE REQUIRED BY:    Please see documents

NOTE:

Sincerely,

*[signature]*

Andrew Lundgren, Manager - Registered Agent Services

---

Please carefully review the document referenced above to confirm all information, including the Response Date, for accuracy. The information noted above is provided based on our review and is not a legal opinion.
**PLEASE CONSULT THE SERVICES OF A COMPETENT PROFESSIONAL ATTORNEY.**

# NATIONAL CORPORATE RESEARCH, LTD.

**The Right Response at the Right Time, Every Time.**

## Notice of Service of Process

Dover, DE • Los Angeles • Sacramento • Springfield, IL • Albany • New York

**615 South DuPont Highway, Dover, Delaware 19901**
**(302) 734-1450  Toll Free (866) 621-3524**
**Fax (800) 253-5177  Email: sop@nationalcorp.com**

**DATE:** August 29, 2014

**TO:** Daniel Dickinson
Eurofins US National Service Center, Inc.
2200 Rittenhouse St.
Ste. 175
Des Moines, IA 50321

**SENT VIA:**
☑ Email
☑ Federal Express
☐ Fascimile Transmission
☐ Other:
Tracking Number:
770998950384

**RE:** SERVICE OF PROCESS:
**EUROFINS AIR TOXICS, INC.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The enclosed Service of Process was received by the statutory agent in: **California**

on the date of: **August 29, 2014**

received via: **Personal Service**

TITLE OF ACTION:            Ronald Masterson, et al vs. Eurofins Lancaster, et al and EUROFINS AIR TOXICS, INC.

COURT AND CASE NO:        Sacramento County Superior Court

Case No.  34-214-00166921-CU-BC-GDS
Summons and First Amended Complaint

RESPONSE REQUIRED BY:     Please see documents

NOTE:

Sincerely,

Andrew A. Lundgren, Manager - Registered Agent Services

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please carefully review the document referenced above to confirm all information, including the Response Date, for accuracy. The information noted above is provided based on our review and is not a legal opinion.
**PLEASE CONSULT THE SERVICES OF A COMPETENT PROFESSIONAL ATTORNEY.**

SP350296
Page 1 of 1

**NATIONAL**
**CORPORATE**
**RESEARCH**, LTD.
The Right Response at the Right Time, Every Time.

**Notice of**
**Service of Process**

Dover, DE • Los Angeles • Sacramento • Springfield, IL • Albany • New York

615 South DuPont Highway, Dover, Delaware 19901
(302) 734-1450  Toll Free (866) 621-3524
Fax (800) 253-5177  Email: sop@nationalcorp.com

**DATE:**  September 3, 2014

**TO:**  Daniel Dickinson
Eurofins US National Service Center, Inc.
2200 Rittenhouse St.
Ste. 175
Des Moines, IA 50321

**RE:**  SERVICE OF PROCESS:
**EUROFINS ENVIRONMENT TESTING US**
**HOLDINGS, INC.**

**SENT VIA:**

✓ Email
✓ Federal Express
  Fascimile Transmission
  Other:
Tracking Number:
  771028191425

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The enclosed Service of Process was received by the statutory agent in: **Delaware**
on the date of: **September 3, 2014**
received via: **Certified Mail**

TITLE OF ACTION:  Ronald Masterson, et al. vs. Eurofins Lancaster Laboratories, Inc., et al.
including EUROFINS ENVIRONMENT TESTING US HOLDINGS,
INC.

COURT AND CASE NO:  Superior Court of California, County of Sacramento

Case No.  34-2014-00166921-CU-BC-GDS
Summons and Complaint, et al.

RESPONSE REQUIRED BY:  See Documents

NOTE:  Electronic Copy only a partial, Full Document will come in mail

Sincerely,

*[signature]*

Andrew Lundgren, Manager - Registered Agent Services

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please carefully review the document referenced above to confirm all information, including the Response Date, for accuracy. The
information noted above is provided based on our review and is not a legal opinion.
**PLEASE CONSULT THE SERVICES OF A COMPETENT PROFESSIONAL ATTORNEY.**

```
 1   DOWNEY BRAND LLP
     M. MAX STEINHEIMER (Bar No. 52830)
 2   ANTHONY L. VIGNOLO (Bar No. 203933)
     AVALON C. JOHNSON (Bar No. 288167)
 3   3425 Brookside Road, Suite A
     Stockton, CA  95219-1757
 4   Telephone:     (209) 473-6450
     Facsimile:     (209) 473-6455
 5   msteinheimer@downeybrand.com
     avignolo@downeybrand.com
 6   ajohnson@downeybrand.com

 7   Attorneys for Plaintiffs
     RONALD MASTERSON, an individual; LINDA L.
 8   FREEMAN, individually and as Trustee of the LINDA
     FREEMAN TRUST
 9
```

<div align="center">

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SACRAMENTO

UNLIMITED JURISDICTION

</div>

| | |
|---|---|
| RONALD MASTERSON, an individual; LINDA L. FREEMAN, individually and as Trustee of the LINDA FREEMAN TRUST, <br><br> Plaintiff, <br><br> v. <br><br> EUROFINS LANCASTER LABORATORIES, INC., a Minnesota corporation; EUROFINS AIR TOXICS, INC., a California corporation; and EUROFINS ENVIRONMENT TESTING US HOLDINGS, INC., a Delaware Corporation; and DOES 1 through 20, <br><br> Defendants. | CASE NO.   34-2014-00166921-CU-BC-GDS <br><br> **PROOF OF SERVICE** |

     I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Downey Brand LLP, 3425 Brookside Road, Suite A, Stockton, California, 95219-1757.  On August 29, 2014, I served the within documents:

**SUMMONS; FIRST AMENDED COMPLAINT; NOTICE OF CASE MANAGEMENT CONFERENCE AND ORDER TO APPEAR**

1383296.1

<div align="center">-1-</div>

☐ **BY FAX:** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐ **BY HAND:** by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒ **BY CERTIFIED MAIL – RETURN RECEIPT REQUESTED:** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Stockton, California addressed as set forth below.

☐ **BY OVERNIGHT MAIL:** by causing document(s) to be picked up by an overnight delivery service company for delivery to the addressee(s) on the next business day.

☐ **BY PERSONAL DELIVERY:** by causing personal delivery by _____ of the document(s) listed above to the person(s) at the address(es) set forth below.

NATIONAL CORPORATE RESEARCH, LTD.
**Agent for Service of Process for:**
EUROFINS ENVIRONMENT TESTING US
HOLDINGS, INC.
615 S. DUPONT HIGHWAY
DOVER, DE 19901

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

    I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on August 29, 2014, at Stockton, California.


                                                SUSAN LONDON

# EXHIBIT 3

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 720 Ninth STREET<br>MAILING ADDRESS: 720 Ninth STREET<br>CITY AND ZIPCODE: Sacramento, CA 95814-1311<br>BRANCH NAME: Gordon D Schaber Courthouse<br>PHONE NUMBER: (916) 874-5522 | |

| SHORT TITLE: Masterson vs. Lancaster laboratories Inc | |
|---|---|

| NOTICE OF CASE MANAGEMENT CONFERENCE<br>AND ORDER TO APPEAR | CASE NUMBER:<br>34-2014-00166921-CU-BC-GDS |
|---|---|

**Hearing Date**

The above entitled action has been set for a case management conference at 08:30 AM on 04/23/2015 in Department 39 in accordance with California Rules of Court 212. You must be familiar with the case and fully prepared to participate effectively in the case management conference.

**Case Management Statement**

All parties must file and serve a case management statement at least 15 calendar days before the case management conference. Parties are encouraged to file a single joint case management statement.

**Minimum Requirements**
Prior to the filing of the case management statement, the parties should have done the following:
-Served all parties named in the complaint within 60 days after the summons has been issued
-Ensured that all defendants and cross-defendants have answered, been dismissed, or had their defaults entered
-Met and conferred with all parties as required by CRC 212 (f) to discuss and resolve issues set forth therein.

**Tentative Ruling**
Following its review of the case management statement(s), the court may determine that a case management conference is not necessary.
To determine whether an appearance is required, the parties must check the court's tentative rulings after 2:00 p.m. on the Court day before the Thursday calendar by accessing the court's internet website at www.saccourt.ca.gov

**Case Management Orders**
At the case management conference, the court will consider whether the case should be ordered to judicial arbitration or referred to other forms of Alternative Dispute Resolution. Whether or not a case management conference is held, the court will issue a case management order shortly after the scheduled conference date.

**Service of Case Management Notice**
Unless otherwise ordered by the court, plaintiff shall serve a copy of this notice on any party to the complaint appearing after the court issued this notice. The cross-complainant shall have the same obligation with respect to the cross-complaint.

**Certification Filed in Lieu of Case Management Statement**
If parties in the action file a certification on a form provided by the court at least 15 calendar days prior to the date of the case management conference that the case is short cause (five hours or less of trial time), that the pleading stage is complete and that the case will be ready for trial within 60 days, the case will be exempted from any further case management requirements and will be set for trial within 60-120 days. The certification shall be filed in lieu of a case management statement.

**Compliance**
Failure to comply with this notice or to appear at the case management conference may result in the imposition of sanctions (including dismissal of the case, striking of the answer, or payment of money).

**Continuances**
Case management conference will not be continued except on a showing of good cause. If your case management conference is continued on motion or by the court on its own motion all parties shall file and serve a new case management statement at least 15 calendar days before the continued case management conference.

Dated: 07/31/2014

David W. Abbott

David W. Abbott, Judge of the Superior Court